| | | |
|---|---|---|
| ERIC STEVENS, CHRISTOPHER L. RODRIGUEZ, MICHAEL S. FRAKES, TERRY PENNELL, RAY MOORE, KENT LARRY BAKKEN, LYNN E. KIRKPATRICK, and MICHAEL S. STONE, each plaintiff is a citizen of the State of Texas, and each plaintiff individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware corporation.<br><br>Defendant. | § § § § § § § § § § § § § § § § § § § § § | Cause No. _____<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Eric Stevens, Christopher L. Rodriguez, Michael S. Frakes, Terry Pennell, Ray Moore, Kent Larry Bakken, Lynn E. Kirkpatrick, and Michael S. Stone, each individually and on behalf of all others similarly situated in the Class, file this suit against Defendant Ford Motor Company. This lawsuit is based upon the investigation of counsel, the review of scientific and automotive industry papers, and the investigation of experts with relevant education and experience. In support thereof, Plaintiffs state as follows:

### I.      INTRODUCTION

1.      Ford Motor Company has sold—and continues to sell—millions of diesel trucks equipped with high-pressure fuel injection pumps that are proverbial ticking time bombs, wholly unbeknownst to an unassuming American public who ponies-up big bucks for these vehicles'

fictitious "durability," "longevity," and "topnotch fuel economy." Ford promised consumers the continued reliability of their diesel engines with increased fuel efficiency and power at greater fuel efficiency. However, this came with a hidden and catastrophic cost that was secretly passed on to consumers. The culprit is the Bosch-supplied CP4 high pressure fuel injection pump, which unbeknownst to consumers is a ticking time bomb when used in American vehicles. As Ford knew before and during the Class Period (2011–present), Bosch's CP4 pump was never compatible with American fuel standards. The CP4 pump is not built to withstand the specifications for U.S. diesel fuel in terms of lubrication or water content, and it struggles to lift a volume of fuel sufficient to lubricate itself. As a result, the pump is forced to run dry and destroy itself as air bubbles allow metal to rub against metal. The pump secretly deposits metal shavings and debris throughout the fuel injection system and the engine until it suddenly and cataclysmically fails without warning, further contaminating the fuel delivery system with larger pieces of metal. This "catastrophic" (i.e., complete and total) pump failure often occurs as early as "mile 0," as the fuel injection disintegration process begins at the very first fill of the tank. This total fuel injection system failure and consequential engine failure results in an outrageously expensive repair bill, all for a repair that will not truly ameliorate the issue so long as the vehicle is being filled with U.S. diesel. And, although complete and total pump failure takes time to occur, the defective CP4 pump starts damaging the vehicle's fuel injection system and engine **immediately** upon the vehicle's first use. Further, the sudden and unexpected shutoff of the vehicle's engine while it is in motion and then subsequent inability to restart the vehicle present an inherent risk to consumer safety—one which Ford itself has recognized in the past. Thus, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles, upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested and immediately damaging defect, in addition to any and all consequential damages stemming therefrom.

2.      Ford's company line is to blame the failures on "fuel contamination," which is not covered under their warranties because it is "not caused by Ford."  Consumers are left with repair bills that range from $8,000.00 to $20,000.00 per vehicle.  Some victims of Ford's grand scam are American businesses who own several vehicles and have suffered multiple failures.  Others have spent several hundred or several thousand dollars attempting to prevent or mitigate these failures.  Moreover, diesel fans pay so much more for their trucks because diesel trucks are expected to last for 500,000 to 800,000 miles, and have more power, *and* a lower fuel bill. Put simply, Plaintiffs and all members of the proposed Class paid a premium for their diesel vehicles, and were harmed by being sold vehicles with a defective fuel injection pump that is substandard for American fuel.

3.      Ford saw Bosch's CP4 fuel injection pump as another way to make money—to take advantage of consumers' desire to drive diesel vehicles that were reliable, durable, fuel-efficient, and powerful.  After the CP4 fuel injection system worked marginally successfully in vehicles in Europe, Ford sought to use the CP4 system in American vehicles, promising consumers exactly what they were looking for—improvements in torque, horsepower, durability, and fuel economy. But Ford could never deliver on that promise for American vehicles because the CP4 fuel pump is not compatible with American diesel fuel; in fact, Ford knew before and during the Class Period, and equipped its modern Power Stroke diesel vehicles with the European-designed CP4 fuel pump anyway.

4.      Ford knew, from the specifications of the pump as compared to the specifications of American diesel, the Bosch-made CP4 Pump was clearly incompatible with the ordinary use of American diesel fuel. That is, well before Ford ever chose to implement the CP4 component part (as incorporated in the diesel engines of the subject Class Vehicles), the issue of incompatibility was (or should have been) known and yet was totally ignored in the design of the Class Vehicles' engine systems.  This is further evidenced by the fact that Ford had experience with widespread

catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s. By 2002, the Truck & Engine Manufacturers Association ("EMA")—of which Ford is a member company[1]—acknowledged that the lower lubricity of American diesel could cause catastrophic failure in fuel injection system components that are made to European diesel specifications. Not only did Ford fail to inform American consumers and fail to stop touting the fabricated benefits of the vehicles containing CP4 pumps, they actively attempted to shift the blame to the American consumers. For instance, in 2010, Ford claimed it was *consumers'* improper use of contaminated or substandard fuels that damaged the vehicles' fuel system, even when Ford knew that the malfunction was *actually* the result of the CP4 fuel injection pump design, which was simply not fit for American diesel fuel.

5.     Vehicle engines with the Bosch CP4 fuel injection pumps are not compatible with American fuel, and Ford's conduct is not compatible with American law. Ford knowingly and intentionally deceived American consumers through its individual representations to respective consumers in a (successful) effort to increase revenues and profits at the expense of consumers.

6.     Indeed, Plaintiffs and similarly situated Class members have suffered from an innately manifested—though not readily apparent—defect that existed in the Class Vehicles prior to purchase (or lease), and which began damaging the Class Vehicles and their fuel delivery systems upon first use. Plaintiffs were thus injured at the point of sale and throughout their ownership of the vehicle and paid far more than they would have if Ford had told the truth. Indeed, Plaintiffs and no reasonable consumer would have bought these vehicles if Ford had told the truth.

7.     These consumers are entitled to be reimbursed for the hundreds of millions of dollars Ford fraudulently obtained from them, and to be compensated for their actual losses.

---

[1]   *See* Truck & Engine Manufacturers Association (EMA) membership webpage, http://www.truckandenginemanufacturers.org/companies/ (last accessed Nov. 13, 2018).

## II.    PARTIES

### A.  The Plaintiffs

8.    For ease of reference, the following chart identifies the Representative Plaintiffs and their vehicles:

| Representative Plaintiff | Make | Model | Year |
|---|---|---|---|
| Eric Stevens | Ford | F-350 | 2017 |
| Christopher L. Rodriguez | Ford | F-250 | 2012 |
| Michael S. Frakes | Ford | F-250 | 2015 |
| Terry Pennell | Ford | F-350 | 2013 |
| Ray Moore | Ford | F-250 | 2016 |
| Kent Larry Bakken | Ford | F-450 | 2016 |
| Lynn E. Kirkpatrick | Ford | F-250 | 2017 |
| Michael S. Stone | Ford | F-250 | 2019 |

9.    Plaintiff Eric Stevens (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Corpus Christi, Texas.  On or around September 1, 2017, Plaintiff purchased a new 2017 Ford F-350, VIN 1FD8W3GT1HED81144 (for the purpose of this paragraph, the "Class Vehicle") for approximately $54,900.00 from Grapevine Ford, an authorized Ford dealership in Grapevine, Texas.  Plaintiff still owns the vehicle and it has approximately 100,700 miles on it.  Plaintiff uses his F-350 as his daily driver to get to and from work, for daily activities, and occasionally to haul his trailer and boat.  In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market.  On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was

durable, and was reliable. Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford Super Duty diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct, as Plaintiff would not have purchased the Class Vehicle or would have paid less for it, had Ford not concealed the CP4 fuel injection system defect. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. In addition, Plaintiff experienced a catastrophic failure of his CP4 fuel injection pump. Plaintiff was driving the vehicle to Shreveport for a job when the truck shut down on the roadway. The vehicle was towed to the nearest diesel repair shop, which ran diagnostics and received a "Low Fuel Pressure" code. The repair shop removed metal shavings from the fuel system and the Plaintiff had to replace the entire fuel system. Ford refused to cover the repairs under warranty despite the fact that the truck had only approximately 90,000 miles on it and the Plaintiff was forced to pay approximately $8,000 out-of-pocket, and the vehicle was then re-equipped with another defective CP4 fuel pump. Plaintiff thusly brings claims individually and as a representative of the Class.

10.     Plaintiff Christopher L. Rodriguez (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Uvalde, Texas.  On or around October 15, 2015, Plaintiff purchased a used 2012 Ford F250, VIN 1FT7W2BT9CEB99766 (for the purpose of this paragraph, the "Class Vehicle") for approximately $32,000.00 from Truck City Ford, an authorized Ford dealership in Buda, Texas, and still owns the vehicle to this day.  Plaintiff uses his F-250 as his daily driver to get to and from work on the oilfield as well as her personal driving vehicle. In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable.  Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the Ford Super Duty diesel engine's CP4

high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct, as Plaintiff would not have purchased the Class Vehicle or would have paid less for it, had Ford not concealed the CP4 fuel injection system defect. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. In addition, Plaintiff experienced a catastrophic failure of his CP4 fuel injection pump while pulling out of his bank in Uvalde, Texas on October 22, 2018. His truck unexpectedly shut down on the roadway and he was forced to tow it to the nearest mechanic. He was told the fuel system had metal shavings in it and would require over $10,000 worth of repair work. At the time of the failure the truck had approximately 90,000 miles on it. Plaintiff thusly brings claims individually and as a representative of the Class.

11. Plaintiff Michael S. Frakes (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Corpus Christi, Texas. In October 2015, Plaintiff purchased a used 2015 Ford F-250, VIN 1FT7W2BT7FEA68730 (for the purpose of this paragraph, the "Class Vehicle") for approximately $50,000.00 from Maxwell Ford, an authorized Ford dealership in Austin, Texas, and still owns the vehicle to this day. Plaintiff uses his F-250 as his daily driver to get to and from work, and to haul his trailer and RTV. The vehicle currently has approximately 72,000 miles on it. In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other

trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford Super Duty diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct, as Plaintiff would not have purchased the Class Vehicle or would have paid less for it, had Ford not concealed the CP4 fuel injection system defect. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

12.     Plaintiff Terry Pennell (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and is domiciled in Kerrville, Texas.  In or around January 2014, Plaintiff purchased a used 2013 Ford F-350, VIN 1FT8W3BT0DEA60105 (for the purpose of this paragraph, the "Class Vehicle") for approximately $42,000 from Ken Stoepel Ford Lincoln, an authorized Ford dealership in Kerrville, Texas, and still owns the vehicle to this day.  Plaintiff uses the vehicle for both business and personal purposes, and specifically relies on it to pull his 21-foot boat and 12-foot trailer.  In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market.  On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable.  Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford Super Duty diesel engine's CP4 high

pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct, as Plaintiff would not have purchased the Class Vehicles or would have paid less for it, had Ford not concealed the CP4 fuel injection system defect. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. In addition, Plaintiff experienced a catastrophic CP4 fuel pump failure after approximately 97,000 miles in September 2018. Specifically, Plaintiff was using his F-350 to pull a landscaping trailer on his way to work when suddenly the engine light came on, the vehicle went into "safe mode," and it would not go over 35 miles per hour. Plaintiff had to have the vehicle towed to Ken Stoepel Ford Lincoln (the dealership of purchase), where he was told that he had "contaminated fuel" and that the repairs would not be covered under warranty. The cost of repair, which involved replacing the high-pressure fuel pump injection system and flushing the fuel tank and fuel system, was approximately $10,200, and Plaintiff was without a vehicle for approximately one week during the repair process. Plaintiff thusly brings claims individually and as a representative of the Class.

13.     Plaintiff Ray Moore (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Munday, Texas. On or around June 7, 2016, Plaintiff purchased a new 2016 Ford F-250, VIN 1FT7W2BT1GEA64478 (for the purpose of this paragraph, the "Class Vehicle") for approximately $50,000.00 from Pruitt Ford, an authorized Ford dealership in Burkburnett, Texas, and still owns the vehicle to this day. Plaintiff uses his F-250 around his farm and to pull a trailer with farm equipment. The vehicle currently has approximately 86,300 miles on it. In the days and weeks preceding Plaintiff's purchase, Plaintiff

saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford Super Duty diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of

purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

14.     Plaintiff Kent Larry Bakken (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Hitchcock, Texas. In February 2016, Plaintiff purchased a new 2016 Ford F-450, VIN 1FT8W4DT1GEC13954 (for the purpose of this paragraph, the "Class Vehicle") for approximately $92,000.00 from Bluebonnet Ford Lincoln, an authorized Ford dealership in New Braunfels, Texas. Plaintiff purchased and still owns the vehicle, and uses it to pull his 40-foot mobile home. The truck currently has approximately 50,000 miles on it. In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither Ford nor any of

its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the Ford Super Duty diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct, as Plaintiff would not have purchased the Class Vehicle or would have paid less for it, had Ford not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. In addition, Plaintiff has repeatedly experienced low fuel pressure in his vehicle as a result of CP4-induced failure, and sees metal fragments each time he changes the vehicle's fuel filter (which is approximately every six months). Plaintiff thusly brings claims individually and as a representative of the Class.

15. Plaintiff Lynn E. Kirkpatrick (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Pasadena, Texas. On or around September 1, 2017, Plaintiff purchased a new 2017 Ford F-250, VIN 1FTW2BT3HEE13142 (for the purpose of this paragraph, the "Class Vehicle") for approximately $70,000.00 from Mack Haik Ford, an authorized Ford dealership in Pasadena, Texas. Plaintiff uses her F-250 for daily activities and occasionally to haul her 38-foot camper. Her truck currently has approximately 12,600 miles on it. In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market.

On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Absent these representations, Plaintiff would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford Super Duty diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct, as Plaintiff would not have purchased the Class Vehicle or would have paid less for it, had Ford not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

16.     Plaintiff Micheal S. Stone (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in League City, Texas.  On or around September 28, 2018, Plaintiff purchased a new 2019 Ford F-250, VIN 1FT7W2BT5KEC77362 (for the purpose of this paragraph, the "Class Vehicle") for approximately $83,000.00 from Cook Ford, an authorized Ford dealership in Texas City, Texas.  Plaintiff uses his F-250 as his daily driver to get to and from work, for daily activities, and occasionally to haul his 31-foot boat and 18-foot car trailer.  The vehicle currently has approximately 2,600 miles on it.  In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Ford's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein Ford claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market.  On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from Ford and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable.  Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it.  These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of

the Ford Super Duty diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct, as Plaintiff would not have purchased the Class Vehicle or would have paid less for it, had Ford not concealed the CP4 fuel injection system defects. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

17. Each plaintiff expected that Ford via its authorized dealers or through its advertising would disclose material facts about the durability and longevity of its vehicles and the existence of any defect that will result in expensive and non-ordinary repairs.

**B. The Defendant**

18. Defendant Ford Motor Company ("Ford") is a publicly traded corporation organized under the laws of the State of Delaware with its principal place of business at One American Road, Dearborn, Michigan 48126. Defendant Ford Motor Company can be served with process through its agent The Corporation Company, 40600 Ann Arbor Road E. Ste. 201, Plymouth, Michigan, 48170.

19. Defendant Ford designs, manufactures, distributes, and sells Ford automobiles in this District and multiple other locations in the United States and worldwide. Ford and/or its agents designed, manufactured, and installed the engine systems in the Class Vehicles. Ford also developed and disseminated the materially misrepresentative owner's manuals and warranty booklets, advertisements, and other intentionally unreasonable and deceptive promotional

materials relating to the Class Vehicles. Ford also designed advertising material that it sent to Ford Dealerships for the purpose of having dealers distribute these to consumers, and Ford authorized dealers to communicate with consumers about the performance of the vehicles.

### III.     VENUE AND JURISDICTION

20.     Venue is proper in this District under 28 U.S.C. § 1391 in light of the following: (1) Defendant Ford Motor Company conducts substantial business in this District and has intentionally availed itself of the laws and markets of the United States and this District; and (2) Many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia,* Ford's promotion, marketing, distribution, and sale of vehicles containing the defective Bosch CP4 fuel pump in this District. Several named Plaintiffs and proposed representatives, as well as thousands of Class members, purchased their Class Vehicles from the multiple Ford dealerships located in this District. Further, a significant number of the Class Vehicles were registered in this District and thousands of Class Vehicles were in operation in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Ford is subject to personal jurisdiction in this District as alleged, *infra*, and Ford has agents located in this District.

21.     The Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interests and costs. Subject-matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq*. The Court has personal jurisdiction over Ford pursuant to 18 U.S.C. §§1965(b) and (d), and Tex. Civ. Prac. & Rem. Code § 17.042, as well as supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Defendant Ford Motor Company.  Ford has committed and continues to commit acts giving rise to this action within Texas and within this judicial District.  Ford has established minimum contacts within the forum such that the exercise of jurisdiction over Ford would not offend traditional notions of fair play and substantial justice.  In conducting business within the State of Texas, and specifically, within this judicial District, Ford derives substantial revenue from its activities and its products being sold, used, imported, and/or offered for sale in Texas and this judicial District.

## IV.     FACTUAL ALLEGATIONS

### A.  The Class Vehicles

23.     For purposes of this Complaint, the "Class Vehicles" consist of Ford-manufactured diesel-fueled automobiles equipped with a 6.7L Power Stroke engine, ranging from the 2011–present model years. All vehicles falling under this Class Vehicle group were manufactured with the defective CP4 fuel injection pump.

### B.  The Rise of Diesel Vehicles in the United States

24.     Diesel engines have long enjoyed a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power.  Diesel engines produce higher torque, even at low revolutions per minute ("RPM"), making them popular in buses, heavy-duty pickups, and vans, including commercial vehicles, farm trucks, and ambulances.

25.     With the invention of common-rail systems, diesel fuel was injected at higher pressure, forming a finer mist that increases fuel efficiency and power.  Common-rail systems also made diesel engines burn cleaner and with less noise.  While diesel had long been popular overseas, these advances fueled a growing market here in the U.S. for diesel trucks, and even diesel passenger cars.

26. From the outset, Ford was in competition with fellow "Big Three" auto manufacturers like General Motors and Fiat Chrysler, each racing to dominate the growing American diesel vehicle market. Ford looked to Europe and the expertise of international automotive parts supplier Bosch to increase the fuel efficiency and power of its diesel engines. The heart of this diesel revolution would be powered by Bosch's extremely durable CP3 fuel injection pump, the predecessor to the CP4 fuel injection pump at issue in this suit. The CP3 pump was one of Bosch's heavy-duty injection pumps, simplified for increased reliability. The reliability of the CP3 became key to the "million-mile" performance of diesel truck engines in the U.S. Not surprisingly, American trust in diesel technology grew.

27. Americans paid a premium for the increased reliability, fuel efficiency, and power of diesel—and, Bosch promised to continue to deliver advances and continued improvements. Bosch claimed that the next generation of fuel pump, the CP4, would maintain reliability while also increasing fuel efficiency and power. According to Bosch, the CP4 provides "[demand-based delivery from tank to rail[.]"[2] In addition, the component manufacturer explains its high-pressure pump, and its function(s), as follows:[3]

> The high-pressure pump CP4 delivers the fuel into the connected rail under high pressure. The CP4 consists of one or two high-pressure elements, each integrated in a housing with its own camshaft. The pump camshaft is driven by belts, chains, or cogwheels and moves the pump pistons to generate the required high pressure.

> The fuel is delivered from the tank to the pump via a low-pressure connection. The fuel lines lead from the high-pressure connectors on both high-pressure elements to the rail. The metering unit is connected electrically to the control unit and is responsible for the requirement-driven supply of the pump with fuel. Fuel which is no longer needed flows back into the tank via a further low-pressure connection.

---

[2] *See* Bosch's "Products and services" page, available at https://www.bosch-mobility-solutions.com/en/products-and-services/passenger-cars-and-light-commercial-vehicles/powertrain-systems/common-rail-system-piezo/high-pressure-pump-cp4/ (last accessed Dec. 2, 2018).

[3] *See id.*

The CP4 common-rail pump has proven highly successful on the market. Over 40 million units have been produced globally so far. It has a modular construction, and as Bosch advertises, can be adapted to the customer's needs.

The CP4 handles pressure levels from 1,800 to 2,700 bar and is used for both on- and off-highway applications from passenger cars, light[-] and medium[-]duty vehicles, up to small heavy[-]duty vehicles. [As Bosch purports,] "[t]he variants tailor-made for each segment differentiate themselves with regard to, for example, lifetime, robustness, and maximum flow rate."

The fuel-lubricated CP4 consists of one or two high-pressure elements, each integrated in a housing with its own camshaft. The pump camshaft is driven by belts, chains, or cogwheels and moves the pump pistons to generate the required high pressure. The fuel is delivered as required using an integrated cogwheel pump or electric fuel pump.

The engine control unit enables the delivery of the required quantity of fuel. It communicates with the metering unit or the optional electric suction valve (eSV) on the pump. Use of the eSV improves the filling of the high-pressure pump compared to the variant with the metering unit, especially in the higher speed ranges.

In essence, Bosch's own predominance in the global market carries with it the superficial guarantees of quality and trustworthiness. This may have helped OEMs like Ford to get the "jump" on market competitors—*but at what cost? And payable by whom?*

28. Much like what occurred in the nationwide Volkswagen emissions scandal involving Bosch, reliance on Bosch's expertise in the design of diesel engines would lead Ford into a course of action it should now regret. The heart of Ford's success under increasingly competitive fuel efficiencies was Bosch's cheaper, substandard CP4 fuel injection pump. Bosch had the technical know-how to do what needed to be done to get ahead; unfortunately for the American public, the easiest way for Ford to succeed was to cheat American consumers on durability and overall vehicle functionality by equipping the Class Vehicles with this ticking time bomb of a fuel injection pump that dooms the modern Ford Power Stroke diesel engine system from day one.

C. **Ford's Knowledge of Incompatibility, Defectiveness, and Failures Associated with Bosch's CP4 Pump When Used with American Diesel Fuel.**

29.     The Bosch CP4 Pump operates at higher pressures than its predecessor, the CP3. The CP4 achieves greater fuel efficiency by pumping less fuel through the engine. The Bosch CP4 Pump had a proven track record in Europe, but it is not compatible with American diesel fuel.

30.     The CP4 relies on the diesel fuel itself to maintain lubrication. The lubricity of diesel in Europe is more standardized than American diesel, but European diesel is also dirtier. Because the sulfur in diesel exhaust is a major cause of smog and acid rain, in 2007, the EPA required diesel fuel sold in the U.S. to have less than 15 ppm of sulfur. This is known as Ultra Low Sulfur Diesel ("ULSD"). It is produced through a refinery process known as hydrodesulfurization ("HDS"). Sulfur provides some of the lubricity needed for the pump to operate. But more importantly, the refinery process required to produce low sulfur diesel destroys a variety of important nitrogen and oxygen based polar and organic compounds that give diesel fuel its lubricity. Indeed, ULSD fuel is considered to be very 'dry' and incapable of lubricating vital diesel fuel delivery components, specifically high-pressure fuel pumps and injectors; as a result, American diesel does not contain the lubrication necessary for the Bosch CP4 Pump to operate durably, and these fuel injection system components "are at risk of premature and even catastrophic failure when ULSD fuel is introduced to the system."[4]

31.     Low sulfur diesel fuel first appeared in American markets in the 1990's, with fewer than 500 ppm of sulfur. It is estimated that 65 million fuel injection pumps failed as a result. It was thought that the pumps failed at the equivalent of 100 to 200 hours of operation. Thus, the critical importance of lubricity for diesel injection pumps was well known to all auto

_____

[4] Arlen Spicer, *Diesel Fuel Lubricity Additives: Study Results*, THE DIESEL PLACE, Aug. 26, 2007, available at http://www.jatonkam35s.com/DeuceTechnicalManuals/Diesel_fuel_additive_test.pdf (last accessed Nov. 29, 2018).

manufacturers for a decade or more before the Class Vehicles were designed or introduced into the market.

32.     Automotive manufacturers were well aware of the mismatch between engine part specifications that require a maximum of 460 wear scar, and the lower lubricity specifications of Ultra Low Sulphur American diesel fuel:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions. Diesel fuel injection equipment relies on the lubricating properties of fuel. Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers. This property is not addressed adequately by ASTM D 975.

4/22/2002 Truck & Engine Manufacturers' Association ("EMA"), Position Statement titled, "EMA Consensus Position Pump Grade Specification." Ford Motor Company is a member of the EMA.[5]

33.     Further, the EMA made clear:

> Regardless of the fuel sulfur level, ASTM D975 currently requires lubricity specified as a maximum wear scar diameter of 520 micrometers using the HFRR test method (ASTM D6079) at a temperature of 60°C. Based on testing conducted on ULSD fuels, however, fuel injection equipment manufacturers have required that ULSD fuels have a maximum wear scar diameter of 460 micrometers. EMA recommends that the lubricity specification be consistent with the fuel injection equipment manufacturers' recommendation.

8/8/2005 Engine Manufacturers Association, Position Paper titled "North American Ultra Low Sulfur Diesel Fuel Properties."

34.     In 2005, the EPA instituted a lubricity requirement for the lower sulfur diesel sold in the U.S. It required sellers of diesel to ensure the fuel meets a minimum lubricity level of a

---

[5] *See* Truck & Engine Manufacturers Association (EMA) membership webpage, http://www.truckandenginemanufacturers.org/companies/ (last accessed Nov. 13, 2018).

maximum wear scar diameter of 520 microns based on the testing and standard propounded by the American Society for Testing and Materials ("ASTM") D-975.

35. By 2007, on-road diesel fuel in the U.S. for highway vehicles was uniformly ULSD, which has an allowable sulfur content much lower (15 ppm) than the previous U.S. on-highway standard for low sulfur diesel (500 ppm)."[6]

36. In reality, U.S. diesel frequently contains even less than 15 ppm, a truth that is widely known within the U.S. automotive industry. For example, according to a 2014 Infineum Worldwide Winter Diesel Fuel Quality Survey in which 341 diesel fuel samples were tested from around the world, **all** diesel fuel samples that the organization collected and tested from the U.S. and Canada contained 10 ppm S or less.[7]

37. Moreover, in September 2009, the Joint Diesel Fuel Injection Equipment Manufacturers ("Joint FIE Manufacturers") released a "Common Position Statement regarding Fuel Requirements for Diesel Fuel Injection Systems," in which the Joint FIE Manufacturers expressed the following key points to their U.S. automotive industry customers:

> "The continuous world-wide tendency to increase engine performance and reduce emissions has necessitated the development of new generations of enhanced diesel fuel injection equipment, supporting the achievement of stringent legislation targets. Rising injection pressures and multiple injections result in higher operating temperatures, increased contract pressures and reduced clearances. . . . Alterations to fuel quality, e.g., by increasingly severe refinery hydroprocessing being introduced to remove

---

[6] *See New Ultra Low Sulfur Diesel fuel and new engines and vehicles with advanced emissions control systems offer significant air quality improvement*, Clean Diesel Fuel Alliance, Feb. 25, 2017, available at https://web.archive.org/web/20170225141751/http://www.ct.gov/deep/lib/deep/air/ultra_low_sul fur_diesel/ulsdfs.pdf (last accessed Nov. 30, 2018); *see also* J. Thijssen, LLC, *The Impact of Future Diesel Fuel Specifications and Engine Emissions Standards on SOFC*, U.S. DEPT. OF ENERGY, NAT'L ENERGY TECHNOLOGY LABORATORY, Jun. 29, 2004, at I, available at https://www.netl.doe.gov/File%20Library/research/coal/energy%20systems/fuel%20cells/DOE-Diesel-Final-040629.pdf (last accessed Nov. 29, 2018).
[7] *Infineum Worldwide Winter Diesel Fuel Quality Survey 2014*, INFINEUM INT'L LTD., available at https://www.infineum.com/media/80722/wdfs-2014-full-screen.pdf (last accessed Dec. 3, 2018), at 6-7.

Sulphur also reduce the content of aromatics and destroy surface active compounds and antioxidants. ***Removal of these beneficial compounds effects boundary lubrication, commonly known as lubricity, and inherent oxidation stability and must be compensated for.*** Fuel parameters such as cetane number, viscosity, density, lubricity, oxidation stability, sulfur and aroma content, together with the absence of free water and dirt contamination, are key parameters required to ensure performance of equipment in the field.

"Biofuels are becoming increasingly available to end-users [including] in the United States of America. . . . It must be recognized that the physical and chemical characteristics of bio components are significantly different to conventional fuels and that care must be taken in their specification and use.

"Diesel fuel injection equipment (FIE) manufacturers fully support the development of alternative sources of fuel. . . . ***However, many vehicles, engines and equipment are not designed to run on them. It is recommended to refer to the vehicle and engine manufacturers 'Limitations of Use' documents for guidance.***"[8]

38.     A prudent manufacturer would design or select a fuel injection pump designed for the fuel of the country in which the vehicle is to be sold.

39.     Yet Ford solicited Bosch to provide the CP4 Pump for Ford's Power Stroke engines in the 2010 and 2011 model years. It was no secret to them that the Bosch CP4 Pump is inappropriate for diesel vehicles in the U.S. The Bosch CP4 Pump specifications for fuel lubricity allow for a maximum of 460 wear scar. By definition, the 520 wear scar specification of American diesel fuel is inadequate to lubricate the Bosch CP4 Pump.

40.     In order to reduce costs and increase fuel efficiency, Ford sold vehicles with a fuel injection pump that was clearly out of specification, having inadequate lubrication for the U.S. market.

---

[8] Joint FIE Manufacturers, *Fuel Requirements for Diesel Fuel Injection Systems: Diesel Fuel Injection Equipment Manufacturers: Common Position Statement 2009*, Sept. 2009, available at http://www.globaldenso.com/en/topics/files/common_position_paper.pdf (last visited Nov. 29, 2018) (emphasis added).

41.     The adverse effects of ULSD on high-pressure fuel pump injection systems have

been acknowledged within the automotive industry. For example, in a July 2014 study on the use

of fuel injection equipment with global diesel fuels, Parker Racor, the leading global supplier of

diesel fuel filtration systems, explained the following:

> "The increase in system pressures in diesel engines has a significant effect on
> filtration requirements. These systems are highly vulnerable to many forms of
> contaminants and the need for robust high efficiency filtration has never been
> higher. . . . An analysis of global diesel fuel quality shows that although the fuel
> quality in the developed markets has improved, significant quality concerns still
> remain. Levels of water and contaminants remain at levels that can cause long term
> issues to the latest fuel injection systems. Specifically, the levels of contaminants
> smaller than 5 microns remain very high. These particles can be small enough to
> pass into the internal clearances of high pressure fuel injection systems and can lead
> to erosion and wear of critical areas leading to a loss in system performance and
> eventually system malfunction. Diesel filtration balances pressure drop, useful life
> and efficiency. ***However the real long term effect on fuel system life is often not
> adequately considered[,] as much of the engine durability testing performed is
> done using high quality fuel that doesn't represent the range of fuels seen in the
> market***. Consideration of filtration performance under less than ideal conditions is
> necessary to develop an acceptable level of protection."

Steven Hardison & Adam Pearce, *July 2014 Summary of Fuel Injection Equipment with Respect

to Diesel Fuel Filtration*, PARKER RACOR & AVL, Jan. 7, 2015, available at

https://www.parker.com/literature/Racor/RSL0194%20Rev%20-%20(TAP_AVL-Fuel-Study-

Racor).pdf (last accessed Dec. 3, 2018), at i; *see also id.* at 13 ("Careful monitoring of fuel quality

and filter performance is needed to protect sensitive diesel engine injection systems"); *id.* at 29

("To avoid costly engine and fuel system components damages, advanced multi-stage filtration is

recommended"); *id.* at 31 ("Modern high pressure diesel fuel injection systems contain very small

internal clearances and are vulnerable to any build-up of deposits on these components. . . . This

issue has become a significant concern in the industry").

42.     Indeed, the automotive industry was well aware of the consequences of this early-

on.  For example, in May 2010, after analyzing foreign particles found in the fuel filter of a failed

Audi diesel engine and determining that the biodiesel used in the subject engine was

"insufficient[ly] cleans[ed]" resulting in deposit formation "which is not conducive to establishing the lubricating film in the [fuel pump] roller support," Bosch noted that, "When [diesel fuel] viscosity is too low, the lubricating film is not established properly and mixed friction and surface contact occurs = bad."[9] Likewise, in its January 2012 submission to NHTSA in response to the agency's investigation into high-pressure fuel pump failures, Ford noted that, "Inadequate lubricity can result in increased tailpipe emissions, excessive pump wear and, in some cases, catastrophic failure."[10] The CP4 is, by its own specifications, expected to fail quickly when used in the U.S.

43.     The Bosch CP4 Pump multiplies the diesel fuel problem in ways that are catastrophic. Ford chose the Bosch CP4 Pump because it was supposed to improve fuel efficiency by using less fuel. The Bosch CP4 Pump struggles to supply adequate fuel to the engine under the lower pressure of newer engines. The combination of the low volume of fuel, which is under constant suction, and the low lubricity of the fuel, allows cavitation of the fuel. Air pockets form inside the pump during operation. These air bubbles allow metal to rub against metal. Ford had achieved greater fuel efficiency at the expense of running the pump dry.

44.     As the Bosch CP4 Pump wears, it sends metal shavings and sometimes even larger particles throughout the fuel system. As the shavings disperse and contaminate the engine and the high-pressure fuel system, the fuse of the proverbial CP4 "time bomb" has been lit, and it is only a matter of time before the entire engine system fails. The failure of a CP4 pump requires repair or replacement of the entire high-pressure fuel system, including the pump, fuel injectors, fuel

[9] Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 12–14 (May 26, 2010 email chain between Audi and Bosch representatives re: "Particle analyses, fuel filter").
[10] Jan. 20, 2012, Ford Response to NHTSA Inquiry EA11-003, Document titled, "INRD-EA11003-50102P.pdf," at 19, available at https://static.nhtsa.gov/odi/inv/2011/INRL-EA11003-50102P.pdf (last accessed Nov. 7, 2018).

rails, and injection lines. Repair costs when a CP4 pump fails average between $8,000.00 and $20,000.00.

45.     As Diesel Tech Magazine, an industry publication, aptly explained in its December 2017 article entitled, "Common Problems: The CP4 Time Bomb:"

> "It's always frustrating to finally get your hands on a brand-new truck (or at least, new to you) and find out there's something wrong with it. It's even more frustrating to learn that not only are you not alone in your suffering, but that it's a common problem to your vehicle . . . . To kick things off, we're going to look at something that's very near and dear to our hearts: the CP4 injection pump . . . . Boy, where to begin? People have taken a somewhat hyperbolic approach and refer to the CP4 as a time bomb, among other colorful terms. The thing is, they're not too far from the truth. Even if you have a 100 percent stock pickup, there's a *really* good chance that you're going to be on the receiving end of a $10,000 bill when it finally goes out on you and destroys your entire fuel system."[11]

46.     The Bosch CP4 fuel injection pump was defective and incompatible with U.S. diesel fuel from the get-go, even prior to its usage in the Class Vehicles. CP4 failures began running rampant in American Audi and Volkswagen vehicles at least as early as 2008.[12] Indeed, in February 2008, Bosch began meeting with Audi and Volkswagen representatives on a monthly—or sometimes *weekly*—basis to track CP4 pump field failures that the auto manufacturers were seeing in the U.S.[13] These failures echo the very failures that continue to

---

[11] Trevor Mason, *Common Problems: The CP4 Time Bomb*, DIESEL TECH, Dec. 2017, available at https://www.dieseltechmag.com/2017/12/common-problems-the-cp4-time (last accessed Nov. 28, 2018) (internal punctuation omitted).

[12] *See*, *e.g.*, Jul. 7, 2008 email between Audi and Bosch representatives re: "Performance drop AU716 98017 with shavings in the HPP," discussing how "[s]omething is disintegrating" in the Audi 716 fuel pump and that "[w]e are a bit speechless" about "[t]he shavings, or whatever it is"), submitted as part of Bosch's May 2012 responses to NHTSA ODI Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 6; *id.* at 27 (Jul. 31, 2008 email from Audi representative re: "Fuel quality in [**REDACTED**]," stating that, "With our [Audi's] V6TDI with the high-pressure pump CP4.2 we have significantly higher failure rates in [**REDACTED**] (higher by a factor of approx. 30 than the average of all markets) . . . . Have you any information suggesting that such a thing could be possible with this country-specific diesel fuel?");

[13] *See*, *e.g.*, *id.* at 28-31 (Feb.-May 2011 email chain between Audi, Volkswagen and Bosch representatives re: "Status CP4 USA," in which the parties discuss the substantial increase in warranty claims with the implementation of the CP4 in vehicles in the U.S. market).

occur in the Class Vehicles to this day, and from late 2011 through early 2012, documentation regarding these widespread CP4 failures was provided to the National Highway Traffic Safety Administration ("NHTSA") by Bosch, Audi, and Volkswagen, in connection with NHTSA's Office of Defect Investigations ("ODI") Inquiry No. INRD-EA11003, an investigation which Ford was subject to as well.[14]

47.    This documentation demonstrates the nature of the CP4 defect that would ultimately come to exist in the Class Vehicles.  For example, in August 2009, Audi sent Bosch a failed CP4 fuel pump for analysis after "[t]he high pressure fuel pump failed catastrophically shedding metal shavings throughout the entire fuel system . . . .  This car will require a complete new fuel system from tank to injectors and everything in between. This will be a very lengthy repair (weeks). . . We need to determine if component failure or bad fuel is to blame." March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 35. Thereafter, on September 1, 2009, Bosch responded to Audi with the following flippant analysis note from their failed pump inspection: "Gentleman, [t]he pump mentioned below was analyzed. The result of the finding is sand-like particles in the fuel. **Defect caused by customer**." *Id.* at 38 (emphasis added).[15]

---

[14] *See, e.g.*, *infra* ¶¶ 56-58, 61-62 and corresponding footnotes (discussing Ford's responses to NHTSA's requests pursuant to ODI Inquiry No. INRD-EA11003).

[15] *See also* March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 21 (Mar. 31, 2008 email from Volkswagen to Bosch re: "Radio: Drivetrain damage failure US07 (Jetta)," in which the parties are discussing an HPFP failure in a 2007 Jetta and the Volkswagen representative frustratedly states, "Can you (panel of experts) explain to us how the failure mechanism was after this mileage? . . . . We will certainly not accept a failure because of fuel quality! . . . . We also see a big risk here for our BIN5 pump, which has to manage with the same fuel in USA"); May 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 9–10 (Jul. 4, 2008 email from Audi to Bosch re: "CP4 BIN5 3rd and 4th failure in USA," analyzing root cause of CP4 field failures and positing, "Why is it that EC pumps do not fail? Because of a different fuel?"); *id.* at 13–14 (Jul. 11, 2008 email between Audi and Bosch representatives re: "W19 BIN5 pump failure" in which Audi writes, "For the zero error meeting in FeP on Tuesday we expect the information discussed at the error meeting on endurance

48. Thus, even early on, it was well known in the U.S. automotive industry that there were serious U.S. diesel incompatibility issues that now run rampant in the Class Vehicles due to the defective CP4 pump.

49. Likewise, in September 2009, Bosch, at the time supplying the defective CP4 fuel pump to Audi and Volkswagen, received a notice from Audi about a "3rd HPP failure" in the U.S., explaining, "I'm afraid there's bad news from the U.S.: After 2 failures in the field . . . the 3rd HPP failure has now occurred in the EC endurance run."[16] Photos attached to the email show the failed Bosch CP4 fuel pump, replete with metal shavings in the gasket (*see* photographic illustration hereafter):[17]



---

testing of fuels with 'poor lubricity, containing water etc.' and all failures, drivetrain damage in all component, system and other endurance runs of Bosch and all customers"); Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 7 (emphasis added) (Jun. 30, 2009 email between Bosch and Audi representatives re: "ANS: HPP measures/ USE," in which the Audi representative writes, "I don't think you're reading my mails anymore! Please look at the failure curves specifically, then you'll see that ***we only have a problem in certain markets[.] . . . Depending on how poor the fuel currently on the market is***"); *id.* ("I'd prefer to have a more robust pump").

[16] Sept. 2, 2009, email from Audi representative to Bosch representatives regarding "3rd HPP Failure USA," produced in response to NHTSA Inquiry EA11003EN-00639[0], available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed Nov. 6, 2018), at 146.

[17] *Id.* at 148–50.







50.     By March 2011, Bosch was continuing to receive "a respectable number of claimed [failures in] CR-pumps Typ CP4 for US-07" about which Volkswagen dealerships were reporting "'[m]etal particle[s] at the filter.' In a few cases the [dealer] use[s] this as an indication, to verify a mechanical breakdown from the CR-pump." Bosch's response?  "Please note[:] To find some particle [sic] or dust in the main filter box, can not be prevented."[18]

51.     In June 2011, Bosch received a report from Volkswagen regarding a CP4 pump failure in a 2.0L Volkswagen TDI in which the Volkswagen representative explained, "I have here a pump from [sic] a 2.0L TDI. I have been testing a lot of these this week and many have an amount of 'metal Debris' or other metallic particles in them."[19] The following image of the contaminated pump accompanied the email:



[18] Mar. 22, 2011, email from Bosch employee to Volkswagen employees regarding analysis of failing CP4 fuel pumps, produced in response to NHTSA Inquiry EA11003EN-00639[0], available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed Nov. 6, 2018), at 11; *see also id.* at 19-22 (spreadsheet showing results of Bosch's pre-analysis of HPFP failures in Volkswagen/Audi vehicles where "metal chips found in fuel system").
[19] Mar. 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 12 (Jun. 9, 2011 email from Volkswagen Group of America, Inc. to Bosch re: "2.0L TDI Fuel Pump").

52.     Indeed, Bosch CP4 failures in U.S. Audi and Volkswagen vehicles were widespread and catastrophic by the end of 2011. *See* Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 69 (emphasis added) (Sept. 15, 2011 email from Volkswagen to Bosch re: "080211_Status_CP4.1_Bosch," in which the Volkswagen representative sends a formal "change request in [the] form of exemplary documents on failures of high-pressure diesel pump Bosch CP4.1. *I think the failures are well known*. It is also important to know that not only the high-pressure fuel pump, but the entire injection system is to be replaced in case of damage to a HPP with a cost >[**REDACTED**] caused by chip contamination").

53.     Yet Ford went on to commission Bosch's CP4 fuel pump for use in its Power Stroke engine vehicles, enticed by the prospect of a cheaper fuel injection pump than the CP4's predecessor.

**D.  Ford Decides to Equip its Diesel Power Stroke Engines with the Bosch CP4 Pump.**

54.     Since 1994, Ford has marketed a "Power Stroke" diesel engine.  The original "Power Stroke" engine was actually designed and manufactured by Navistar International, not Ford.  Ford relied on the expertise of Navistar, originally known as the International Harvester Company, from Chicago, Illinois, and re-branded the popular engine as its own.  The Navistar-produced "Power Stroke" engine enjoyed a reputation for reliability.  Ford utilized the Navistar 7.3L "Power Stroke" engine until the year 2003, and it enjoyed a reputation as possibly the best engine Navistar ever produced.

55.     Seeking to gain an advantage, Ford began a long partnership with Bosch in 2004. But from the beginning, Ford was aware of a mismatch between Bosch's European fuel injection pumps and American diesel fuel.  Ford was also alarmed at the high stakes of a pump failure if it were covered under warranty.  In an email, a Ford fuel injection engineer referenced a trip to

Germany to meet with Bosch and some photos that Bosch may share. The attachment to his email stated:

> U.S. diesel standards (ASTM D975) allow up to 500 ppm water content in fuel; European specifications (EN590) allow 200 ppm max. More variation in U.S. Consumer fuel sources and fuel quality vs. European markets—high volume truck stops vs. low volume neighborhood gas stations equipped w/diesel, use of off-road diesel fuel by some consumers, etc. . . . failure mode in one component, entire system (all injectors, pump, rails and lines) would require replacement—major warranty expense component . . . .

10/21/2004 email from Dave Eastman of Ford's Diesel Fuel Injection Systems Department.

56. In connection with this problem, in 2009, Ford was discussing the decreased lubricity of ultralow sulfur American diesel ("ULSD"). A November 17, 2009 email from Brien Fulton, Diesel Powertrain Systems Technical Specialist at Ford, to Beth Raney-Pablo from the Fuels and Lubricants Engineering Department at Ford stated: "[T]he data does contain some ULSD which due to the process to remove sulfur tends to reduce lubricity." A November 13, 2009 email from Brien Fulton to Scott Eeley at Ford stated: "You need to be aware of the current fuel lubricity levels . . . we have lots of fuel above 520 [micrometers]."[20]

57. Further, Ford accepted the fact that U.S. diesel was "out of spec" and chose against hardware changes, acknowledging and rejecting a suggestion from Chevron in November 2009

---

[20] Nov. 17, 2009, email chain involving Ford Diesel Powertrain Systems Technical Specialist Brien Fulton and other Ford employees re: "TLP09-117 Brief Report on HFRR Lubricity Evaluation of Diesel Fuels," submitted by Ford to NHTSA in response to ODI Inquiry No. EA11003, part of compilation of Ford fuel pump-related emails in "Appendix G" to Ford's Jan. 20, 2012 NHTSA submission (document titled "INRD-EA11003-50107P"), at 398-425. *See also id.* at 411 (from presentation slide headed, "Overview: North & South America Diesel Quality:" "North American fuels tend to have poorer lubricity and lower cetane[, whereas] South American fuels tend to have comparable lubricity to EU fuels.").

that "Ford need[s] to change hardware to be more robust instead of counting on the fuel suppliers to improve quality, or ask for tighter lubricity specification."[21]

58.     In September 2010, when Ford was still experiencing lubricity issues with its diesel HPFPs, Ford engineer Brien Fulton noted that, "Diesel fuel systems and water don't mix, even on the microscopic level."[22]

59.     Thus, it is clear that Ford was concerned about the lubricity and uniformity of American diesel for its engines, and was aware of the cost to the consumer if the injection pump were to catastrophically fail.

60.     In 2010, Ford sought to increase its profits by making its own diesel engines, and it continued to work with Bosch for the design of the fuel injection system. Under the leadership of Derrick Kuzak, group vice president of Global Product Development, Ford advertised that its "new diesel engine will deliver significant improvements in torque, horsepower, and fuel economy while adding more fueling flexibility." *See also* "A New Era in Ford Diesel Technology for Pickups Starts Now," Ford Social, available at: https://social.ford.com/en_US/story/design/super-duty/a-new-era-in-ford-diesel-technology-for-pickups-starts-now.html (last accessed Oct. 1, 2018). For 2011, Kuzak promised, "This all-new diesel engine has been so extensively tested both in the lab and in the real world that we're confident we're giving our customers the most reliable

---

[21] Nov. 13, 2009, email from Chevron Ornite Company OEM & Industry Liaison Jerry C. Wang to Ford employees re: "TLP09-117 Brief Report on HFRR Lubricity Evaluation of Diesel Fuels," submitted by Ford to NHTSA in response to ODI Inquiry No.EA11003, part of compilation of Ford fuel pump-related emails in "Appendix G" to Ford's Jan. 20, 2012 NHTSA submission (document titled "INRD-EA11003-50107P"), at 433. *See also id.* (emphasis added) (Wang presents another option to Ford, stating, "[T]his is an out of spec fuel issue so there is no need to change hardware and hope fuel quality will improve or ***just accept this as fact of life if the warranty is manageable***").

[22] Sept. 17, 2010, email from Ford Diesel Powertrain Systems Technical Specialist Brien Fulton to Ford employees Robin Lawther, Forest Heggie, Karl Burroughs, and Carlos Armesto re: "High pressure fuel systems vs water in diesel fuel," submitted by Ford to NHTSA in response to ODI Inquiry No. EA11003, part of compilation of Ford fuel pump-related emails in "Appendix G" to Ford's Jan. 20, 2012 NHTSA submission (document titled "INRD-EA11003-50107P"), at 365-66.

and productive powertrain available today." *Id.* Ford claimed that the new Power Stroke engine could utilize up to 20 percent biodiesel. *See id.* However, in order to achieve greater fuel efficiency, the Power Stroke engine incorporated a newer, lower-volume fuel injection pump, Bosch's CP4 pump.

61.     At least as early as 2010, Ford began looking for ways to blame consumers or fuel supplies for the poor performance of their CP4 pumps:

> 2008–2011 Super Duty, equipped with the diesel engine that have been filled with gasoline, incorrect diesel fuel or other non-diesel fuels can damage the fuel system components, including the High-Pressure Injection Pump and fuel injectors. Non-recommended fuels and additives do not meet the lubricating, cooling and anti-corrosion properties that is required of the fuel system components.

9/8/2010 Technical Service Bulletin ("TSB") email by Tony Lusardi, Ford Product Concern Engineer for the 6.7L Diesel. Rather than acknowledge the problems with the Bosch CP4 Pump and American diesel fuel as the cause of engine troubles, Bosch and Ford would point to fuel contamination, a condition not covered under warranty.[23]

---

[23] *See, e.g.*, Nov. 23, 2009 email from Ford Diesel Drivability Service Engineer Zachary Baker to Ford Diesel Engine Team Leader Derek McCallister re: "6.4 Pump & Injectors," submitted by Ford to NHTSA in response to ODI Inquiry No. EA11003, part of compilation of Ford fuel pump-related emails in "Appendix G" to Ford's Jan. 20, 2012 NHTSA submission (document titled "INRD-EA11003-50107P"), at 8 (emphasis added) (Baker explaining how to deal with customer warranty claims involving HPFP failures as follows: "In the event that fuel contamination is evident (contaminated fuel, corrosion in the secondary filter housing, rusted injector barrels, etc.), *and there is a catastrophic fuel system failure with debris in the fuel system*, I will advise the dealer that *the repair will likely not be covered under warranty due to fuel contamination*"); *id.* at 2 (emphasis added) (Dec. 2, 2009, email from Ford engineer Scott Eeley to fellow Ford engineers Bob Espinoza, Leon Bergeron, Craig Davis, Scot McDonagh, Carlos Armesto et al. re: "6.4 Pump & Injectors," (noting that "[m]ore than 115 ml water in the fuel system is abnormal and indicates excess water in the fuel supply chain. *Failures caused by non-specified fuel are not covered by Ford Motor Company Warranty—refer to Owners Guide*"); *id.* at 1 (discussing ways for Ford to "reduce warranty costs" by giving Ford service technicians tips for placing blame on consumers, such as identifying a historical "check engine light" diagnostic trouble code in the customer's vehicle data download which indicates that the customer has "ignore[d] the light [and] they should be held responsible (insurance claim)").

62.     On February 7, 2011, as the first models of the Class Vehicles were being sold, NHTSA investigated Ford for a potential defect in its predecessor diesel high pressure fuel injection pumps as well as certain model year vehicles containing the CP4 pump.[24]  On March 30, 2011, Ford internally activated a "Job Aid" for Ford dealers to address "2011 F-Super Duty vehicles equipped with a 6.7L diesel engine which . . . may have damaged fuel system components including the high pressure (HP) pump and fuel injectors. ***Fuel and additives which do not meet the minimum lubrication, cooling and anti-corrosion properties*** [sic] ***required by the high pressure fuel system components*** may cause symptoms including, but not limited to, the following: crank/no start, long crank/hard start, rough run, low power. . . and/or fuel rail pressure (FRP) slow to build."[25] These symptoms are known consequences of CP4 pump implosion.[26]

63.     Indeed, field incidents involving CP4 implosions in 2011 MY Ford F-Series trucks came rolling in almost as soon as the vehicles were off the assembly line. For example, in its January 2012 submission to NHTSA in response to ODI Inquiry No. EA11-003, Ford submitted records of more than one-hundred 2011 model year F-Series diesel trucks having experienced engine destruction due to the defective CP4 fuel pump—many of which Ford identified as "Root Cause: Poor lubricity fuel."[27]

64.     In this same January 2012 NHTSA submission, Ford represented the following: "Ford has ensured that the HPFP design in the peer vehicles is compatible with diesel fuels sold in

---

[24] The scope of the investigation was the 2008–2012 Super Duty F-Series trucks (NHTSA defect investigation EA11-003:NVS-213hkb).

[25] Jan. 20, 2012, Ford Response to NHTSA Inquiry EA11-003, Document titled, "INRD-EA11003-50103P.pdf," Global Concern No. 103-2011-0041, at 24 (emphasis added).

[26] *See, e.g., infra* ¶¶ 73-74 (providing examples of CP4-related customer complaints in which drivers experience sudden engine shut off and inability to restart the vehicle).

[27] Jan. 20, 2012, Ford Response to NHTSA Inquiry EA11-003, Document titled, "INRD-EA11003-50103P.pdf," Global Concern No. 103-2011-0041, at 502-547.

the United States through engine and vehicle testing with the previously referenced diesel test fuels."[28]

65.    Ford was clearly on notice that American fuel did not meet the specifications of the Bosch CP4 Pump. Any reasonable person would think that Ford would utilize a more lubricated or robust pump design going forward, but they did not. The affected Ford vehicles containing the Bosch CP4 Pump are 2011–*present* model year Ford Pickups with 6.7L Power Stroke engines, and the owners are saddled with the expense of Ford's poor design choice. Ford doubled-down on its choice to use the CP4 as the heart of its diesel engines. Rather than replace it, Ford educated dealerships how to deceive customers convincing them that the devastating failures were caused instead by contaminated fuel.

66.    Moreover, Ford was on notice—and indeed, *admitted*—that high-pressure fuel pump failures such as those associated with the CP4 pose an inherent risk to vehicle occupant safety. In August 2016, Ford conducted a safety recall for MY 2015–16 Ford Transit vans equipped with 3.2-liter diesel engines due to "[a] fuel injection pump malfunction" which "may cause the engine to not start or stall without warning and without the ability to restart."[29] Ford further acknowledged that "[a]n engine stall while driving, without warning or the ability to restart can increase the risk of a crash."[30]

---

[28] Jan. 20, 2012, Ford Response to NHTSA Inquiry EA11-003, Document titled, "INRD-EA11003-50102P.pdf," at 20, available at https://static.nhtsa.gov/odi/inv/2011/INRL-EA11003-50102P.pdf (last accessed Nov. 7, 2018).
[29] *See* Aug. 22, 2016, Ford Part 573 Safety Recall Report for NHTSA Recall Campaign No. 16V-618, available at https://static.nhtsa.gov/odi/rcl/2016/RCLRPT-16V618-7678.PDF (last accessed Nov. 14, 2018); *see also* https://news.pickuptrucks.com/2016/08/recall-alert-2015-2016-ford-transit.html (last accessed Nov. 14, 2018).
[30] Aug. 22, 2016, Ford Part 573 Safety Recall Report for NHTSA Recall Campaign No. 16V-618, available at https://static.nhtsa.gov/odi/rcl/2016/RCLRPT-16V618-7678.PDF (last accessed Nov. 14, 2018).

67.     The federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.  49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

68.     The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. *United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983).  A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident."  49 U.S.C. § 30102(a)(8).  Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related.  49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c).  Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles.  49 C.F.R. §§ 577.5(a), 577.7(a).  Violating these notification requirements can result in a maximum civil penalty of $15,000,000.  49 U.S.C. § 30165(a)(1).

69.     To be sure, Ford has been put on notice of ***scores*** of consumer complaints regarding the now-notorious and catastrophic engine failure caused by CP4 pump failure.

70.     For example, on September 21, 2011, the following story was circulated on RV.net by one sorely disappointed owner of a 2011 F-350 6.7L Power Stroke diesel with only 35,000 miles:

> To all my friends here at Rvnet[:]
>
> I see my issues with my fuel system have traveled to Rvnet. I would have started a thread earlier in the saga but have been very busy. This should have been a simple situation to fix. It has turned into a circus.
>
> Here is the link to the story. It has escalated into an epic event:
>
> http://www.ford-trucks.com/forums/1099978-painful-an-update.html
>
> I wanted to know the facts of the failure before I brought the story here. I wanted to keep rampant speculation and unnecessary commentary out of the discussion. It is really an unfortunate turn of events. The cliff's notes version is as follows:
>
> Truck quit like the key was turned off. It was a Saturday[.]
>
> Ford Roadside assistance towed it to the nearest open Ford facility[.]
>
> This dealer began the service work late on Monday morning.
>
> According to them their diagnostics led them to replace the fuel rail pressure sensor. After waiting a day for the part...still no start[.]
>
> According to them, further diagnostics then led them to the fuel injection control module. The part will be in on Friday afternoon and we will get it out the door before we close...wrong again.
>
> There has been no mention of contaminated fuel up to this point. This is a huge deal because fuel samples should have been taken before any fuel system work was attempted. Now the dealer has 3 days of work where he can not recover any warranty money. Anyone see what's coming?
>
> Now the dealership dance starts. They claim fuel contamination and tell me I am paying. On Monday, they contacted the Ford tech hotline with an exaggerated story about water in the fuel.
>
> I called Ford customer care. After 2.5 hours of discussion over the course of Monday afternoon, I was summarily dismissed with the admonition that the bill for the repairs would be mine. My request to talk to an upper level customer service manger was refused.

I removed the truck from the non servicing dealer. I can not tell you how much fun that was. I had it towed 75 miles to my servicing dealer.

They have begun work on the truck. There is no evidence of water penetration beyond the water separator/primary fuel filter. There was less than 2 ounces of water removed from the separator...if that is where it actually was found...they captured the sample in used drinking water bottles. The under hood secondary filter shows no evidence of ever having water in it. The parts they said were damaged with rust have no signs of rust.

The high pressure fuel pump is toast. There is no evidence present showing water contamination...or any other form of contamination.

Now we wait for the Ford Field Service Engineer.

. . . . I am not confident at all that this will be resolved in a fashion that makes me whole."[31]

71.     Then, the following day, this same user posts an update:

Well, another day has slipped by in my ongoing attempt to get my truck fixed under warranty. It has been 12 days since the truck quit. There have been some developments.

First, my dealer has decided that this is unquestionably a warranty repair. His repair and service records on the truck indicate no history of water being found in the separator when they worked on the truck. There can be no long term water presence to do the type of damage that the non servicing dealer tried to claim. Ford technical documents with pictures showing the type of water and rust damage required to void warranty show parts exponentially more damaged than one might expect. My parts show no such damage.

The Ford tech hotline is not cooperating with my dealer. They have refused to send out a Field Service Engineer . . . ."[32]

72.     Five years later, this same F-350 owner posts again to his original "Open Roads"

enthusiasts forum now that the CP4 issue has gone viral, stating the following (after summarizing

his 2011 debacle):

---

[31]  *My Big Ford Drum is Broke*, RV.NET, Sept. 21, 2011, available at http://www.rv.net/forum/index.cfm/fuseaction/thread/tid/25428988.cfm (last accessed Nov. 28, 2018).
[32]  *Id.*

"The real cost to fix this problem, at least with Ford, is over $10,000...my repair was $10,300.00...and if you do not make these repairs to Ford's specification (replace everything but the tank) the engine warranty is flagged[)]. [S]eeing that Ford does not fix many of them under warranty anyway rends that position moot[.]

"I close this missive with a comment made to me during my Ford ordeal by the lead engineer at Ford for the 6.7 engine project...paraphrasing for brevity...'I was at Bosch the other day. I walked by two pallets full of failed CP4 pump returns...one Ford and one GM...looked about the same size pile of each...'"[33]

73.     In a similar vein, on August 1, 2016, the owner of a 2015 Ford F-350 Supercab

submitted the following complaint to NHTSA regarding the defective condition:

> "2015 F350 6.7 DIESEL WITH 46,000 MILES THAT IS DOWN BECAUSE HPOP IS DEFECTIVE AND SPREADING MEDAL THROUGH SYSTEM. FORD HAS INSPECTED AND SAID IT IS BECAUSE OF WATER IN FUEL, EVEN THOUGH NO WARNING LIGHTS OR CODES ARE AVAILABLE. FORD PULLED SENSORS OUT OF ENGINE AND REJECTED REPAIR BECAUSE OF TARNISH ON SENSORS. THE ONLY CODES WERE FOR (LOW FUEL PRESSURE & REDUCED POWER). NO OTHER CODES. INITIAL INSPECTION REVEALED ABOUT 3/4 INCH OF WATER IN WATER SEPARATOR BUT NO LIGHT OR CODE. THE WARNINGS OCCURRED WHEN TRUCK WAS STARTED AND IT RAN ABOUT 100 FT BEFORE BEING SHUTDOWN AND TOWED TO DEALERSHIP. THIS APPEARS TO BE A COMMON PROBLEM SINCE FORD OFFERS A REPAIR KIT FOR THIS ISSUE. TOTAL COST OF REPAIR IS BETWEEN $9500,00 & $12,500 DOLLARS AND THIS ON A TRUCK WHICH IS STILL UNDER WARRANTY THAT FORD WILL NOT HONOR. THE TRUCK WASN'T A YEAR OLD UNTIL MAY 2016 AND HAS BEEN DOWN FOR OVER FOUR MONTHS BECAUSE FORD WILL NOT REPAIR. THIS IS THE BOSCH C4 SERIES PUMP. *BF *TR"[34]

---

[33] *2011 Duramax and up fuel pump problems*, OPEN ROADS FORUM, Jan. 22, 2016, available at http://198.1.26.240/index.cfm/fuseaction/thread/tid/28726814/print/true.cfm (last accessed Nov. 28, 2018) (ellipses in original).
[34] NHTSA ID No. 10892303.

74.     Indeed, Ford is notorious for blaming consumers for this catastrophic failure and blatantly refusing to take responsibility for its own defective vehicle design.  By way of example, see the following non-exhaustive list of complaints that consumers have filed with NHTSA regarding the same exact CP4-fueled issue occurring over and over again in Ford diesel vehicles:

- Mar. 21, 2014, 2013 Ford F-250 Supercab customer complaint filed with NHTSA:

  > "HAD CHECK ENGINE LIGHT COME ON. BROUGHT TO FORD SERVICE 3 TIMES. THE LAST TIME THEY QUOTED ME 11,145 TO FIX SAYING WATER WAS IN FUEL. I THOUGHT IT WAS UNDER WARRANTY, WHICH THEY CLAIM IT IS NOT. MY INSURANCE COMPANY SENT BY AN ENGINEER, WHICH HE SENT FUEL TO INDEPENDENT LAB. FUEL RESULTS CAME BACK NEGATIVE FOR EXCESSIVE FUEL. TRUCK HAS BEEN AT SERVICE CENTER FOR 1 MONTH, WITH NO RESULTS. *TR"[35]

- Jan. 9, 2014, 2013 Ford F-250 Supercab customer complaint filed with NHTSA:

  > "VEHICLE STALLED AND STOPPED RUNNING IN TRAFFIC ON HIGHWAY 231 IN MONTGOMERY AL. . . . CALLED FORD ROADSIDE ASSIST. I HAVE 125K EXTENDED WARRANTY AND HAD VEHICLE TOWED TO NEAREST FORD DEALERSHIP . . . . VEHICLE WAS DIAGNOSED WITH 'EVIDENCE OF WATER IN FUEL SYSTEM[.'] THERE WAS NO WATER PRESENT IN SYSTEM, NO 'WATER IN FUEL SYSTEM' WARNING LIGHT HAS [EVER] LIT UP ON THIS VEHICLE, HAD IT CHECKED IN THE PAST, WAS TOLD WAS FUNCTIONAL, WAS TOLD REPAIRS WERE 'NOT COVERED' . . . . THE REPAIRS ARE MORE THAN I CAN AFFORD FOR A TRUCK THAT IS UNDER WARRANTY. THIS IS CLEARLY A SYSTEM FAILURE. *TR"[36]

- Feb. 12, 2014, 2011 Ford F-350 Supercrew customer complaint filed with NHTSA:

  > "THE ENGINE LIGHT CAME ON TODAY IN MY 2011 F350 DIESEL. DEALER SAYS DEF PUMP ERROR CODE. DEALER SAYS NO PUMPS AVAILABLE UNTIL 03/15/2014. I THINK FORD SHOULD ISSUE A SERVICE BULLETIN. DEALER SAYS NO WARRANTY. DEALER STATES TRUCK WILL SHUT DOWN AT ANY TIME. THIS SHOULD BECOME A RECALL        ISSUE        WITH        THE        NHTSA.

---

[35] NHTSA ID No. 10576017.
[36] NHTSA ID No. 10559221.

OWNERS OF THESE TRUCKS TOW TRAILERS FREQUENTLY WITH LENGTHS IN EXCESS OF 36'. HAVING A TOW VEHICLE SHUT DOWN IN TRAFFIC AT HIGHWAY SPEEDS IS EMINENTLY DANGEROUS AND WILL CAUSE FATALITIES
REFER TO NHTSA CAMPAIGN NUMBER: 13V535000 ON SIMILAR VEHICLES. *TR"[37]

- May 23, 2014, 2011 Ford F-350 Supercrew customer complaint filed with NHTSA:

"THIS DIESEL TRUCK WAS BEING DRIVEN AT 20 MPH WHEN WITHOUT ANY WARNING, THE ENGINE SHUT OFF RESULTING IN LOSS OF ALL POWER STEERING AND BRAKES. WOULD NOT RESTART. TOWED TO DEALER SERVICE. DEALER DIAGNOSED LACK OF FUEL PRESSURE AND THEY OBSERVED METAL SHAVINGS IN THE LOWER FILTER INDICATING THE HPFP WAS DISINTEGRATING. DEALER SUBMITTED PICTURES OF THE FLOW CONTROL VALVE TO FORD WARRANTY PRIOR APPROVAL PER SERVICE MANUAL DIRECTIONS. DEALER OBSERVATION WAS THAT THEY OBSERVED NO SIGNIFICANT WATER OR DEBRIS CONTAMINATION IN THE FUEL FILTER. PRIOR APPROVAL RESPONSE WAS THAT THE PICTURES SUBMITTED WERE REPRESENTATIVE OF FUEL CONTAMINATION AND DENIED THE WARRANTY COVERAGE FOR THE REPAIR. NO WATER IN FUEL INDICATION WAS EVER SEEN BY OWNER. FILTERS MAINTAINED PER MAINTENANCE SCHEDULE. BILL FOR REPAIR IS ESTIMATED AT APPROX $11,000. "TWO WEEKS PRIOR, THIS VEHICLE WAS TOWING A 14K LB 5TH WHEEL DOWN THE SANTIAM PASS IN OREGON. STEEP INCLINES, SHARP DROP OFFS, AND SNOW ON THE ROAD. A SUDDEN LOSS OF POWER WITHOUT WARNING WOULD VERY LIKELY HAVE RESULTED IN LOSS OF CONTROL OF THE VEHICLE, SEVERE BODILY INJURY, OR DEATH. IT APPEARS THE BOSCH CP4 FUEL PUMP WAS NOT DESIGNED TO OPERATE WITH THE 560 SCAR FUEL LUBRICITY OF US FUELS AND THAT FORD IS BLAMING PUMP FAILURES ON WATER CONTAMINATION BY OBSERVATION OF A CORROSION APPEARANCE ON ANOTHER COMPONENT. WARRANTY COVERAGE WAS DENIED WITHOUT ANY OBSERVATION OF THE FUEL PUMP ITSELF. NOTE THAT NO INDICATION THAT ANYTHING WAS WRONG WITH THE TRUCK WAS OBSERVED PRIOR TO THE FAILURE. THE TRUCK IS EQUIPPED WITH A FACTORY 5TH WHEEL HITCH AND IS

---

[37] NHTSA ID No. 10563967.

INTENDED TO HAUL UP TO 21.5K LB TRAILERS. SUDDEN LOSS OF POWER STEERING AND BRAKES WITHOUT WARNING UNDER THIS INTENDED USE IS EXTREMELY DANGEROUS. *TR"[38]

- Aug. 14, 2014, 2013 Ford F-350 Supercrew customer complaint filed with NHTSA:

  "I WAS DRIVING IN MY NEIGHBORHOOD AT ABOUT 25 MPH AND THE ENGINE QUIT, AND WOULD NOT RESTART!! [. . . ] THE TRUCK HAD TO BE TOWED TO THE DEALER AND IT HAS [BEEN] THERE FOR OVER A WEEK AND THEY CALLED YESTERDAY AND TOLD ME THERE WERE METAL SHAVINGS IN THE FUEL PUMP AND I DO NOT KNOW IF THE METAL SHAVINGS GOT INTO THE OIL SYSTEM TO RUIN THE ENGINE!! *TR"[39]

- Dec. 9, 2014, 2012 Ford F-250 Supercrew customer complaint filed with NHTSA:

  "TL* THE CONTACT OWNS A 2012 FORD F-250 SD. THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 63 MPH, THE REDUCED POWER AND THE CHECK ENGINE WARNING LIGHTS ILLUMINATED. THE VEHICLE WAS TOWED TO A SECOND DEALER, WHO DIAGNOSED THAT THERE WAS AN UNKNOWN SUBSTANCE IN THE FUEL TANK. THE VEHICLE WAS NOT REPAIRED . . . . THE APPROXIMATE FAILURE MILEAGE WAS 18,877."[40]

### E. Supposed "Remedies" are Insufficient and Costly.

75.     Because of its incompatibility with U.S. diesel fuel, CP4 pumps and corresponding fuel injection systems, even when replaced or "fixed," will continue to fail in the Class Vehicles. Indeed, in a June 2010 email chain between Bosch and representatives of Audi and Volkswagen regarding the catastrophic failure of a CP4 pump in a 2010 Audi A3 TDI, Audi asked Bosch, "[W]hy are the defects mentioned below still present after replacing the high-pressure pump and the injector? What could the [dealer] have done wrong by way of incorrect repair so that such

---

[38] NHTSA ID No. 10593571.
[39] NHTSA ID No. 10622326.
[40] NHTSA ID No. 10663076.

defects are appearing?" Bosch responded that "In this case the complete fuel system (HPP, rail, injectors, **all** lines) need to be changed . . . .  I assume that because of the 'cruncher,' the entire system is contaminated with chips, which are then pumped in circulation and can soon lead to the next failure! The rough running can be explained by the fact that a chip is already present before or in the injector and is impairing its function."[41]

76.     The Bosch CP4 Pump problem is so prevalent that several independent parts suppliers now provide kits to mitigate the inevitable harm.  "Disaster Preventer Kits" or "bypass kits" usually refer to a fuel bypass system that does not prevent the failure, the loss of the expensive injection pump, or the need to clean metal shavings from the fuel system.  But these kits are designed to redirect the lubricating fuel for the CP4 back to the fuel tank, so that it will be filtered before it returns to the engine.  The bypass kit directs the fuel contaminated with metal shavings into the gas tank, which is less expensive to clean than the engine and high-pressure fuel system— in other words, a Band-Aid solution. These bypass kits are also less expensive than more complete remedies, requiring only $300-$400 in parts, and are marketed as having the ability to "[k]eep[] injectors/rails safe from CP4 pump failure debris."[42] Many consumers have turned to this sort of remedy preemptively due to the known impending failures their vehicles are facing.

77.     Another method of addressing the Bosch CP4 Pump failure is to modify the Class Vehicles to return to the older, more reliable technology of simply using more fuel. With Power Stroke engines, the strategy may be simply to buy a predecessor CP3 pump from an independent automotive parts vendor and install it in place of the Bosch CP4 Pump.  Indeed, the CP4 pump is

---

[41] March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 79-80 (Jun. 7-9, 2010 email chain between Bosch, Audi, and Volkswagen representatives regarding CP4 fuel pump failure falsely attributed to "misfuel").

[42] Online sales listing for "Ford 6.7 CP4.2 bypass kit (2011+)," S&S DIESEL MOTORSPORT, available at https://ssdiesel.com/shop/all/ford-6-7-cp4-2-bypass-kit-2011/ (last accessed Nov. 13, 2018).

so substandard that many Class Vehicle owners have opted to replace their CP4 pumps with CP3 pumps at a cost of at least $3,000 per vehicle for the replacement parts alone.[43] Resorting to this "remedy" fails to make consumers whole because they are not getting the fuel efficiency promised with the Bosch CP4 Pump, and for which they paid a premium. Further, consumers are having to pay thousands of dollars out of pocket to essentially redesign a design flaw that was intentionally implemented by Ford in the Class Vehicles.

78. Another potential "remedy" is to leave the CP4 in place on the Class Vehicle, but install a lift pump, a second pump to assist the Bosch CP4 Pump and increase the fuel pressure. But, again, this "remedy" deprives consumers of the fuel-efficiency for which they paid a premium.

79. The lift pump and CP3 pump options remedy part of the problem by pumping and burning more fuel. So, in addition to the expense of buying a new fuel injection pump, the "remedies" would require owners to purchase more fuel.

80. A fourth way to mitigate the damage is to spend money for fuel additives to increase the lubricity of the fuel. This approach may work best in conjunction with the previously discussed modifications, but even by itself, it can be expensive.

81. In short, there is no known way to remedy or mitigate CP4 pump failure without decreasing the fuel efficiency promised to Plaintiffs and other Class members and without significant expense to Plaintiffs and other Class members.

**F. Ford Knew Durability and Superiority Were Material to Consumers and Made Hollow Promises of Durability and Superiority.**

---

[43] *See*, *e.g.*, http://www.engineered-diesel.com/lml-duramax-cp3-conversion-kit-with-re-calibrated-pump-50-state-carb-certified (selling "LML Duramax CP3 Conversion Kit with re-calibrated Pump[s]" for $3,000.00 and noting that the "[k]it is designed to replace the less reliable CP4 that comes stock on the LML").

82.     Ford's 2011 Super Duty truck brochures for the 6.7L Power Stroke engine equipped vehicles emphasized the "impressive fuel economy" and "DURABILITY: Super duty is built to the extremely high standards of durability and reliability you'd expect in a full-size pickup that's Built Ford Tough."[44]

83.     This same brochure also touted how the 2011 Ford Super Duty's 6.7L Power Stroke diesel engine provided the "BEST DIESEL fuel economy, power and torque IN THE CLASS," with a "**20% IMPROVEMENT IN FUEL ECONOMY** over the previous model, making it the best in its class:"[45]

---

[44]     2011     Ford     Super     Duty     Brochure,     at     2,     available     at https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2011&postalCode=55401 (last accessed Nov. 15, 2018).

[45] *Id.* at 5.



## 6.7L V8 DIESEL PERFORMANCE

**14% MORE PEAK HP** and **23% MORE PEAK TORQUE**, at lower rpm, than its predecessor.



**A** **ALUMINUM CYLINDER HEADS** with precision dual water jackets reduce weight and improve cooling.

**B** **CLASS-EXCLUSIVE INBOARD EXHAUST AND OUTBOARD AIR INDUCTION** architecture helps reduce turbo lag.

**C** **COMMON-RAIL FUEL INJECTION SYSTEM**, operating at nearly 30,000 psi, uses precise control to provide optimum power, efficiency and noise, vibration and harshness (NVH) performance.

**D** **CLASS-EXCLUSIVE SINGLE-SEQUENTIAL TURBOCHARGER** uses the compact, efficient design of a dual-sided compressor wheel to help deliver maximum power quickly.

- **ENGINE-EXHAUST BRAKING** helps provide better grade descent control with less brake and transmission wear and tear. Fully integrated with tow/haul mode, it provides increased engine braking at higher engine speeds.

- **LOWEST NVH IN THE CLASS** with a notably quieter, more refined sound than ever before – the result of meticulous attention paid to the designs of the combustion system, the engine block and the turbocharger.

- **CLEANEST SUPER DUTY DIESEL EVER** reduces nitrogen oxide (NOx) levels by more than 80% compared to last year.

# BEST DIESEL
## fuel economy,
## power and torque
# IN THE CLASS.

## Ford 6.7L Power Stroke® V8 Turbo Diesel.

Designed, engineered and built by Ford, this heavy-duty diesel helps Super Duty® deliver up to a **20% IMPROVEMENT IN FUEL ECONOMY** over the previous model, making it the best in its class.[1] It also gives you best-in-class horsepower and torque. We're talking **400 HP** and a massive **800 LB.-FT. OF TORQUE**. That's a game-changing combination. And this **B20-CAPABLE** engine has already proven itself in over 10 million miles of cumulative testing. It's the **MOST TESTED POWER STROKE DIESEL ENGINE EVER**.

[1]Based on Ford drive-cycle tests of comparably equipped 2011 Ford and 2010/2011 competitive models.

**2011** **SUPER DUTY**®

ford.com



84. Ford similarly touted its 2012 Super Duty 6.7L Power Stroke diesel trucks as "delivering up to a 20% improvement in fuel economy over the previous generation, making it the best in its class:"[46]







---

[46] 2012 Ford Super Duty Brochure, at 7, available at https://www.thoroughbredford.com/PDF-Vehicles/2012/2012-SuperDuty.pdf (last accessed Nov. 15, 2018).

85.     Similarly, in its advertising materials for the 2013 Ford Super Duty 6.7L Power Stroke diesel truck, Ford noted that, "This Super Duty® has endured more torture testing than any previous generation of Ford Truck—including over 10 million cumulative miles on the most tested Power Stroke® diesel engine ever."[47]

86.     The brochure specifically touts Ford's 2013 6.7L Power Stroke Diesel truck as having "[b]est-in-class horsepower, torque and fuel economy," explaining that the truck "delivers 400 hp, 800 lb.-ft of torque, and up to a 20% improvement in fuel economy over the previous generation, making it the best in its class[:]"[48]

---

[47] 2013 Ford Super Duty Brochure, at 4, available at https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2013&postalCode=11738 (last accessed Nov. 15, 2018).
[48] *Id.* at 5.



## DIESEL BEATS THE COMPETITION 3 TIMES OVER.

Best-in-class horsepower, torque and fuel economy.¹ The 6.7L Power Stroke® V8 Turbo Diesel gives you all 3. With this advanced engine, Super Duty® delivers 400 hp, 800 lb.-ft. of torque, and up to a 20% improvement in fuel economy over the previous generation, making it the best in its class. Designed, engineered and built by Ford, the 6.7L features many innovative details including aluminum cylinder heads with precision dual water jackets that help minimize weight and maximize cooling. It's also the most tested Power Stroke diesel ever. This B20-capable engine has proven itself in over 10 million miles of cumulative testing under extreme conditions from 120°F scorching heat to -40°F bone-chilling cold. It's Built Ford Tough.®

**Cleanest Super Duty diesel ever.** This engine generation utilizes industry-proven technology and innovative Ford strategies to meet the latest federal emissions standards — reducing nitrogen oxide (NOx) levels by more than 80% compared to the previous-generation diesel. For your part, just watch for a low diesel exhaust fluid (DEF) alert in the vehicle's message center, then locate the blue DEF fill cap and replenish the DEF supply. The reservoir holds 5 gallons of Ford-approved DEF, which can be purchased from your Ford Dealer or other authorized retailers.

**Delivers maximum power quickly.** The diesel engine's class-exclusive single-sequential turbocharger features the compact, efficient design of a dual-sided compressor wheel.

**Powers upfits any time the engine's running.** Whether you're in motion or at a complete stop, you can power your upfits with the diesel and our class-exclusive live-drive power take-off (PTO) provision.² It keeps the job going with an output gear linked directly to the engine crankshaft.

**Standard TorqShift® 6-speed SelectShift Automatic.³** This rugged transmission is also designed, engineered and built by the Ford powertrain team. Its torque converter includes low-speed lockup capability (down to 900 rpm), which enables the engine to run efficiently at lower rpm. The high-strength sinter-metal carrier, with its patented Ford rocker one-way clutch, easily handles the extreme low-end torque of the diesel engine, as well as the high speeds of the gas engine. Plus, a high-capacity, high-efficiency fluid filter extends your fluid- and filter-change intervals up to 150,000 miles.



¹Based on Ford drive-cycle tests of comparably equipped 2011/2012 Ford and 2011/2012 competitive models. ²Available feature.

2013 **SUPER DUTY®**
ford.com

87.     Once again, in 2014, Ford proclaimed that its 6.7L diesel Power Stroke was "[t]he diesel leader on 3 fronts," including "[b]est-in-class fuel economy[,] [b]est-in-class 400

horsepower[,] [a]nd best-in-class 800-lb.-ft. of standard torque," with "innovative details that contribute to its durability:"[49]



88.    In its 2015 Super Duty brochure, Ford proclaimed that the 6.7L Power Stroke diesel truck had been "[p]roven in over 12 million miles of cumulative testing and real-world use under extreme conditions," making it "the most tested Power Stroke diesel ever:"[50]

---

[49]    2014    Ford    Super    Duty    Brochure,    at    4,    available    at http://cdn.dealereprocess.net/cdn/brochures/ford/2014-f250superduty.pdf (last accessed Nov. 15, 2018).

[50]    2015    Ford    Super    Duty    Brochure,    at    4,    available    at https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2015 (last accessed Nov. 15, 2018).



## DO MORE THAN EVER WITH THE DIESEL LEADER.

Designed, engineered and built by Ford, our Second-Generation 6.7L Power Stroke® V8 Turbo Diesel engine³ produces more power and torque than ever.

**Its 860 lb.-ft. of torque and best-in-class 440 hp** are facilitated in part by a new larger turbocharger, which helps improve airflow and performance. You'll really appreciate it when towing heavy loads uphill and at high altitudes.

**Best-in-class diesel fuel economy**² is maintained with the help of new high-pressure fuel injectors that achieve a more efficient, cleaner burn.

**Proven in over 12 million miles** of cumulative testing and real-world use under extreme conditions, this B20-capable engine is the most tested Power Stroke diesel ever. From 120°F scorching heat to -40°F bone-chilling cold. Rest assured, it's Built Ford Tough.®



89.    In Ford's 2016 Super Duty brochure, Ford touted its 6.7L Power Stroke diesel trucks by proclaiming that, "**Best-in-class diesel fuel economy** is maintained with the help of high-pressure fuel injectors that achieve a clean, efficient burn:"[51]

---









90.    The following year, Ford proclaimed that its 2017 6.7L Power Stroke diesel truck was "the strongest [] yet" and "[t]he most tested Power Stroke diesel ever," with "class-best 925 LB.-FT. torque" and "unsurpassed diesel fuel economy:"[52]

---

[52] 2017 Ford Super Duty Brochure, at 7, available at https://www.ford.com/services/assets/Brochure?bodystyle=Truck&make=Ford&model=SuperDuty&year=2017 (last accessed Nov. 15, 2018).



91.    For the 2018 model year, Ford promised consumers that its 6.7L Power Stroke

diesel trucks would "deliver [the Super Duty's] highest combination of horsepower and torque

ever."[53]  Ford further noted that its "twin -pilot injection delivers smooth, quiet acceleration," and

that the trucks' "large fuel tanks—up to 48 gallons maximum—help extend driving range."[54]  Most

ironically, though, Ford bragged that the "strength and integrity of the 6.7L diesel is maintained

by a masterful mix of component materials," and that the truck has "excellent throttle response. . .

delivered in part by a high-pressure, common rail fuel injection system. . . [with] plezo-controlled

fuel injectors provid[ing] precise injection [and] superior fuel atomization:"[55]

---

[53] 2018 Ford Super Duty Brochure, at 8, available at
https://www.ford.com/services/assets/Brochure?bodystyle=Truck&make=Ford&model=SuperD
uty&year=2018 (last accessed Nov. 15, 2018).
[54] Id.
[55] *Id*.



92. Ford also provided an express five-year/100,000-mile warranty for the 6.7L Power Stroke diesel engine trucks.[56]

93. Ford also represented to Ford Power Stroke diesel consumers that, with respect to the 2011–present 6.7L Power Stroke diesel engine, "You may operate your vehicle on diesel fuels containing up to 20% biodiesel, also known as B20,"[57] and provided further directions for which

---

[56] *See, e.g.*, 2015 Ford Super Duty Brochure, at 24, available at https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2015 (last accessed Nov. 15, 2018).

[57] *See* 2018 Ford Super Duty Owner's Manual, Section entitled, "Fueling and Refueling: FUEL QUALITY—DIESEL," at 189, available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2018-Ford-250-350-450-450-Owners-Manual-version-1_om_EN-US-EN-CA_10_2017.pdf (last accessed Nov. 26, 2018) ("You should use Ultra-Low Sulfur Diesel fuel (also known as ULSD) designated as number 1-D or 2-D with a maximum of 15-ppm sulfur in your diesel vehicle"); 2017 Ford Super Duty Owners Manual, Section entitled, "Fueling and Refueling," at 188, available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2017-Super-

diesel fuel to use if *not* in North America—indicating Ford's obvious expectation that the Class Vehicles would be filled with American diesel fuel.

94. Nevertheless, Ford has refused to honor its warranties, deviously claiming that the metal shavings caused by the failures of their pump design voided the warranty because they also caused fuel contamination.[58]

**G. Ford Designed, Manufactured and Sold Vehicles it Knew Would Experience Catastrophic Failures Which Form Would Not Honor Under Its Warranties.**

95. Despite the clear mis-match between the Bosch CP4 Pump and American diesel fuel, Ford has cleverly passed the $8,000.00–$20,000.00 cost of failure along to the consumer. Moreover, Ford's agents, specifically its dealerships, are determining that CP4 pump failures are not under manufacturer warranty. The logic is that when a European-designed CP4 pump mists internal diesel engine components, its innate incompatibility with less American diesel produces

---

Duty-Owners-Manual-version-1_om_EN-US_06_2016.pdf (last accessed Nov. 26, 2018) (stating same); 2016 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Fuel and Refueling," at 18–19, available at
http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2016-Ford-6.7L-Diesel-F-250-550-Supplement-version-1_60l6d_EN-US_04_2015.pdf (last accessed Nov. 26, 2018) (stating same); 2015 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Fuel and Refueling," at 18, available at
http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2015-Ford-6.7L-Diesel-F-250-550-Supplement-version-1_60l6d_EN-US_02_2014.pdf (last accessed Nov. 26, 2018) (stating same); 2014 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Fuel and Refueling," at 17, available at
 http://www.fordservicecontent.com/Ford_Content/catalog/owner_guides/1460l6d1e.pdf (last accessed Nov. 26, 2018) (stating same); 2013 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Fuel and Refueling," at 15, available at https://dmna.ny.gov/nynm/manuals/Ford_F_350_Owners_Manual_2013_Diesel_Supplement.pdf (last accessed Nov. 26, 2018) (stating same); 2012 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Maintenance and Specifications," at 21-22, available at http://www.fordservicecontent.com/Ford_Content/catalog/owner_guides/1260l6d1e.pdf (last accessed Nov. 26, 2018) (stating same); 2011 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Maintenance and Specifications," at 21-22, available at http://www.fordservicecontent.com/Ford_Content/catalog/owner_guides/1160l6d1e.pdf (last accessed Nov. 26, 2018) (stating same).
[58] *See, e.g.*, *supra* ¶ 72 (detailing how Ford has repeatedly refused to cover damage caused by CP4 pump implosion under warranty).

damaging levels of metal-on-metal friction, launching metal debris into the high-pressure fuel system and the engine. Warranties do not cover the use of contaminated fuel. Because the fuel is now contaminated with metal from the pump, the repairs are for fuel contamination and are not covered by the warranties.

96.     Ford induced Plaintiffs and other Class members to pay a premium for increased durability, performance and fuel efficiency, with a design it has long known would cause fuel contamination—a condition Ford now uses to absolve itself of the catastrophic and costly consequences to Plaintiffs and other Class members.

## V. TOLLING OF THE STATUTE OF LIMITATIONS

97.     As of the date of this Complaint, Ford continues to market its vehicles based on superior durability, performance, and fuel efficiency, despite their knowledge that the Class Vehicles are defective and have failed or will fail. In fact, Ford still has not disclosed and continues to conceal that the Class Vehicles are defective, incompatible with American diesel fuel, and will experience catastrophic and costly failure.

98.     Until shortly before the filing of this Complaint, Plaintiffs and other Class members had no way of knowing about Ford's wrongful and deceptive conduct with respect to their defective Class Vehicles.

99.     With respect to Class Vehicles that have not experienced a catastrophic CP4 pump failure, Plaintiffs and other Class members did not discover and could not reasonably have discovered that their Class Vehicles are defective, that their Class Vehicles are out of specification and incompatible with American diesel fuel, that this incompatibility has resulted in the breakdown of fuel components and contamination of fuel caused by the defective CP4 fuel pump, that their CP4 fuel pumps will fail, that the durability and performance of their Class Vehicles is impaired by this defect and incompatibility and that such durability and performance is far less than Ford

promised, or that, as a result of the foregoing, they overpaid for their vehicles, the value of their vehicles is diminished, and/or their vehicles will require costly modification to avoid a catastrophic even more costly failure, and that any such modifications will impair other qualities of the Class Vehicles that formed a material part of the bargain between the parties in the purchase of the Class Vehicles by Plaintiffs and other Class members.

100.    With respect to Class Vehicles that have experienced a catastrophic CP4 pump failure prior to the filing of this Complaint, Plaintiffs and other Class members did not discover and could not reasonably have discovered that their CP4 pump failure was due to a defect known to Ford or that such failure was due to an incompatibility between the Class Vehicle and the fuel intended by Ford to be used in the Class Vehicles.

101.    Within the time period of any applicable statutes of limitation or repose, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Ford were concealing the conduct complained of herein and misrepresenting the defective nature of the Class Vehicles.

102.    Plaintiffs and other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect that Ford did not report information within their knowledge to consumers, dealerships or relevant authorities; nor would a reasonable and diligent investigation have disclosed that Ford were aware of the non-conforming and defective nature of the CP4 fuel pump and the Class Vehicles in which it was incorporated.  Plaintiffs only learned of the defective nature of the CP4 fuel injection pump and their vehicles and of Ford's scheme to design and sell such non-conforming and defective fuel pumps and vehicles only shortly before this action was filed.

103.     All applicable statutes of limitation and repose have also been tolled by Ford's knowing, active, and fraudulent concealment, and denial of the facts alleged herein throughout the time period relevant to this action.

104.     Instead of disclosing the defective nature of the CP4 fuel pumps to consumers, Ford falsely represented that CP4 pump failure in the Class Vehicles was caused by Plaintiffs' or other Class members' conduct or by the use of contaminated fuel.

105.     In reality, Ford's conduct in designing, manufacturing, marketing or selling Class Vehicles for use with American diesel fuel, with which Defendants knew the Class Vehicles were incompatible, causes the "fuel contamination" that ultimately leads to CP4 pump failure.

106.     Ford, with the purpose and intent of inducing Plaintiffs and other Class members to refrain from filing suit, pursuing warranty remedies, or taking other action with respect to Ford's conduct or the Class Vehicles, fraudulently concealed the true cause of CP4 pump failure by blaming Plaintiffs, Class members and/or contaminated fuel when Ford, even before the design, manufacture or sale of the Class Vehicles, knew that the defective nature of the Bosch CP4 Pump would and has caused fuel contamination and resulting CP4 pump failure.

107.     Ford was under a continuous duty to disclose to Plaintiffs and other Class members the true character, quality and nature of the durability and performance of Class Vehicles, the ongoing process of fuel contamination in Class Vehicles, CP4 pump failure, and the true cause of CP4 pump failure.  Instead, Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the foregoing facts.  As a result, Ford is estopped from relying on any statutes of limitation or repose as a defense in this action.

108.     For the foregoing reasons, all applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Ford's fraudulent concealment with respect to all claims against Ford; and, Ford is estopped from asserting any such defenses in this action.

## VI. CLASS ACTION ALLEGATIONS

109.     Throughout this Complaint, "Class Vehicle" is defined as any Ford vehicle fitted at any time with a Bosch CP4 fuel pump.

110.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following presently known class (collectively, the "Class"):

> All persons or entities in the state of Texas who are current or former owners and/or lessees of 2011–present model year Ford diesel vehicles equipped with a Power Stroke 6.7L engine and/or CP4 fuel injection pump system.

111.     Excluded from the Class are individuals who have personal injury claims resulting from a CP4 fuel injection pump failure. Also excluded from the Class are Ford and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any entity in which Ford has a controlling interest. In addition, Governmental entities and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff are excluded from the Class. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

112.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

113.     The Class Representatives are asserting claims that are typical of claims of the Class, and they will fairly and adequately represent and protect the interests of Class in that they have no interests antagonistic to those of the putative Class members.

114.     The amount of damages suffered by each individual member of the Class, in light of the expense and burden of individual litigation, would make it difficult or impossible for

individual Class members to redress the wrongs done to them. Plaintiffs and other members of the Class have all suffered harm and damages as a result of Ford's unlawful and wrongful conduct. Absent a class action, Ford will likely not have to compensate victims for Ford's wrongdoings and unlawful acts or omissions, and will continue to commit the same kinds of wrongful and unlawful acts or omissions in the future (indeed, upon information and belief, Ford continues to manufacture diesel-engine vehicles with the ticking time-bomb that is the CP4 pump to this day).

115. **Numerosity under Federal Rule of Civil Procedure 23(a)(1):** The Class is so numerous that individual joinder of all of its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class Plaintiffs is at least in the thousands, and are numerous and geographically dispersed across Texas. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, as well as by the notice Class members will receive by virtue of this litigation so that they may self-identify. The disposition of the claims of Class members in a single class action will provide substantial benefits to all Parties and the Court. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The number of persons for whom this action is filed who are citizens of Texas effectively exhausts the membership of the class, with the potential exception of some few, but unknown, transients in Texas or residents of Texas who happen to be citizens of other states.

116. **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):** This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

    a.    Whether Ford engaged in the conduct alleged herein;

b.      Whether Ford knew about the CP4 defect and the inherent problems related thereto when said component part is used with American diesel fuel, and if so, how long Ford knew or should have known as much;

c.      Whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed the defective Class Vehicles into the stream of commerce in the United States;

d.      Whether the Ford diesel engine systems that are the subject of this complaint are defective such that they are not fit for ordinary consumer use;

e.      Whether Ford omitted material facts about the quality, durability, fuel economy, and vehicle longevity of the Class Vehicles;

f.      Whether Ford designed, manufactured, marketed, and distributed Class Vehicles with defective or otherwise inadequate fuel injection systems;

g.      Whether Ford's conduct violates Texas consumer protection statutes, and constitutes breach of contract or warranty and fraudulent concealment/omission, as asserted herein;

h.      Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

i.      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, what amount.

117.    **Typicality under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs' claims are typical of the other Class members' claims because all have been comparably injured through Ford's wrongful conduct as described above.

118.    **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent.  Additionally, Plaintiffs have retained

counsel with substantial experience in handling complex class action and multi-district litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

119. **Superiority of Class Action under Federal Rule of Civil Procedure 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The financial detriment suffered by Plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford. Accordingly, it would be impracticable for the members of the Class to individually seek redress for Ford's wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### VII. CAUSES OF ACTION
### CLAIMS BROUGHT ON BEHALF OF THE CLASS
### AND ON BEHALF OF THE NAMED PLAINTIFFS

### COUNT I
### FRAUD BY OMISSION/MISREPRESENTATION

120. Plaintiffs re-allege and incorporate Paragraphs 1 through 119 as though fully set forth herein.

121. Plaintiffs bring this Count individually and on behalf of the Class against Defendant Ford.

122. As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

123. As alleged above, Ford intentionally concealed and suppressed material facts concerning the durability and performance of the Bosch CP4 Pump and (more importantly) facts concerning the durability and performance of the Class Vehicles and their engines, in order to defraud and mislead the Class about the true nature of the Class Vehicles.

124. As alleged above, Ford knew at least by 2002 that its fuel injection systems required heightened lubricity, which was not met by American diesel fuel specifications.

125. As alleged above, Ford had specific knowledge by at least 2002 that its diesel fuel injection systems were incompatible with American diesel fuel specifications.

126. As alleged above, prior to the design, manufacture and sale of the Class Vehicles, Ford knew that the Bosch CP4 Pumps were expected to quickly fail in the Class Vehicles and that such failure would result in contamination of the fuel system components and require repair and replacement of those components, the repairs or replacements of which Ford would refuse to cover under its warranties.

127. Despite this knowledge, Ford marketed the Class Vehicles, touting the increased durability and performance of the Class Vehicles.

128. The foregoing omitted facts and representations were material because they directly impacted the value of the Class Vehicles purchased or leased by Plaintiffs and other Class Members, because those facts directly impacted the decision regarding whether or not Plaintiffs and other Class Members would purchase a Class Vehicle, and because they induced and were intended to induce Plaintiffs and other Class Members to purchase a Class Vehicle.

129. Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail, and due to its false representations regarding the increased durability of the Class vehicles, Ford had a duty to disclose to Class Members that their vehicles were incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles.

130. Ford knew that Plaintiffs and other Class Members reasonably relied upon Ford false representations and omissions. Plaintiffs and other Class members had no way of knowing that Ford representations and omissions were false and misleading, that the Class Vehicles were incompatible with the fuel Ford knew would be used to operate the Class Vehicles, that the normal and intended use of the Class Vehicles will cause the Bosch CP4 Pumps to fail, or that Ford would refuse to repair, replace or compensate Plaintiffs and other Class members for the failure of the Bosch CP4 Pumps and the known consequences of that failure to the Class Vehicle engines.

131. Plaintiffs and other Class Members could not have known that the Class Vehicles, which were touted by Ford for their durability and performance, will fail when used as intended by Ford to be used.

132. Ford knew that Plaintiffs and other Class Members could not have known that Class Vehicles will fail when used as intended by Ford.

133. Ford falsely represented the durability of the Class Vehicles and omitted material facts regarding the lack of durability of the Class Vehicles, the incompatibility of the Class Vehicles with the fuel intended by Ford to be used in the Class Vehicles, and the consequences of

that incompatibility, for the purpose of inducing Plaintiffs and other Class Members to purchase Class Vehicles, and to increase Ford's revenue and profits.

134. Ford's devious scheme to design, market and sell Class Vehicles with defective CP4 pumps, knowing that U.S. fuel that was certain to be used in the Class Vehicles and the consequence of using U.S. diesel fuel in those vehicles, then concealing its fraudulent scheme from the public and consumers over numerous model years, reveals a corporate culture that emphasized sales and profits over integrity and an intent to deceive Plaintiffs, other Class Members and the American public regarding the durability and performance of the Class Vehicles and their fuel delivery systems.

135. Ford had a duty to disclose the incompatibility of Class Vehicles with U.S. diesel fuel, including the consequences of that incompatibility, to Plaintiffs and Class members.

134. Had Plaintiffs and other Class Members known that the Class Vehicles did not have increased durability over other diesel vehicles, the Class Vehicles were incompatible with the fuel intended by Plaintiffs, the other Class members and Ford to be used in the Class Vehicles (without which the Class Vehicles would serve no purpose to Plaintiffs and other Class members), or that the Class Vehicles will fail when used as intended, Plaintiffs and other Class members would not have purchased a Class Vehicle, or would have paid substantially less for their Class Vehicle than paid based on Ford's false representations and omissions, or, in the case of Plaintiffs and other Class members whose vehicles experienced CP4 pump failure, would have taken affirmative steps to mediate the impact of or prevent failure.

135. Because of Ford's false representations and omissions, Plaintiffs and other Class Members have sustained damages because they own vehicles that are diminished in value as a result of Ford's concealment of the true nature and quality of the Bosch CP4 Pump and the Class Vehicles.

136. Ford's failure to disclose the incompatibility of the Class Vehicles with U.S. diesel fuel was intended to cause and did cause Plaintiffs and other Class Members to operate Class Vehicles with U.S. fuel; and, as a result, certain Plaintiffs and other Class Members have been damaged by the failure of the Bosch CP4 Pumps and the resulting failure of Class Vehicle engines, resulting in damages to Class Members and Plaintiffs including but not limited to the cost of repair or replacement of the CP4 fuel pump, the cost of damage caused to the Class Vehicles by the failure of the CP4 fuel pump, loss of use of the Class Vehicles, loss of earnings, and other damages.

137. Accordingly, Ford is liable to Plaintiffs and other Class Members for damages in an amount to be proved at trial.

138. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Class Members' rights and the representations and omissions made by Ford to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT II**
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT ("DTPA")**
**(Tex. Bus. & Com. Code §§ 17.41, _et seq._)**

139. Plaintiffs re-allege and incorporate Paragraphs 1 through 119 as though fully set forth herein.

140. Plaintiffs intend to assert this Count individually and on behalf of the Class against Ford.

141. Plaintiffs intend to assert a claim under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code §

17.46.  Plaintiffs will make a demand in satisfaction of the Act and may amend this Complaint to Assert claims under the Act once the required sixty (60) days have elapsed.  This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Texas Deceptive Trade Practices-Consumer Protection Act.

**COUNT III**
**UNJUST ENRICHMENT**

142.     Plaintiffs re-allege and incorporate Paragraphs 1 through 119 as though fully set forth herein.

143.     Plaintiffs bring this Count individually and on behalf of the Class against Ford.

144.     As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles.  Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

145.     As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the Bosch CP4 Pump and the Class Vehicles and the concealment thereof, Ford charged a higher price for the Class Vehicles than the Vehicles' true value and Ford, therefore, obtained monies that rightfully belong to Plaintiffs and other Class members.

146.     Ford has benefitted from manufacturing, selling, and leasing at an unjust profit defective Class Vehicles whose value was artificially inflated by Ford's concealment of the defective nature of the CP4 fuel pump and of the Class Vehicles, and false representations related thereto.

147.     Ford enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for their vehicles that actually had lower values.

148.     Ford has received and retained unjust benefits from the Plaintiffs and other Class members, and inequity has resulted.

149.     It would be inequitable and unconscionable for Ford to retain these wrongfully obtained benefits.

150.     Because Ford concealed its fraud and deception, Plaintiffs and other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from Ford's misconduct.

151.     Ford knowingly accepted and retained the unjust benefits of its fraudulent conduct.

152.     As a result of Ford's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and other Class members, in an amount to be proven at trial. Plaintiffs and other Class members, therefore, seek an order establishing Ford as a constructive trustee of the profits unjustly obtained, plus interest.

## COUNT IV
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY,
### (Tex. Bus. & Com. Code §§ 2.314 and 2A.212)

153.     Plaintiffs re-allege and incorporate Paragraphs 1 through 119 as though fully set forth herein.

154.     Plaintiffs bring this Count individually and on behalf of the Class against Ford.

155.     As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles.  Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

156.     Ford was at all times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(2), and "seller" of motor vehicles under § 2.103(a)(4).

With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

157. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code. §§ 2.105(a) and 2A.103(a)(16).

158. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law, pursuant to Tex. Bus. & Com. Code § § 2.314 and 2A.212.

159. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are incompatible with the use of American diesel fuel (the fuel intended to be used by Ford and expected to be used by Plaintiffs and other Class Members) in that use of American diesel fuel (the only fuel reasonably available to Plaintiffs and other Class Members) causes a breakdown of the CP4 fuel pump (a condition that Ford knew would occur prior to the design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and catastrophic failure of the Bosch CP4 Pump, and contamination and failure of other components in the Class Vehicle fuel delivery system.

160. It was reasonable to expect that Plaintiffs may use, consume or be affected by the defective vehicles.

161. The Class Vehicles contained an inherent defect that was substantially certain to result in malfunction during the useful life of the product.

162. Plaintiffs were and are third-party beneficiaries to the defendant manufacturer's contracts with Ford-certified/authorized retailers who sold the Class Vehicles to Plaintiffs.

163. In addition, or in the alternative, Plaintiffs directly relied upon Defendant Ford's advertising, as alleged above.

164.   Ford was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to Ford, complaints by Plaintiffs or Class members to Ford either orally or in writing, complaints to Ford dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

165.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and other Class members have been damaged in an amount to be proven at trial.

## COUNT V
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT,
## (15 U.S.C. § 2301, *et seq.*)

166.   Plaintiffs re-allege and incorporate Paragraphs 1 through 119 as though fully set forth herein.

167.   Plaintiffs bring this Count individually and on behalf of the Class against Ford.

168.   As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles.  Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

169.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)–(d).

170.   The Class Vehicles manufactured and sold by Ford are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

171.     Plaintiffs and other Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).   They are consumers because they are persons entitled under applicable state law to enforce against the warrantors the obligations of their implied warranties.

172.     Ford was a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

173.     Ford provided Plaintiffs and other Class members with an implied warranty of merchantability in connection with the purchase or lease of the Class Vehicles, that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).  As a part of the implied warranty of merchantability, Ford warranted that the Class Vehicles were fit for their ordinary purpose as motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

174.     Ford breached its express and implied warranties, as described in more detail above, and is therefore liable to Plaintiffs and other Class members pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles were equipped with defective CP4 fuel pumps that are incompatible with American diesel fuel (which fuel is intended by Ford to be used in the Class Vehicles, expected by Plaintiffs and other Class members to be used in Class Vehicles, and is the only fuel reasonably available in order for Plaintiffs and other Class members to use the Class Vehicles for their intended or ordinary purpose), which, when used with the intended American diesel fuel, break down, resulting in fuel contamination, complete and catastrophic failure of the Bosch CP4 Pump, and contamination and catastrophic and costly failure of the Class Vehicles' fuel delivery systems.

175.     In its capacity as a warrantor, Ford had knowledge of the inherent defects in the Class Vehicles.  Any effort by Ford to limit the implied warranties in a manner that would exclude

coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

176. Any limitations Ford might seek to impose on their warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs and the other Class members, as, at the time of purchase and lease, Plaintiffs and the other Class members had no other options for purchasing warranty coverage other than directly from Ford.

177. Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew that the Class Vehicles were defective and would continue to fail during and after any purported expiration of warranties.

178. Despite knowing that failure was expected to occur with the intended use of American diesel fuel, Ford failed to disclose these defects to Plaintiffs and the other Class members. Therefore, any enforcement of the durational limitations on those warranties is harsh and shocks the conscience, and moreover violates public policy.

179. Plaintiffs and each of the other Class members have had sufficient direct dealings with either Ford or its agents (*i.e.*, dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiffs and each of the Class members, on the other hand. Nevertheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers.

180. Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court

determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

181.    Nonetheless, Ford was provided notice of the defective and non-conforming nature of the Class Vehicles, as described herein, within a reasonable time of Plaintiffs' knowledge of the non-conforming and defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to Ford, complaints by Plaintiffs or Class members to Ford either orally or in writing, complaints to dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships, intermediate sellers or repair facilities, and by the allegations contained in this Complaint.

182.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.00.  The amount in controversy of this action exceeds the sum of $50,000.00 exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Ford as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.        An order temporarily and permanently enjoining Ford from continuing unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.        Injunctive relief in the form of a recall, free replacement, or buy-back program;

D.        An order establishing Ford as a constructive trustee over profits wrongfully obtained, plus interest;

E.        Costs, restitution, damages, including punitive damages, exemplary damages and treble damages, and disgorgement in an amount to be determined at trial;

F.        An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

G.        An award of costs and attorney's fees; and

H.        Such other or further relief as may be appropriate.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: December 20, 2018                   Respectfully submitted,

/s/ Robert C. Hilliard
Robert C. Hilliard
Texas State Bar No. 09677700
Federal I.D. No. 5912
Hilliard, Martinez, Gonzales LLP
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Phone: (361) 882-1612
Fax: (361) 882-3015
Email: bobh@hmglawfirm.com
***ATTORNEY IN CHARGE FOR***
***PLAINTIFFS***

**OF COUNSEL:**
Rudy Gonzales, Jr.
Texas State Bar No. 08121700
Federal I.D. No. 1896

Email: rudy@hmglawfirm.com
John B. Martinez
Texas State Bar No. 24010212
Federal I.D. No. 25316
Email: john@hmglawfirm.com
Marion Reilly
Texas State Bar No. 24079195
Federal I.D. No. 1357491
Email: marion@hmglawfirm.com
Bradford P. Klager
State Bar No. 24012969
Federal I.D. No. 24435
Email: brad@hmglawfirm.com

**HILLIARD MARTINEZ GONZALES LLP**
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Phone: (361) 882-1612
Fax: (361) 882-3015

*-And-*

T. Michael Morgan, Esq.
FBN: 0062229
E-Mail: mmorgan@forthepeople.com
Secondary Email: plarue@forthepeople.com
**MORGAN & MORGAN, P.A.**
20 North Orange Ave., Ste. 1600
P.O. Box 4979
Orlando, FL 32801
Tel.: (407) 418-2081
Fax: (407) 245-3392

*-And-*

Steve W. Berman
steve@hbsslaw.com
Sean R. Matt
sean@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594