UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DARREN FULTON and CRAIG JUDE BROUSSARD, each plaintiff is a citizen of the State of Texas, and each plaintiff individually and on behalf of all others similarly situated,<br><br>     *Plaintiffs*,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware corporation.<br><br>     *Defendant*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Cause No. 2:18-cv-00456<br><br><br>**SECOND AMENDED<br>CLASS ACTION COMPLAINT**<br><br><br><u>**JURY TRIAL DEMANDED**</u> |

<u>**SECOND AMENDED CLASS ACTION COMPLAINT**</u>

Darren Fulton and Craig Jude Broussard, each individually and on behalf of all others similarly situated ("the Class"), file this Second Amended Complaint against Defendant Ford Motor Company. This lawsuit is based upon the investigation of counsel, the review of scientific and automotive industry papers, and the investigation of experts with relevant education and experience. In support thereof, Plaintiffs state as follows:

## I.  INTRODUCTION

1.  Ford Motor Company ("Ford") has designed, manufactured, distributed, and sold hundreds of thousands of 2011–present Ford diesel trucks equipped with 6.7L Power Stroke diesel engines (the "Class Vehicles") which contain defective high-pressure fuel injection pumps (the "CP4 pump") designed by Robert Bosch GmbH ("Bosch"). Ford has concealed from consumers

the crucial fact that the CP4 pump has a fragile and unstable design, which causes metal parts to rub against each other on the first day of operation and through the life of the vehicle. This friction generates metal shavings that contaminate the fuel system, which inevitably will cause component wear, and can lead to catastrophic engine failure. Ford never disclosed this critical defect to consumers at the point of sale or in any other communication.

2.      The design of the CP4 pump is fundamentally flawed in several respects. While cheap and simple, the pump is—as others have described it—a ticking "time bomb."[1] As Ford knew, the CP4 pump's fragile design—which generates metal shavings in the fuel system regardless of fuel quality—is particularly incompatible with U.S. diesel fuel, which is "dry" and not lubricious. The CP4 pump uses the fuel itself for lubrication, and the design of the pump requires a cam and two pumping cylinders with individual rollers to seamlessly roll together without skipping, sliding, sticking, or wearing to operate effectively. Since standard U.S. diesel fuel is not lubricious, the wear on the cam and rollers is accelerated, producing an even greater number of tiny metal shavings that disperse throughout the high-pressure fuel injection system.

3.      The release of these metal shavings into the fuel system can be catastrophic, as it eventually causes the fuel injectors to become blocked and leads to an entire shutdown of the engine. Repair costs for a catastrophic failure are at least $10,000 and are time-intensive; however, any such repair is futile because it will not actually fix the issue so long as the vehicle is being filled with U.S. diesel fuel.

4.      Catastrophic failure can occur as early as mile one, as the fuel injection disintegration process begins at the very first fill of the tank and start of the engine, with pump components beginning to deteriorate and dispersing metal shavings throughout the internal engine

---

[1] *See* NHTSA Complaint ID No. 10838539.

components and fuel supply system. And catastrophic failure often causes the vehicle to shut off while in motion and renders it unable to be restarted because the vehicle's fuel injection system and engine component parts have been completely contaminated with metal shards. This presents an inherent and substantial risk to consumer safety—one which Ford itself has recognized in the past—and one which Plaintiffs were not aware of prior to purchasing the Class Vehicles.

5.     Even short of catastrophic failure, the fragile pump design will inevitably lead to pump component wear that damages the fuel injectors, or cause them to inject fuel at times and rates which cause significant harm to the component parts of the vehicle's engine. There are numerous ways in which the defective pump can harm the engine and related components, including; (1) over-fueling, which decreases fuel economy; (2) broken injector tips; (3) fuel spray hitting the cylinder wall, causing dilution of the lube oil, which damages the engine; (4) over-heating of cylinders causing wear damage to the cylinders; (5) melted or twisted pistons; (6) damaged exhaust valves; (7) damaged turbochargers; (8) hydraulic lock; (9) damaged cylinder heads; (10) damaged exhaust manifolds; and (11) damage and/or loss of emission control (including increases in NOx, particulates, and carbon dioxide).

6.     Ford's frequent company line is to blame catastrophic failures on "contaminated fuel," which is not covered under warranty because it is "not caused by" Ford. But poor fuel quality is not the primary cause of pump failure, because the defect is inherent in the pump design itself. Other diesel trucks without the CP4 pump do not have these problems.  It is also unfair to blame customers for "bad" fuel because it is effectively impossible for customers to determine the quality of their fuel when they fill up at the pump—and one "bad" fueling can lead to catastrophic failure. Even Ford engineers recognize that consumers have "no . . . way to assess the quality of the fuel

3

or to confirm if a fuel complies with the applicable requirements."[2] Although recognizing that customers can change fuel locations if they have concerns, a Ford engineer noted how "this doesn't help those customers where the single tank of bad fuel led to a component failure."[3]

7.     Some victims of Ford's scheme are businesses which own several vehicles and have suffered multiple failures. Others have spent hundreds or thousands of dollars on repairs and mitigation efforts. The Class Vehicles themselves come with a hefty price tag, ranging from approximately $42,000 to $67,000. Diesel fans pay a premium of approximately $5,000 to $8,000 for their vehicles because diesel engines are traditionally expected to last for a range of 500,000 to 800,000 miles.[4]

8.     Well before Ford ever chose to use the CP4 pump, the issue of U.S. diesel fuel lubrication was well-known throughout the auto manufacturing industry, but was completely disregarded in the design, manufacture, marketing, and sales or leases of the Class Vehicles. Ford, as well as fellow domestic automotive manufacturers GM and FCA, had industry-wide experience with catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s. By 2002, the Truck & Engine Manufacturers Association ("EMA")—of which Ford is a member company[5]—acknowledged that the lower lubricity of American diesel could cause catastrophic failure in high-pressure fuel injection system components.

9.     Ford and its affiliates knowingly and intentionally deceived American consumers through its consistent representations to consumers in order to sell the Class Vehicles. Through

---

[2] FORD_DIESEL_00006315, at 1-2.
[3] *Id.*
[4] *See* WorkTruckOnline.com, *Pros & Cons: Diesel vs. Gas in Class 3-4 Trucks* (Nov. 3, 2011), available at https://www.worktruckonline.com/147984/pros-and-cons-of-gas-vs-diesel-in-class-3-4-trucks;     PickupTrucks.com, Considering a Diesel Pickup? Here Are Costs to Ponder (Sept. 8, 2018), available at https://news.pickuptrucks.com/2018/09/considering-a-diesel-pickup-here-are-costs-to-ponder.html.
[5] *See* Truck    &    Engine    Manufacturers    Association    (EMA)    membership    webpage, http://www.truckandenginemanufacturers.org/companies/ (last accessed Nov. 13, 2018).

representations by Ford dealers, and through Ford's advertisements online, in print, on TV, and on the radio, Ford promised consumers the continued reliability of their diesel engines, but with increased fuel efficiency and power at greater fuel efficiency. These representations were false, and Ford failed to disclose the defect, passing along the substantial cost of the defect to consumers.

10.     No Plaintiff—indeed, no reasonable consumer—would have purchased or leased these vehicles if Ford's disclosures had been materially truthful. And certainly no consumer would have paid a premium for these defective trucks or paid the price they were charged.

11.     When consumers have complained, in order to deny warranty claims, Ford has blamed vehicle owners for the presence of metal wear particles in the fuel, even though these fragments were produced by the pump's faulty design. Ford has further sought to delay vehicle owners' discovery of the damage through re-defining "failure" and delaying repairs, in the hopes that the final and catastrophic failure occurs out of warranty.

12.     Plaintiffs accordingly bring this class action complaint to recover on behalf of the class all relief to which they are entitled, including but not limited to recovery of the purchase price of their vehicles, compensation for overpayment and diminution in value of their vehicles, out-of-pocket and incidental expenses, disgorgement of Ford's unjustly derived profits, and an injunction compelling Ford to replace or recall and fix the Class Vehicles.

## II.     PARTIES

### A.  The Plaintiffs

13.     For ease of reference, the following chart identifies the Representative Plaintiffs and their vehicles:

| Representative Plaintiff | Make | Model | Year |
|---|---|---|---|
| Darren Fulton | Ford | F-250 | 2017 |
| Craig Jude Broussard | Ford (2) | F-250 (2) | 2011 & 2015 |

**Plaintiff Darren Fulton**

14.     Plaintiff Darren Fulton (for purposes of this paragraph and the next four paragraphs, "Plaintiff") is a citizen of the State of Texas, and is domiciled in Rosharon, Texas. On or around February 1, 2018, Plaintiff purchased a new 2017 Ford Power Stroke diesel F-250 (for the purpose of this paragraph and the next four paragraphs, the "Class Vehicle" or "Truck") for approximately $59,000 from Gulf Coast Ford, an authorized Ford dealership in Angleton, Texas. Plaintiff purchased his Ford F-250 as his daily driving vehicle.

15.     On or around October 24, 2018, with just approximately 17,500 miles on the odometer, Plaintiff experienced a catastrophic failure on his CP4 fuel injection pump. Plaintiff was driving the Class Vehicle to work on a busy freeway in Houston, Texas, when the Vehicle suddenly went into "limp mode" and the "FUEL PRESSURE LOW" warning light came on in the Vehicle, followed by the "REDUCED ENGINE POWER" light. Fearing that he would become trapped in highway traffic with an inoperable vehicle, Plaintiff's F-250 "limped" off the freeway, and Plaintiff drove on the back streets to the nearest Ford dealership, Russell & Smith Ford, an authorized Ford dealer in Houston, Texas. Once at the dealership, Mr. Fulton was told that he had contaminated fuel, and Ford refused to cover the estimated repair of more than $14,000 under warranty for the required "fuel contamination kit" installation.  The Ford dealer also told Plaintiff that his repair would not be covered under warranty because he "did not change his fuel filter at the correct service intervals," however Plaintiff was aware of and relied upon the fact that the Ford Fuel Filter Replacement Guide states that such filters should be replaced every 22,500 miles—*approximately 5,000 more miles* than the Vehicle even had on the odometer at the time of the failure. Thus,

Plaintiff's F-250 was not even in need of a fuel filter change based on the mileage recommendations from Ford.

16.     Mr. Fulton never drove the Class Vehicle again; it was ultimately repossessed and sold at a loss of more than $10,000, and Mr. Fulton's credit score was adversely affected as a result. Mr. Fulton's automotive insurance company, Texas Farm Bureau, ordered expert testing of the fuel in Mr. Fulton's vehicle after the catastrophic failure, and the fuel analysis report came back stating that the "fuel has metal shavings and rust particles," and that the truck failed due to an "internal mechanical failure."  Notably, "[t]he fuel portion of the sample [met] the water and sediment requirements of ASSTM D975," which governs U.S. diesel fuel quality.

17.     In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled Ford's television commercials, internet advertisements, sales brochures, and heard statements from Ford dealership sales representatives wherein Ford claimed the Power Stroke diesel truck which Plaintiff ultimately purchased, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market.  More importantly, Plaintiff relied on representations from Ford through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all Ford advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Neither Ford nor any of

its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford Power Stroke diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had Ford disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would not have purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive conduct.  As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance and fuel economy of the vehicles, diminished value of the vehicles and benefit of the bargain damages. Ford has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of Ford's disgorged profits.

18.     Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

**Plaintiff Craig Jude Broussard**

19.     Plaintiff Craig Jude Broussard (for purposes of this paragraph and the next six paragraphs, "Plaintiff") is a citizen of the State of Texas, and is domiciled in Houston, Texas. In or around October 2010, Plaintiff purchased a new 2011 Ford Power Stroke diesel F-250 (for purposes of this paragraph and the next six paragraphs, the "Vehicle" or "First Vehicle") from

Champion Ford (now AutoNation Ford), an authorized Ford dealer in Houston, Texas, to use as his daily driving vehicle. In or around October 2014, Plaintiff was driving the Vehicle on the highway when, while going through a traffic light intersection, the engine locked up and died. Plaintiff coasted over to the shoulder, but the Vehicle would not restart. Plaintiff then had the Vehicle towed to Energy Country Ford, an authorized Ford dealership and service center in Port Arthur, Texas, where Ford service personnel informed him that his CP4 fuel pump had catastrophically failed and the repair bill would be approximately $12,000. Ford initially told Plaintiff that he would have to pay for the repair out of pocket because he had put "bad fuel" in it. He countered by providing them with the receipt for the diesel fuel he had purchased (at the gas station across the street from the dealer) and told them to test the fuel themselves. The fuel was ultimately tested and found to be within U.S. diesel regulations. After a lengthy three-plus-months' dispute over which party would cover the repair, Ford finally relented and covered the repair under warranty. The First Vehicle had approximately 92,000 miles on its odometer at the time of the failure.

20.     After that episode and the Vehicle near the 100,000-mile mark, Plaintiff decided to trade the Vehicle in for a second Vehicle in October 2014, at which time he purchased a new 2015 Ford Power Stroke diesel F-250 (for the purposes of this paragraph and the next five paragraphs, the "Second Vehicle" or "Second Truck"), with an approximate purchase price of $60,000 from Joe Myers Ford, an authorized Ford dealership in Houston, Texas. Prior to this purchase, Plaintiff was assured by the Ford dealership that "the CP4 fuel pump failures were known" but "Ford had made improvements" to later model years such that he did not need to worry about going through the same ordeal he had gone through with the catastrophic CP4 fuel pump failure in his First Vehicle. As with his First Vehicle purchase, Plaintiff wanted a vehicle he could use as his daily

driving vehicle. Plaintiff still owns the vehicle and it presently has approximately 89,000 miles on the odometer.  As he did with the first Vehicle, Plaintiff has always regularly serviced the Second Vehicle according to Ford's recommended service intervals.

21.    On May 13, 2017, Plaintiff experienced another catastrophic CP4 fuel pump failure, this time in his Second Truck. At the time, Plaintiff and his wife were traveling back from the beach in Broussard's 2015 Ford F-250, which had approximately 43,500 miles on its odometer. Plaintiff was rounding the corner from Interstate 10 to Interstate 290 when the reduced engine power and warnings and lights lit up on the dashboard. He exited the interstate and turned the vehicle off. He was then able to drive to the Joe Myers Ford dealership a couple of miles away.

22.    Joe Myers Ford diagnosed the catastrophic CP4 pump failure as the cause, and, as a result, Mr. Broussard lost his $60,000 Class Vehicle for approximately three weeks while it was being repaired. Mr. Broussard was informed that his total repair cost would be approximately $11,277, which Ford refused to cover under warranty even though it was still under a Ford-backed 5 year/100,000-mile manufacturers' warranty at the time. Notably, the Ford service center tech who repaired the vehicle stated that the pump and all of the fuel lines were bad as there were metal shavings found throughout the system.

23.    In the days and weeks preceding Plaintiff's purchase of both the First and Second Vehicles, and in contemplating his vehicle needs, Plaintiff saw and recalled Ford's television commercials, internet advertisements, sales brochures, and heard statements from Ford dealership sales representatives wherein Ford claimed the Power Stroke diesel trucks which Plaintiff ultimately purchased, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market.  More importantly, Plaintiff relied on representations from Ford through the means listed above that the Class Vehicles were compatible with American diesel

fuel, as all Ford advertisements Plaintiff ever observed contained representations of the Class

Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not.

Absent these representations, Plaintiff would not have purchased the vehicles, or would have paid

less for them, because they are unfit for its ordinary use.  Unbeknownst to Plaintiff, at the time of

acquisition, the Class Vehicles contained a defective CP4 fuel injection system that was

particularly unsuitable for American vehicles, and consequently the vehicles could not deliver the

advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff

relied upon.  Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff

or Class members of the existence of the unlawfully and unexpectedly defective nature of the Ford

Power Stroke diesel engine's CP4 high pressure fuel pump system—which is common to all Class

Vehicles—prior to purchasing.  Had Ford disclosed the defect, Plaintiff—though his research prior

to purchase—would have received these disclosures, and either would have not purchased the

Class Vehicles, or would have paid less for them. Accordingly, Plaintiff and each Class member

suffered concrete economic injury as a direct and proximate result of Ford's wrongful, deceptive

conduct.  As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses

include, but are not limited to, the full purchase price of the Trucks, out-of-pocket losses by

overpaying for the vehicles at the time of purchase, decreased performance of the vehicles,

diminished values of the vehicles, and benefit of the bargain damages. Ford has been unjustly

enriched as a result, and Plaintiff is entitled to a pro rata share of Ford's disgorged profits.

  24. Plaintiff also paid a premium for his Trucks. Based on his research and knowledge

of trucks, Plaintiff knew that diesel trucks were more expensive than comparable trucks that ran

on gas, but he purchased the Trucks based on his belief that it would be more durable compared to

a gas engine, with superior torque and towing capabilities. The premium for a diesel truck

compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for each of his Trucks by at least the value of this premium.

25.     In addition, due to his reasonable apprehension of enduring yet another catastrophic failure (and another $10,000+ repair), Mr. Broussard has been forced to obtain and install a Power Stroke CP4 "disaster prevention kit" in the hopes of mitigating future failures, at a cost of approximately $500.

**B. The Defendant**

26.     Defendant Ford Motor Company ("Ford") is a publicly traded corporation organized under the laws of the State of Delaware with its principal place of business at One American Road, Dearborn, Michigan 48126.  Defendant Ford Motor Company can be served with process through its agent The Corporation Company, 40600 Ann Arbor Road E, Ste. 201, Plymouth, Michigan, 48170.

27.     Defendant Ford is in the business of designing, manufacturing, distributing, and selling Ford-brand automobiles in this District, in the jurisdictions of the Named Plaintiffs' Class Vehicles purchases and/or leases, and in all jurisdictions in the State of Texas, whose Class Claims are iterated herein.  Ford and/or its agents designed, manufactured, and installed the engine systems in the Class Vehicles.  Ford also developed and disseminated the materially misrepresentative owner's manuals and warranty booklets, advertisements, and other intentionally unreasonable and deceptive promotional materials relating to the Class Vehicles.  Ford also designed advertising material that it sent to Ford Dealerships for the purpose of having dealers distribute these to consumers, and Ford authorized dealers to communicate with consumers about the performance of the vehicles, and Ford ensured that the dealership was a place where Ford could disclose material facts to prospective buyers.

### III.   VENUE AND JURISDICTION

28.    Venue is proper in this District under 28 U.S.C. § 1391 in light of the following: (1) Defendant Ford Motor Company has marketed, advertised, sold, and leased the Class Vehicles within this District; and (2) many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia,* Ford's promotion, marketing, distribution, and sale of vehicles containing the Bosch CP4 high-pressure fuel pump.  Further, a significant number of the Class Vehicles have been registered in this District and thousands of Class Vehicles continue to be in operation in this District.  Venue is also proper under 18 U.S.C. § 1965(a) because Ford is subject to personal jurisdiction in this District as alleged, *infra*, and Ford has agents located in this District.

29.    The Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs.  Subject-matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq*. The Court has personal jurisdiction over Ford pursuant to 18 U.S.C. §§ 1965(b) and (d), and Tex. Civ. Prac. & Rem. Code § 17.042, as well as supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

30.    This Court has personal jurisdiction over Defendant Ford Motor Company.  Ford has committed and continues to commit acts giving rise to this action within Texas and within this judicial District.  Ford has established minimum contacts within the forum such that the exercise of jurisdiction over Ford would not offend traditional notions of fair play and substantial justice. In conducting business within the State of Texas, and specifically, within this judicial District,

Ford derives substantial revenue from its activities and its products being sold, used, imported, and/or offered for sale in Texas and this judicial District

## IV.     FACTUAL ALLEGATIONS

### A.  The Class Vehicles

31.     For purposes of this Complaint, the "Class Vehicles" consist of the following vehicles: 2011–present Ford-manufactured diesel-fueled automobiles equipped with a 6.7L Power Stroke engine. All vehicles falling under this Class Vehicle group were manufactured with the defective CP4 fuel injection pump.

### B.  Ford Profits from the Rise of Diesel Vehicles in the United States.

32.     Diesel engines have long enjoyed a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power.  Diesel engines produce higher torque, even at low revolutions per minute ("RPM"), making them popular in buses, heavy-duty pickups, and vans, including commercial vehicles, farm trucks, and ambulances.

33.     The key benefits of diesel engines over their gasoline counterparts are the following:

> **(a)     Durability:** Diesel (compression ignition) engines are, by design, stronger and more robust than gasoline (spark ignition) engines, and their long life and low maintenance are among the reasons for their popularity.

> **(b)     Fuel Efficiency:** The diesel engine is 20-35% more efficient than a gasoline engine, because the compression ignition cycle (and greater compression ratio) is more thermodynamically efficient than the spark ignition cycle, and because diesel fuel has a greater energy content on a per gallon basis than gasoline. As a result, a diesel engine's fuel cost per mile is expected to be lower than gasoline.

> **(c)     Torque and Power:** Diesel engines provide more torque, especially at low engine speeds, which leads to better acceleration and higher towing capacity. Modern diesel engines operating at higher speed can now match or exceed gasoline engines in terms of

peak power. This combination of torque and power is another reason
why some customers prefer diesel.

34.     Most Class 2A, 2B, and 3 (1500-3500) series pickup trucks, as well as certain sport

utility vehicles sold by the Big Three Automakers (FCA, Ford, and GM)—including the Class

Vehicles at issue in this case—offer both a gasoline and diesel option. Because of the features and

advantages listed above, buyers are willing to pay a premium of $5,000-$8,000 more for the diesel

powered versions.[6]

35.     The diesel combustion process, invented by Rudolph Diesel over a century ago,

uses a hydrocarbon-based fuel which is substantially different than gasoline. Diesel fuel is a

heavier and less refined mix of hydrocarbons and is designed to self-ignite when mixed with air

under elevated temperatures and pressures. In the diesel combustion process, the fuel is pumped

to a very high pressure and then forced into an injector through very small spray holes. This fuel

is atomized into spray plumes of fine droplets in the engine combustion chamber. The droplets

rapidly evaporate and mix with heated air and spontaneously ignite, thus releasing the energy to

drive the piston and pressurize the fuel.

36.     Since the invention and early development of the diesel engine more than 100 years

ago, the injection of fuel into the cylinder has been one of its greatest technical challenges. Earlier

versions of the fuel injection system were designed as a pump-line-nozzle arrangement where a

fuel pump delivered fuel directly to each injector via its own fuel line. As emission and fuel

economy standards have become more stringent, and customer demands for performance have

increased, diesel manufacturers switched to a high-pressure, common rail system, starting in

Europe in the 1990s.

---

[6] *See* WorkTruckOnline.com, *supra* note 4; PickupTrucks.com, *supra* note 4.

37.     In a common-rail fuel system, a high pressure pump supplies fuel to a reservoir (a pressure containment vessel) known as the fuel rail. The rail holds an ample supply of pressurized fuel available to be injected (or "metered") into the engine power cylinders by the fuel injectors. The flow of fuel in each injector is managed by a complex electronic control system, which is programmed by sophisticated algorithms and calibration files. The key advancement with the common rail system is that each injector is capable of injecting in multiple precise pulses of fuel and at varying times based on driving conditions.

38.     The most complex and expensive part of the common rail fuel injection system are the high-pressure components, including the high-pressure pump, the fuel rails, and the injectors.

39.     One of the key benefits of common rail technology is the ability to have multiple fuel injection events in a single injection cycle. Multiple injections, executed by lifting the injector nozzle needle, are used to carefully meter fuel into the cylinder which smooths out the combustion event resulting in lower noise and lower emissions.[7] Modern engines may have multiple injection events, including post injection of fuel used to release fuel into the exhaust stream for the purpose of heating up the after-treatment components to reduce emissions.

40.     In sum, the key benefits of modern common rail fuel system are, among others:[8]

---

[7] The injectors spray an exceedingly fine mist of diesel fuel into the cylinder, where it ignites and powers the engine. The finer the mist, the less emissions, because the combustion process is more homogenous, which has at least two beneficial effects: (1) the smaller droplets evaporate and mix more readily with the air, preventing the development of fuel-rich "pockets" which product particulate matter; and (2) homogenized levels of heat mean there are fewer high peak temperatures, which lead to formation of NOx. The net effect of the high-pressure system is less NOx and particular matter.

[8]     *See*   https://www.bosch-mobility-solutions.com/en/products-and-services/passenger-cars-and-light-commercial-vehicles/powertrain-systems/common-rail-system-piezo/ (last accessed Mar. 17, 2020).

- Providing pressurized fuel to well above 2,000 bar[9] across most of the operating range of the engine (previous mechanical fuel systems could only achieve high pressure at high engine speeds).

- Multiple injection events, accurately timed and measured for the precise engine operating conditions to meet stringent noise and emissions regulations, including the following:

  o Cold-start ability can be improved by early pre-injections to avoid the need for glow plugs.[10]

  o Engine noise can be lowered by pre-injections of fuel prior to main injection to produce power.

  o Aftertreatment systems (particulate filters) can be regenerated by very late post injections.

  o Injection rates can be digitally "shaped" to give an optimum rate of injected fuel to better control the diesel heat release rate, which minimizes NOx emissions.

  o Exhaust particulates can also be lowered by injection "post" or late small amounts of fuel.

- High reliability and durability – common rail systems in Europe have been shown to be more reliable and durable than previous mechanical fuel systems if properly fueled and maintained.

---

[9] A bar is a unit for measure for pressure. One bar is about 14.8 pounds per square inch; 1,800 bar is equivalent to about 27,000 pounds per square inch.
[10] A glow plug is a heating device which aids in the starting of diesel engines.

- Less maintenance – modern common rail systems are designed to be self-adapting and require little maintenance.

- Less noise, vibration and handling problems – precise control over the injection and combustion events reduces engine noise, runs more quietly, produces less shaking and shock, and produces better operator control over the acceleration of the vehicle. High pressures are only generated in the centralized fuel pump rather than in individual mechanical injectors, which reduces engine vibration and gear train torques and noises.

- Higher injection pressure – pressures up to 2,500 bar (36,000 pounds per square inch) are only achievable with common rail fuel systems. The higher pressures are necessary for improved fuel atomization and more complete combustion.

- Better engine combustion management – the precision control offered by common rail reduces the mechanical strains on the engine, including peak cylinder pressures, temperatures, and observing exhaust aftertreatment system limits.

41.     From the outset, Ford was in competition with fellow "Big Three" auto manufacturers like General Motors ("GM") and Fiat Chrysler ("FCA"), each racing to dominate the growing American diesel vehicle market.  Ford looked to the international automotive parts supplier Bosch to increase the fuel efficiency and power of its diesel engines.  The heart of this diesel revolution would be powered by Bosch's more durable CP3 fuel injection pump, the predecessor to the CP4 fuel injection pump at issue in this suit.  The reliability of the CP3 became key to the "million-mile" reputation of diesel truck engines in the United States.

42.     Americans paid a premium for the increased reliability, fuel efficiency, and power of diesel—and Ford claimed to continue to deliver advances in diesel engine technology.  In its

advertisements and press releases—both online and in printed material—Ford claimed that the Power Stroke engines, which contained the CP4, would maintain reliability while also increasing fuel efficiency and power. *See infra* § IV.K. The over-simplified design of the CP4 rendered it cheaper to manufacture, but also increased its need for high lubricity fuel, and increased the likelihood that the ultimate failure would be catastrophic.

## C. The Fragile CP4 Fuel Pump Design

43.     The Bosch CP4 fuel pump is directly coupled to the engine, which means it is operating whenever the engine is operating. Since the CP4 is a critical part of the engine system, it must be designed for very long life and must be capable of operating with commercially available fuel. A sound and robust design would also make it tolerant to fuels that are commercially sold but do not meet the proper requirements. It should also be designed to withstand some level of customer abuse and neglect, such as inadvertent misfueling, running out of fuel, delaying a filter change, or draining the water separator.

44.     The CP4 operates at higher pressures than its predecessor, the CP3, and has inherently higher Hertz contact stresses than the CP3, which exacerbates the wearing of the pump parts. The CP3 pump has three pumping cylinders and plungers, and as the cam shaft turns, a polygon ring on an eccentric camshaft. As the camshaft rotates, the polygon is moved in a sliding manner against the plunger foot plate and converting rotational (circular) motion into linear (up and down) motion. Below is a diagram of the CP3 pump:

**Figure 1: CP3 Pump**



45.     Because of its sliding foot contact area and lower stresses, the CP3 is more tolerant of poor fuel quality.

46.     The CP4 pump design was a radical departure from the CP3, and it relies on a fragile cam-roller-tappet mechanism which did not exist in the CP3. Instead of the wide plunger foot plates sliding against the wide polygon cam to drive the plungers (as shown in Figure 1 above), the CP4 pump uses a small, 10 mm roller pin (about the size of a AAA battery) as the only source of contact with the camshaft. With this system, the CP4 system is placing a lot of pressure on the contact point between the roller and the cam. This very small area of contact carries all the forces required to transfer the energy to generate the very high pumping pressures. In addition, since the 10 mm diameter roller is about one quarter the size of the camshaft lobe on which it rotates, the smaller roller must rotate 4 times as fast as the CP4 camshaft. Since the Power Stroke engine drives the CP4 at the same speed as the engine, this means the roller must rotate at

4 times the engine speed, or in the range of 11,200 revolutions per minute (for an engine speed of 2,800 rpm). Below is a schematic of the tappet holding the roller pin, which contacts the cam:

**Figure 2: Roller, Cam shaft, and Tappet**



47.     Below is a photograph showing a side-by-side comparison of the CP3 and CP4 pumps, which illustrates how the contact area between the CP4's cam and roller is much smaller than the area between the CP3's ring and plunger foot:

**Figure 3: Comparison of CP3 and CP4 Pumps**



48.     The design differences are further illustrated in the graphic below, which again shows the large surface contact area between the polygon and the plunger of the CP3 as compared to the small line contact between the cam and the roller of the CP4:

**Figure 4: Schematic Comparison of CP3 and CP4 Pumps**



49.     The CP3 pump's sliding foot design distributes the load and reduces stresses on the polygon cam follower. It slides back and forth and does not need to roll to create a lubricating fluid film. Conversely, the CP4 cam-roller design results in very high forces along a single line of contact. The friction of the roller in the tappet must be less than the friction on the roller cam interface or else the roller will not rotate (or spin); instead it will slide. The roller also creates a hydrodynamic lubrication film of fuel between the roller and cam. This film is very thin, on the order of 1 micron or less (1 micron = 40 millionths of an inch). If the roller stops rotating and sticks or slips on the cam, it loses this lubrication film and starts to wear. In real world operating conditions, the result of all these factors is a lack of robustness because of the susceptibility to contamination through metal shavings or other debris, caused in part by metal-on-metal rubbing between the roller pin and the cam.

50.     The critical roller pin design of the CP4 creates very high stress (called Hertz stresses) as diagramed below:

**Figure 5: Hertz Stresses on CP4 Roller and Cam**



51.     Comparing relative Hertz stresses of CP3 and CP4, the CP4 roller-to-cam contact Hertz stresses are about two times higher than the CP3. These higher stresses will increase contact fatigue and wear of the metal parts that come in contact with each other. In the case of the CP4, these parts are the roller and camshaft. Accordingly, use of the CP4 pump for the same amount of force would be more likely to wear and fail than the CP3 for the same lubrication conditions of lubricity, viscosity and fuel quality. This would be aggravated and increase wear dramatically if the roller pin stops rotating and starts sliding. Aggressive roller and cam wear changes the roller diameter to more of a slider and generates wear debris.

52.     Unlike the CP3 pump, which uses a sliding elephant's foot design to spread stresses and shortened distance of metal on metal travel, the CP4's cam-roller design results in very high forces along a single line of contact. The friction of the roller in the tappet must be less than the

friction on the roller cam interface. The result of all these factors is fragility, and susceptibility to contamination through metal shavings or other debris, caused in part by metal-on-metal rubbing between the roller pin and the cam.

53.     The CP4 pump was first introduced in Europe in the 2007 timeframe, and criticism of the pump began almost immediately based on its fragile design and its sensitivity to fuel quality. In addition to the design limitations referenced above, the tappet which houses the roller pin is not prevented from rotating around in its own axis inside the cylindrical pump housing. If the tappet does rotate out of position, the roller pin rotates from parallel to the camshaft, to perpendicular to the camshaft. Once rotated the roller will no longer rotate, and instead the cam slides across the roller, leading to wear and erosion, as a trough is being carved into the cam. The wear and erosion will generate metal shavings that are carried by the fuel throughout the fuel system, including downstream to the sensitive high pressure fuel injectors. The photograph below shows the severe wear and gouging caused by rotation of the tappet:[11]

**Figure 6: Wear on the Cam and Roller**



---

[11] Tomasz Osipowicz, *Testing of Modern Fuel Injection Pumps*, 15 TEKA COMM'N OF MOTORIZATION AND ENERGETICS IN AGRICULTURE 57-60 (2015), available at http://www.pan-ol.lublin.pl/wydawnictwa/ TMot15_1/Osipowicz.pdf.

54.     The second issue is additional wear due to the metal-to-metal surface contact between the cam and roller, and metal-to-metal contact between the roller and roller shoe. This wear inevitably results in the creation of metal filings which can contaminate the fuel system and damage the injectors. The metal-to-metal wear can occur any time the roller stops rotating inside the tappet shoe. Metal particles that lodge inside the roller shoe can effectively jam the rolling pin in a stuck position. In addition, low viscosity caused by water in the fuel can reduce the film layer thickness the roller depends on to ride above the shoe.

55.     When particles enter the roller shoe, and if the film of fluid is not think enough, the hard diamond-like coating of the tappet roller shoe can wear off. As the coating wears, damage becomes progressively worse, even as the wearing generates more hard and fine particles that can make their way through the fuel system to the injectors. Below is a close-up of the CP4 tappet roller shoe, showing abrasive wear of the coating:

**Figure 7: Wear on the Diamond Coating**



56.     Finally, the pump depends upon the fuel to lubricate the roller pin and the cam shaft and prevent wear. U.S. diesel fuel (as explained further below) is refined to a less lubricous specification limit as compared to Europe.

25

57.     Small wear particles (small enough to pass through the engine's filters, or created downstream of the filters through corrosion or wear) are problematic—and potentially catastrophic—for the CP4 for two reasons. First, if the wear particles come in between the cam and the roller, they can create increased point-contact stresses which can damage the ultra-smooth faces of the components, eventually leading to spalling, cracking or loss of material. Second, if the wear particles lodge between the roller and the roller shoe they can cause the roller to stick. If the roller sticks or stops rolling it can cause the tappet to slide between the cam and the roller or to rotate out of alignment with the cam. Any of these conditions causes stress, metal fatigue, wear, and ultimately catastrophic failure.

58.     "Catastrophic" failure can occur through accumulation of wear when the roller skids on the camshaft and aggressively wears to the point of complete roller and tappet breakdown. Large fragments of the worn parts can crack the fuel pump housing and cause fuel leakage to the engine compartment. Migration of wear particles into the common rail, injectors and engine can cause progressive or sudden damage to the pump, injectors, engine, turbocharger and aftertreatment systems. Engine stall or failure to start can also occur which leads to a "mission disabling" failure and vehicle limping to a repair shop or on the side of the road.

59.     Catastrophic failure also occurs when the level of wear is so severe that the pump plunger is not able to complete the full pressurizing stroke and the fuel pressure target is not achieved. If the pump is completely unable to pressurize the fuel the engine will either not start, or, if it is running, the engine will stop. As a result, the vehicle must be towed as it is no longer operable.

60.     When a catastrophic CP4 pump failure is confirmed, not only must the pump itself be replaced, the entire high-pressure sub-system consisting of fuel lines, fuel rails, sensors, and

injectors must be replaced as well. On the low pressure side, the fuel tank must be drained and thoroughly cleaned, the fuel lines much be flushed, and the both fuel filters replaced.

61.     Even if the pump does not catastrophically fail, small, micron-sized metal filings from the wearing process enter into the high-pressure fuel system. This can lead to fuel injector damage, which could impact the precise control of fuel flow. Additional and unwanted excess fuel also leads to a number of problems including damaging or prematurely ageing the pistons, cylinders, turbo charger, or the downstream after-treatment components.

62.     The defective CP4 pump has been the subject of numerous scholarly and analytical industry articles, which describe how the pump can catastrophically fail, as well as how wear in the pump generates metal shavings which can cause injector problems and engine over-fueling. For example, a Polish academic investigator described the problem as follows:

> Fuel injection pump Bosch CP4 is composed of: a drive shaft, a roller in the holder and a plunger pumping section. The most durable component of the tested fuel injection pump tested is its plunger pumping section. The roller with its holder is in the pump body. *A defect of this component is lack of stabilization, which causes that the whole roller can rotate 360° in the pump body.*
>
> If the roller starts rotating around its own axis during the pump operation, it is no longer possible for it to return to its original position. Then, it starts destroying a cam on the pump drive shaft. As a result of friction on a cam and a roller, metal filings are generated, fouling and destroying the whole fuel supply system.[12]

63.     A second report, presented to the International Congress on Combustion Engines, stated as follows:

> An improper cam-roller-pusher solution is a **fundamental flaw** of this generation of [CP4] pumps. The applied roller significantly contributed to reducing forces in the mechanism by utilizing rolling friction, however the pusher with a circular cross-section had a tendency to rotate, particularly when contaminants were present, friction was elevated by inferior fuel quality or insufficient fuel

---

[12] Osipowicz, *supra* note 11.

quantity. When the roller's position changes to perpendicular relative to the shafts' axis, rolling friction changes to sliding friction, which exponentially accelerates the mechanism's wear. Metal filings from the damaged roller destroy inter-operating element of the pumping section, and cause seizing when they penetrate into injectors.[13]

64.    The figure below from one of the academic reports shows the orientation of a rotated tappet and the damage that occurs when the roller rotates on its axis, causing the cam to slide across the roller, rather than rolling together with it:

**Figure 8: Effects of Rotation of the Roller**



65.    These same academics summarized the problem as one of design that is highly sensitive to the quality of fuel:

> Due to the high precision of injection process control, with high pressure or fuel compression, these systems are characterized by sensitively to the quality of applied fuel due to the large faces acting on the system's elements. Numerous design solutions are susceptible to damage resulting from defective design of a given element, beside damage generated by fuel of insufficient quality. In the case of pump defects, leading to the creation of filings with

---

[13] Mateusz Bor, et al., *Analysis of Hypocycloid Drive Application in a High-Pressure Fuel Pump*, 118 MATEC WEB OF CONFERENCES: VII INTERNATIONAL CONGRESS ON COMBUSTION ENGINES, 00020 (2017), available at https://www.matec-conferences.org/articles/matecconf/pdf/2017/32/matecconf_icce2017_00020.pdf (emphasis added).

diameters below several micrometers, other elements of the injection systems are also damaged very frequently, which increase repair costs significantly.[14]

66.     As Diesel Tech Magazine, an industry publication, aptly explained in its December 2017 article entitled, "Common Problems: the CP4 Time Bomb:"

> It's always frustrating to finally get your hands on a brand-new truck (or at least, new to you) and find out there's something wrong with it. It's even more frustrating to learn that not only are you not alone in your suffering, but that it's a common problem to your vehicle. . . . To kick things off, we're going to look at something that's very near and dear to our hearts: the CP4 injection pump. . . . Boy, where to begin? People have taken a somewhat hyperbolic approach and refer to the CP4 as a time bomb, among other colorful terms. The thing is, they're not too far from the truth. Even if you have a 100 percent stock pickup, there's a *really* good chance that you're going to be on the receiving end of a $10,000 bill when it finally goes out on you and destroys your entire fuel system.[15]

67.     Ford's corporate representative in this case, Mr. Brien Fulton, largely echoed the likely consequences of the defective design. In discussing the metal shavings generated by the pump, Mr. Fulton testified that "[t]he surfaces we normally find [the shavings] are on the roller and cam… If you get wear on those portions, the pump – pump performance will start to degrade… If that piston loses its ability to contact the surface, that pump doesn't as effectively pump that fuel into the rail."[16] Mr. Fulton further described how debris caused by the roller wear (or contamination) can cause the roller to flip or misalign: "The failures we've seen, we've seen the tappet rollers flip or misalign in there."[17]

### D.  Characteristics of U.S. Diesel Fuel

---

[14] *Id.*

[15]  Trevor Mason, *Common Problems: the SP4 Time Bomb*, DIESEL TECH MAGAZINE (Dec. 2017), https://www.dieseltechmag.com/2017/12/common-problems-the-cp4-time.

[16] Fulton Dep. at 115:5-116:13 (excerpted). *See id.* at 116-117 generally for further description.

[17] *Id.* at 123:9-13.

68.    As the foregoing suggests, the properties and quality of diesel fuel are very important. Key fuel properties such as minimum levels of lubricity and viscosity must be met at all times throughout the life of the engine in order to at least partially mitigate the damage from the defective pump.

69.    The CP4 relies on diesel fuel itself to maintain lubrication. The lubricity of diesel in Europe is more standardized than American diesel, but European diesel is also dirtier.  Because the sulfur in diesel exhaust is a major cause of smog and acid rain, in 2007, the EPA required diesel fuel sold in the U.S. to have less than 15 ppm of sulfur. This is known as Ultra Low Sulfur Diesel ("ULSD").  It is produced through a refinery process known as hydrodesulfurization ("HDS").  Sulfur provides some of the lubricity needed for the pump to operate.  But the refinery process required to produce low sulfur diesel destroys a variety of important nitrogen- and oxygen-based polar and organic compounds that give diesel fuel its lubricity.  Indeed, ULSD fuel is considered to be very "dry" and incapable of lubricating vital diesel fuel delivery components, specifically high-pressure fuel pumps and injectors; as a result, American diesel accelerates the breakdown and wear of the pump, and the fuel injection system components "are at risk of premature and even catastrophic failure when ULSD fuel is introduced to the system."[18]

70.    Low sulfur diesel fuel first appeared in American markets in the 1990s, with fewer than 500 ppm of sulfur. It is estimated that 65 million fuel injection pumps failed as a result.  It was thought that the pumps failed at the equivalent of 100 to 200 hours of operation.  Thus, the critical importance of lubricity for diesel injection pumps was well known to all auto manufacturers for a decade or more before the Class Vehicles were designed or introduced into the market.

---

[18] Arlen Spicer, *Diesel Fuel Lubricity Additives: Study Results*, THE DIESEL PLACE, Aug. 26, 2007, available at http://www.jatonkam35s.com/DeuceTechnicalManuals/Diesel_fuel_additive_test.pdf (last accessed Nov. 29, 2018).

71.     The main body that sets standards for diesel fuel is the ASTM;[19] the specific standard for U.S. diesel fuel is known as the ASTM-D975, which has been adopted by the EPA as a binding regulation.[20] Lubricity in diesel fuel is quantified as measurement of wear. A test method called a high frequency reciprocating rig (HFRR) involves oscillating a weighted ball across a flat plate and measuring the scratches or "wear scar" pattern on the surface. The diameter of the wear scar is thus an indicator of lubricity, with larger diameters indicating low (poor) lubricity fuel and smaller diameters indicating high (better) lubricity fuels.

72.     In the U.S., the minimum HFRR wear scar diameter is 520 μm (wear scar), compared to the European standard of 460 wear scar. Since the CP4 pump is self-lubricating with the diesel fuel it is pumping, the lack of lubricity of U.S. diesel significantly diminishes the pump's durability and longevity. And since the lubricity of the diesel fuel is an important factor in the durability of the pump, careful attention should have been paid to the difference in U.S. and European fuels.

73.     Engine manufacturers were well aware of the mismatch between engine part specifications that require a maximum of 460 wear scar, and the lower lubricity specifications of Ultra Low Sulphur American diesel fuel:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions.  Diesel fuel injection equipment relies on the lubricating properties of fuel.  Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers.  This property is not addressed adequately by ASTM D 975.

4/22/2002 Truck & Engine Manufacturers' Association ("EMA"), Position Statement titled,

---

[19] "ASTM" previously stood for the American Society for Testing and Materials. Now, however, the ASTM standards are negotiated and implemented worldwide. The governing body is currently known as ASTM International.
[20]  40 C.F.R. § 80.1468.

"EMA Consensus Position Pump Grade Specification." Ford Motor Company is a member of the

EMA.[21]

74.    Further, the EMA made clear:

> Regardless of the fuel sulfur level, ASTM D975 currently requires lubricity specified as a maximum wear scar diameter of 520 micrometers using the HFRR test method (ASTM D6079) at a temperature of 60°C. Based on testing conducted on ULSD fuels, however, fuel injection equipment manufacturers have required that ULSD fuels have a maximum wear scar diameter of 460 micrometers. EMA recommends that the lubricity specification be consistent with the fuel injection equipment manufacturers' recommendation.

8/8/2005 Engine Manufacturers Association, Position Paper titled "North American Ultra Low

Sulfur Diesel Fuel Properties."[22]

75.    In a September 2009 Common Position Statement published by the Joint Diesel

Fuel Injection Equipment Manufacturers ("Joint FIE Manufacturers") regarding Fuel

Requirements for Diesel Fuel Injection Systems, the Joint FIE Manufacturers expressed the

following comments to their colleagues in the automotive industry:

> The continuous world-wide tendency to increase engine performance and reduce emissions has necessitated the development of new generations of enhanced diesel fuel injection equipment, supporting the achievement of stringent legislation targets.   Rising injection pressures and multiple injections result in higher operating temperatures, increased contract

---

[21] *See* Truck & Engine Mfrs.' Ass'n, *supra* note 5.

[22] U.S. automotive industry-wide knowledge of the need to manufacture vehicles with equipment capable of handling the U.S.'s low-lubricity diesel fuel many years before the manufacture of the vehicles at issue here corroborates Ford's knowledge of the problem from the company's very inception. *See, e.g.,* Order on Def.'s Mot. Dismiss 12, *Click v. Gen. Motors LLC*, No. 2:18-cv-00455 (S.D. Tex. Mar. 27, 2020), ECF No. 83 ("GM complains that it cannot be charged with knowledge about the CP4 fuel pump before it actually began incorporating those fuel pumps into its vehicles . . . . But that assumes, contrary to product development and industry standards, that a manufacturer has no responsibility to research and test products prior to manufacturing them.") (citations omitted); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 879 (N.D. Cal. 2019) (upholding Plaintiffs' CP4-defect-based fraudulent concealment claims against GM based on the following allegations which largely mirror the allegations here: "Plaintiffs allege that GM became aware of the need to install equipment capable of handling low lubricity diesel fuel many years before manufacturing the vehicles at issue here, because the entire automotive industry had 'experience[d] . . . widespread catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s.' Compl. ¶ 6. When low-sulfur diesel 'first appeared in the American market in the 1990's,' an 'estimated . . . 65 million fuel injection pumps failed as a result.'").

pressures and reduced clearances . . . .  Alterations to fuel quality, e.g., by increasingly severe refinery hydroprocessing being introduced to remove Sulphur also reduce the content of aromatics and destroy surface active compounds and antioxidants. ***Removal of these beneficial compounds effects boundary lubrication, commonly known as lubricity, and inherent oxidation stability and must be compensated for.*** Fuel parameters such as cetane number, viscosity, density, lubricity, oxidation stability, sulfur and aroma content, together with the absence of free water and dirt contamination, are key parameters required to ensure performance of equipment in the field.

Biofuels are becoming increasingly available to end-users [including] in the United States of America . . . .  It must be recognized that the physical and chemical characteristics of bio components are significantly different to conventional fuels and that care must be taken in their specification and use.

Diesel fuel injection equipment (FIE) manufacturers fully support the development of alternative sources of fuel . . . .  ***However, many vehicles, engines and equipment are not designed to run on them.  It is recommended to refer to the vehicle and engine manufacturers 'Limitations of Use' documents for guidance.***[23]

76.     Likewise, in a July 2014 study on the use of fuel injection equipment with global diesel fuels, Parker Racor, the leading global supplier of diesel fuel filtration systems, explained the following:

The increase in system pressures in diesel engines has a significant effect on filtration requirements. These systems are highly vulnerable to many forms of contaminants and the need for robust high efficiency filtration has never been higher . . . .  An analysis of global diesel fuel quality shows that although the fuel quality in the developed markets has improved, significant quality concerns still remain. Levels of water and contaminants remain at levels that can cause long term issues to the latest fuel injection systems. Specifically, the levels of contaminants smaller than 5 microns remain very high. These particles can be small enough to pass into the internal clearances of high pressure fuel injection systems and can lead to erosion and wear of critical areas leading to a loss in system performance and eventually system malfunction. Diesel

---

[23] Joint FIE Manufacturers, *Fuel Requirements for Diesel Fuel Injection Systems: Diesel Fuel Injection Equipment Manufacturers: Common Position Statement 2009*, Sept. 2009, available at http://www.globaldenso.com/en/topics/files/common_position_paper.pdf (last visited Nov. 29, 2018) (emphasis added).

filtration balances pressure drop, useful life and efficiency. ***However the real long term effect on fuel system life is often not adequately considered[,] as much of the engine durability testing performed is done using high quality fuel that doesn't represent the range of fuels seen in the market***. Consideration of filtration performance under less than ideal conditions is necessary to develop an acceptable level of protection.[24]

77.     Most diesel fuel in the United States is produced by distillation of petroleum oil in a refinery. The fuel is refined and processed to meet certain specifications outlined in regulations and guidelines adopted by the EPA. The refinery also blends additives into the fuel to meet the applicable specifications. Once U.S. diesel fuel is produced in the refinery it enters a distribution system where it travels to terminals and then ultimately to a fuel pumping station. In the U.S., fuel may be transported in a variety of ways included pipelines, trucks, and rail. The figure below is a schematic showing the flow of fuel from its source (crude oil) through refining and distribution:

---

[24] Steven Hardison & Adam Pearce, *July 2014 Summary of Fuel Injection Equipment with Respect to Diesel Fuel Filtration,* PARKER RACOR & AVL, Jan. 7, 2015, available at https://www.parker.com/literature/Racor/RSL0194%20-%20(TAP_AVL-Fruel-Study-Racor).pdf (last accessed Oct. 31, 2019), at i; *see also id.* at 13 ("Careful monitoring of fuel quality and filter performance is needed to protect sensitive diesel engine injection systems"); *id.* at 29 ("To avoid costly engine fuel system components damages, advance multi-stage filtration is recommended"); *id* at 31 ("Modern high pressure diesel fuel injection systems contain very small internal clearances and are vulnerable to any build-up of deposits on these components…. This issue has become a significant concern in the industry").

**Figure 9: Transport of Fuel from Source to Gas Station**



78.     Fuel is tested to ensure it meets ASTM specification once it leaves the refinery and again when it leaves the bulk terminal. Fuel may be blended (with biodiesel for example), or enhanced with various additives at either the refinery or the terminal. Although there is a system in place to try to achieve uniformity of fuel quality, as described below, in practice there are a number of factors that lead to the frequent production of substandard quality fuel.

**E.  The Unreliability of U.S. Diesel Fuel**

79.     Despite EPA requirements, in reality, U.S. diesel frequently contains even less than 15 ppm, a truth that is widely known within the U.S. automotive industry.

80.     Notably, according to Infineum's[25] 2014 Worldwide Winter Diesel Fuel Quality Survey testing of 341 diesel fuel samples from around the world, <u>all</u> diesel fuel samples the

---

[25] Infineum is a company that is globally recognized as the leader in diesel fuel quality surveys.

organization collected and tested from the U.S. and Canada contained sulfur levels of 10 ppm or less.[26]

81.    Other fuel surveys indicate that U.S. diesel scar differs drastically across the continental U.S. For example, in 2018 Infineum conducted a survey of the lubricity of U.S. diesel fuel from various regions of the continental U.S. and found the following:

**Table 1: Survey of Lubricity of U.S. diesel fuel (2018)[27]**

|  | Minimum lubricity scar score | Maximum lubricity scar score | Mean | Sample size | Locations exceeding 520 wear scar | Locations exceeding 460 wear scar | Locations exceeding 400 wear scar |
|---|---|---|---|---|---|---|---|
| **East Coast** | 219 | 506 | 385 | 10 | 0 | 1 | 5 |
| **Midwest** | 198 | 526 | 390 | 37 | 1 | 9 | 24 |
| **West Coast** | 289 | 526 | 448 | 10 | 1 | 6 | 7 |
| **Total** |  |  |  | 57 | 2 | 16 | 36 |

82.    Based on this chart, it is clear that there are certain locations where the fuel's lubricity will further accelerate the breakdown and wear of the pump. Over the course of a truck's lifetime, a truck driver will likely use diesel fuel that is "dry," which will accelerate the damage to the engine outlined herein.

83.    However, with the advent of ULSD fuel, high lubricity fuels are hard to obtain and the consumer has no way of knowing the lubricity of the fuel at a standard retail filling station. To that extent, the numbers listed in Table 1 are troubling: nearly two thirds of all diesel fuel stations sell diesel fuel that exceeds the maximum lubricity score that Bosch indicated was "strongly recommended." About 3 in 10 diesel fuel stations exceed European standards. Based on this data,

---

[26] *Infineum Worldwide Winter Diesel Fuel Quality Survey 2014,* INFINEUM INT'L LTD., available at https://www.infineum.com/media/80722/wdfs-2014-full-screen.pdf (last accessed Oct. 31, 2019), at 6-7.
[27] *See* https://www.infineuminsight.com/media/2228/infineum-wdfqs-2018-v10-14112018.pdf.

it seems all but inevitable that truck owners will eventually fill up their trucks with diesel fuel that is "dry" and harmful to the trucks' engines.

84.     Ford's documents are consistent with this conclusion, a sampling of which is excerpted below (all emphasis added):

> •     In a November 13, 2009 email string among Ford engineers, one of them stated, "You need to be aware of the current fuel lubricity levels . . . we have lots of fuel above 520 [scar]."[28]  In response to a request for more up-to-date lubricity figures in that email chain, one of the engineers sent the chart below, which shows the highest number of samples were taken on fuel above 520 scar.[29]

---

[28] FORD_DIESEL_00041707.
[29] *Id.*

**Chart 1: Lubricity Content Trend**



- According to a draft document that Ford engineers prepared in April 2011.



---

[30] "HFRR" stands for High Frequency Reciprocating Rig, and it the standard testing machine used to measure lubricity by the ASTM.  The HFRR number cited above is the same as the "wear scar" referenced in this report.
[31] FORD_DIESEL_00048148.  This document was described in the accompanying email as a "draft document" for a discussion with NHSTA in April 2011.  *See* FORD_DIESEL_00048146.

•   In an internal email among Ford engineers from October 2011 discussing diesel fuel quality, one of the engineers noted that "**What the ASTM D975 specification is and what is actually in the field are two different things**, and unregulated biofuel adds another twist. . . . It's a very complicated topic."[32]

•   An Engineering Manager at Ford responds to this email chain as follows: "There appears to be a lot of confusion about diesel fuel quality with our Customers. . . . From the Customer's perspective, they read 'must meet ASTM D975 or ASTM D7467 B6-B20' in the diesel supplement, and **their eyes roll back in their heads.  The information is just not useful**. . . . When you stop for fuel on a road trip do you walk into every refueling station and ask the clerk behind the counter?  Most time you'll just to see [sic] the deer in the headlights stare as a response."[33]

•   The Engineering Manager then describes the "burden on the Customer" from the CP4 pump, and Ford's decision to not cover the claims under warranty because of "fuel quality issues:"



•   Another engineer, Ms. Raney-Pablo (who was introduced to the email thread as "our resident diesel fuel guru") responds and elaborates on the variability issue: "I agree that knowing the fuel must meet ASTM D975 or ASTM D7467 B6-B20 is only useful if the fuel station has the information – which most do not (and certainly not . . . the cashier on duty).  Stating these specs in the owners guide . . . provides a legal definition of the minimum fuel requirements relating to the Ford warranty.  If the fuel used is out of compliance AND if it shown to have caused the failure, then Ford

---

[32] FORD_DIESEL_00066315, at 3.
[33] *Id.* at 2.
[34] *Id.*

may deny warranty.  The challenge is proving that the fuel used by the customer is 1) out of compliance and 2) that that single batch of fuel caused the failure.  **Unfortunately for most customers, when they pull up to a fuel pump to refill their vehicle, the only fuel quality information available to them is what's stated on the pump**. In most cases this will be a label f[or] ultra-low sulfur (ULSD) and another label if the biodiesel content exceeds 5%. Other than sulfur content and sulfur-biodiesel labeling, retail fuel quality is controlled at the state level. Some states, but not all, require fuels to comply with ASTM D975 and/or ASTM D7467. Enforcement to these standards also differ by state. Some states actively enforce fuel quality standards through fuel sample testing, other states are more passive, waiting for customer complaints before investigation."[35]

- Ms. Raney-Pablo concludes as follows: "The bottom line for US customers is that as stated in the owners guide, they need to use fuel which is ULSD and the biodiesel content should not exceed 20%. Most of the time this is the only information they will have by which to judge a fuel because of the pump labeling. **They have no other way to assess the quality of the fuel or to confirm if a fuel complies with the applicable requirements (which differ by state)** – unless they have their own fuel test kit. **The labels unfortunately do not guarantee good fuel**.  They may still get a bad batch of fuel, despite selecting a fuel that has the right labels.  If it leads to a drivability issue, they can change fuel stations and/or brands.  **But this doesn't help those customers where the single tank of bad fuel led to a component failure**."[36]

- An internal PowerPoint presentation in October 2012 created by Ford engineers identified ████████████ ████████████    and the next slide contains the following photo, precisely showing the defect and the consequences (all text in the slide was in the original Ford document):[37]

---

[35] *Id.* at 1-2.
[36] *Id.* at 2.
[37] FORD_DIESEL_00014517.

**Figure 10: Poor Lubrication Outcome**



### F. Water in U.S. Diesel Fuel

85.     U.S. diesel fuel can also easily degrade and move off specification during transportation and storage, including from the entry of water into the fuel.[38] Water can seep into the fuel supply, which decreases the fuel's viscosity.[39] During transfer of fuel—either from refinery to storage tanker, or from tanker to the pump—air can get into the fuel. When the air cools, water condenses and drops into the tank. If this occurs, the fuel loses viscosity, which has a directly

---

[38] Rick Chapman, Why Fuel Quality Standards are Important, STI Webinar – Petroleum Storage Tank Maintenance, INNOSPEC (Dec. 18, 2013), available at https://www.steeltank.com/Portals/0/Shop%20Fab/ 12.18.13STI%20webinar%20Fuel%20Specs%20FINAL.pdf.

[39] Viscosity is a measure of the thickness of a liquid, which can affect the lubricity. Generally, a viscous liquid is more lubricious, although there are many exceptions: corn syrup is viscous but not lubricious; cooking spray is not viscous but is lubricious.

negative effect on its lubricity, resulting in an insufficient layer of protection between the roller pin and the tappet shoe.

86.     The potential for water to get into the fuel supply is a well-known and easily anticipatable problem for OEMs such as Ford. Diesel fuel tanks "breathe" through filler caps and vents, and as fuel is withdrawn by the fuel pump, humid air can enter the fuel tank and water can condense when the fuel tank cools.

87.     As early as 2004, in a summary of the effects of water on diesel fuel, a Ford engineer explained that "Diesel fuel has hygroscopic properties; that is, it can absorb water vapor directly from the air."[40] In addition, he noted that "Water displaces surface fuel film used to lubricate sliding injector and pump components, causing accelerated wear."[41]

88.     Ford's own documents show that water contamination was anticipatable. A product development engineer in an internal Ford email exchange, in discussing water getting into the high-pressure fuel pump, stated: "This needs to be viewed as something that must get fixed; water in fuel is not a rare occurrence on diesel and team needs to drive Bosch to change material in pressure regulator so that it is robust to water (i.e. material change or ?)."[42] Another engineer responded, "Where did the water come from: I doubt if someone used water [in lieu of] fuel. I suspect that it was a batch of bad fuel, which is likely to happen with several customers."[43]

89.     In April 2009, a Ford engineer noted that, "Regarding poor quality fuel, we certainly have that here in the USA, even at Ford facilities. A few months back, one of our M1 vehicles with only a few thousand miles on it failed a chassis fuel pump. We traced the problem

---

[40] FORD_DIESEL_00000202.
[41] *Id.*
[42] FORD_DIESEL_00026866, at -6868.
[43] FORD_DIESEL_00026866.

to the pressure regulator in the CP4.2 rusting shut due to high water content in the fuel, which caused the vehicle fuel pump to dead head."[44]

90.     Yet Ford continues to blame customers for water in the fuel, based on the flimsy assumption that the consumers are at fault for what is a foreseeable condition to Ford.

**G.  Dirt/Corrosion Particles and Gasoline Contamination in U.S. Diesel Fuel**

91.     Diesel fuel can become contaminated by dirt or corrosion particles. Fuel tanks can become rusty through exposure to air. The net result of contamination is the particles clog up the two filters in the fuel injection system.

92.     It was no surprise to Ford, then, when it began experiencing serious problems with particles in the CP4 fuel pump in its 6.7L diesel-engine vehicles during the pre-production phase.[45]

93.     Contamination is also a well-known and easily anticipated problem for OEMs. Another email exchange among Ford engineers stated: "Just to capture the information I mentioned in our Friday evening phone call, I've heard repeatedly and from different people at Bosch that the 2011 GM Duramax CP4.2 pump has had warranty problems due to contamination, with fibers being implicated in many cases."[46]

**H.  Pre-Class Period Failures and Industry Knowledge**

94.     The Bosch CP4 fuel injection pump was defective and particularly incompatible with U.S. diesel fuel from the very beginning, even prior to its usage in the Class Vehicles.[47] For

---

[44] FORD_DIESEL_00027879.
[45] *See, e.g.*, FORD_DIESEL_00005438, Dec. 1, 2009 email chain between Ford employees K. Pumford, S. Eeley, et al. discussing analysis of metal deposits found on fuel injectors in Ford's "Scorpion" engine (pre-production 6.7L engine); FORD_DIESEL_00005223 and -5224, Jan. 29, 2010 email chain between Ford employees A. Radke, J. Rauch, B. Futon, et al. re: "Urgent (KTP J1 Issue) for 6.7L Diesel Fuel System Contamination Analysis" (discussing "latest analysis of the debris found in the high pressure pump, primary and secondary filters").
[46] FORD_DIESEL_00005019.
[47] *See, e.g.*, FORD_DIESEL_00051880, at -1884 ████████████████████████████████████████
████████████████████ FORD_DIESEL_00052471, at -2480 (May 30, 2012 presentation regarding ████████████████████████

example, on February 7, 2011, the National Highway Traffic Safety Administration's ("NHTSA")

Office of Defects Investigation ("ODI") opened a safety investigation based on 160 complaints

"alleging incidents of engine stall and/or loss of power that appear to be related to high pressure

fuel pump ('HPFP') failures in certain model year (MY) 2009 through 2010 Volkswagen Jetta and

MY 2010 Volkswagen Gold and Audi A3 vehicles equipped with [turbo diesel engine] clean diesel

engines. Approximately half of the reports indicate that the failure resulted in an engine stall

incident, with many of these alleging stall incidents at highway speeds in traffic with no restart."

During this investigation, ODI requested documents not only from Volkswagen and Bosch, but

also from GM, Ford, and FCA. Documents that the OEMs produced were subsequently published

on NHTSA's website.

95.    These documents demonstrate widespread and early knowledge of the defect and

its potentially catastrophic effects. Among the documents' disclosures are the following:

> •    In September 2009, Bosch, at the time supplying the
>
> defective CP4 fuel pump to Audi and Volkswagen, received a notice
>
> from Audi about a "3rd HPP failure" in the U.S., explaining, "I'm
>
> afraid there's bad news from the U.S.: After 2 failures in the field
>
> … the 3rd HPP failure has now occurred in the EC endurance run."[48]

_____

████████████████████████████████████████

████ FORD DIESEL 00057419 (Oct. 1, 2012 letter from Bosch to Ford ████

████████████████████████████████████████

[48] Sept. 2, 2009, email from Audi representative to Bosch representatives regarding "3rd HPP Failure USA," produced in response to NHTSA Inquiry EA11003EN-00639[0], available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed Oct. 31, 2019), at 146.

Photos attached to the email show the failed Bosch CP4 fuel pump,

replete with metal shavings in the gasket:[49]






- In August 2009, Audi sent Bosch a failed CP4 fuel pump for

analysis after "[t]he high pressure fuel pump failed catastrophically

shedding metal shavings throughout the entire fuel system . . . . This

car will require a complete new fuel system from tank to injectors

and everything in between. This will be a very lengthy repair

(weeks) . . . . We need to determine if component failure or bad fuel

---

[49] *Id.* at 148-50.

is to blame." Thereafter, on September 1, 2009, Bosch responded to Audi with the following analysis note from their failed pump inspection: "Gentleman, [t]he pump mentioned below was analyzed. The result of the finding is sand-like particles in the fuel. **Defect caused by customer.**" *Id.* at 38 (emphasis added).[50]

•       In May 2010, after analyzing foreign particles found in the fuel filter of a failed Audi diesel engine equipped with a CP4 fuel pump and determining that the biodiesel used in the subject engine was "insufficient[ly] cleans[ed]" resulting in deposit formation "which is not conducive to establishing the lubricating film in the [fuel pump] roller support," Bosch noted that, "When [diesel fuel] viscosity is too low, the lubricating film is not established properly and mixed friction and surface contact occurs = bad."[51]

---

[50] *See also* March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 21 (Mar. 31, 2008 email from Volkswagen to Bosch re: "Radio: Drivetrain damage failure US07 (Jetta)," in which the parties are discussing an HPFP failure in a 2007 Jetta and the Volkswagen representative states, "Can you (panel of experts) explain to us how the failure mechanism was after this mileage? . . . . We will certainly not accept a failure because of fuel quality! . . . . We also see a big risk here for our BIN5 pump, which has to manage with the same fuel in USA"); May 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 9-10 (July 4, 2008 email from Audi to Bosch re: "CP4 BIN5 3rd and 4th failure in USA," analyzing root cause of CP4 field failures and positing, "Why is it that EC pumps do not fail? Because of a different fuel?"); *id.* at 13-14 (Jul. 11, 2008 email between Audi and Bosch representatives re: "W19 BIN5 pump failure" in which Audi writes, "For the zero error meeting in FeP on Tuesday we expect the information discussed at the error meeting on endurance testing of fuels with 'poor lubricity, containing water etc.' and all failures, drivetrain damage in all component, system and other endurance runs of Bosch and all customers"); July 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 7 (emphasis added) (June 30, 2009 email between Bosch and Audi representatives re: "ANS: HPP measures/ USE," in which the Audi representative writes, "I don't think you're reading my mails anymore! Please look at the failure curves specifically, then you'll see that *we only have a problem in certain markets[.] . . . Depending on how poor the fuel currently on the market is*"); *id.* ("I'd prefer to have a more robust pump").

[51] July 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 12–14 (May 26, 2010 email chain between Audi and Bosch representatives re: "Particle analyses, fuel filter").

• In a June 2010 email chain between Bosch and representatives of Audi and Volkswagen regarding the catastrophic failure of a CP4 pump in an 2010 Audi A3 TDI diesel vehicle (published on NHTSA's website), Audi asked Bosch, "[W]hy are the defects mentioned below still present after replacing the high-pressure pump and the injector? What could the [dealer] have done wrong by way of incorrect repair so that such defects are appearing?" Bosch responded that "In this case the complete fuel system (HPP, rail, injectors, all lines) need to be changed . . . . I assume that because of the 'cruncher,' the entire system is contaminated with chips, which are then pumped in circulation and can soon lead to the next failure! The rough running can be explained by the fact that a chip is already present before or in the injector and is impairing its function."[52]

• In June 2011, Bosch received a report from Volkswagen regarding a CP4 pump failure in a 2.0L Volkswagen TDI in which the Volkswagen representative explained, "I have here a pump from [sic] a 2.0L TDI. I have been testing a lot of these this week and

---

[52] *See, e.g.*, July 7, 2008 email between Audi and Bosch representatives re: "Performance drop AU716 98017 with shavings in the HPP," discussing how "[s]omething is disintegrating" in the Audi 716 fuel pump and that "[w]e are a bit speechless" about "[t]he shavings, or whatever it is"), submitted as part of Bosch's May 2012 responses to NHTSA ODI Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 6; *id.* at 27 (July 31, 2008 email from Audi representative re: "Fuel quality in [**REDACTED**]," stating that, "With our [Audi's] V6TDI with the high-pressure pump CP4.2 we have significantly higher failure rates in [**REDACTED**] (higher by a factor of approx. 30 than the average of all markets) . . . . Have you any information suggesting that such a thing could be possible with this country-specific diesel fuel?"); *id.* at 28-31 (Feb.-May 2011 email chain between Audi, Volkswagen and Bosch representatives re: "Status CP4 USA," in which the parties discuss the substantial increase in warranty claims with the implementation of the CP4 in vehicles in the U.S. market).

many have an amount of 'metal Debris' or other metallic particles

in them."[53]

96.     By the end of 2011, it was well known that Bosch CP4 failures in U.S. Audi and

Volkswagen vehicles were widespread and catastrophic.[54]

97.     Although many of the communications cited above in the NHTSA investigation

involved Bosch and Audi or Volkswagen, Ford engineers almost certainly would have heard about

these problems early on. Vehicle manufacturers such as GM, FCA, and Ford, and component

manufacturers such as Bosch, Delphi, and Cummins, have significant and dedicated departments

which continuously monitor regulatory compliance with safety, emissions, customs, and tax laws.

Their marketing departments monitor their competitors and public domain information to track

emerging trends which may impact their business, such as the release of new competitive products

or problems with commonly used components on other manufacturer's products. These

departments maintain extensive databases of competitive information including design details,

teardown analyses and reverse engineering to maintain their competitive edge or comparative

advantage. These databases are searchable by employees and information is pushed to new product

development teams.

98.     Specific departments in OEMs (including Product Compliance, Liability, and

Environmental Management) will monitor many public (and subscription) sites such as

---

[53] Mar. 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 12 (Jun. 9, 2011 email from Volkswagen Group of America, Inc. to Bosch re: "2.0L TDI Fuel Pump").

[54] *See* July 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 69 (Sept. 15, 2011 email from Volkswagen to Bosch: "***I think the [CP4] failures are well known***. It is also important to know that not only the high-pressure fuel pump, but the entire injection system is to be replaced in case of damage to a HPP with a cost >[**REDACTED**] caused by chip contamination") (emphasis added); *see also* Mar. 22, 2011 email from Bosch employee to Volkswagen employees regarding analysis of failing CP4 fuel pumps,(showing that, by March 2011, Bosch was continuing to receive "a respectable number" of CP4 "mechanical breakdowns" in the U.S.); *id.* at 19-22 (spreadsheet showing results of Bosch's pre-analysis of HPFP failures in Volkswagen/Audi vehicles where "metal chips found in fuel system").

truckandenginemanufacturers.org, NHTSA.gov, EPA.gov, the California Air Resources Board (ww2.arb.ca.gov), and international agencies (e.g., www.cen.eu, ASTM.org) to ensure compliance with all standards, regulations and awareness of changing regulations, recalls, and safety-related issues, among others. They will also subscribe or fund firms to do this analysis and information gathering for them. They also employ lobbyists in government agencies to keep abreast of new situations. These firms are all well informed about market conditions and product liability potential issues.

99.    In addition, the federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.[55]

100.    Emerging problems (such as the NHTSA investigation of Volkswagen/Audi CP4 pump failures) would certainly be tracked by Ford and other OEMs. There are federal regulatory requirements mandating such tracking. Relevant information would then be condensed and pushed to design, development, testing, service and quality departments to ensure that they were aware of these emerging problems. These global firms maintain extensive bodies of knowledge such as "lessons learned" or "engineering standard work" databases to ensure that problems encountered internally or externally are codified into their own standards and disseminated to working levels of engineering, design, quality and service. "Lessons learned" from competitors are invaluable since they avoid similar problems during development and production. These "lessons learned"

---

[55] 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

databases are particularly important when OEMs develop global products at multiple engineering centers around the world. "Lessons learned" and competitive benchmarking are key steps in the Design Validation Planning of all major OEMs and part of their "Value Analysis" studies for New Product Introduction.

101.    In addition, working level engineers and designers also are encouraged to join trade organizations such as the Society of Automotive Engineers, American Society of Mechanical Engineers, and ASTM, and to subscribe to many trade publications and tradeshows to stay current with changing requirements and competitive information. When a new product, regulation, standard, or issue is being announced or rumored, all major automotive news organizations will investigate and report on these developments since they are crucial for the OEMs' business. Product problems are also tracked closely since they affect stock market valuations and warranty accruals in SEC filings.

102.    Government organizations such as NHTSA, EPA, and CARB routinely push information to OEMs and require responses to ensure that they are on notice of emerging safety issues, recalls, emissions and safety compliance changes. This information is required to be published broadly by OEMs within their internal websites to employees to put them on notice, and there are compliance audits to ensure that employees are trained and certified where necessary.

103.    NTHSA recalls and investigations would certainly be communicated to the product development, quality, purchasing, and service teams.

104.    Accordingly, information about the CP4 pump's problems would have been widely known throughout the industry, and certainly known to Ford.

105.    Ford acknowledged in its January 20, 2012 response to NHTSA's investigation of high-pressure fuel pump failures that "Inadequate lubricity can result in increased tailpipe

emissions, excessive pump wear and, in some cases, catastrophic failure."[56] According to Ford's corporate representative, Ford's acknowledgement to NHTSA regarding inadequate lubricity was only a year after the class vehicles began to be sold and would only have been driven 5,000-25,000 miles.[57] In other words, the CP4 pump began to fail right away.

106.    Importantly, the field data Ford itself submitted to NHTSA in January 2012 was already sufficient to detect a serious defect involving Class Vehicles' fuel pumps. Among other things, Ford submitted records of more than one hundred 2011 MY F-Series diesel trucks which experienced engine destruction due to the defective CP4 fuel pump—many of which Ford identified as "Root Cause: Poor lubricity Fuel."[58] Ford was aware of the field reports of high-pressure fuel pump failure in at least the 2011 model year F-Series, many of which involved moving stalls.

107.    A major quality control measure used by Ford and other automotive manufacturers is to compare a particular model year vehicle's warranty claims and other aggregate information (such as driver complaints and field reports) with the preceding model year vehicle's data to evaluate whether there is a measurable uptick in the failure rate. In modern day vehicle production, failures are typically measured per thousand vehicles or sometimes even per hundred thousand vehicles, and defect trends are frequently identified after just one or several reported failures

108.    In addition, for many decades, Ford has conducted durability and reliability testing of its new vehicles before introducing them to the market. This means that Ford trucks, including Class Vehicles, are supposed to be exposed to lengthy and comprehensive physical testing that

---

[56] Fulton Dep. Ex. 4 at 19.
[57] Fulton Dep. at 178:6-22.
[58] Jan. 20, 2012 Ford Response to NHTSA Inquiry EA11-003, Document titled, "INRD-EA11003-50103P.pdf," available at https://www.nhtsa.gov/recalls?nhtsaId=EA11003 (last accessed May 20, 2020), at 502-547.

reveals how the vehicles and component parts (including the engines and fuel pumps) will last when driven for tens of thousands of miles.

109.    Through this testing, Ford also would have discovered the defect—before selling the first Vehicle. As the driver complaints to NHTSA show,[59] and as the Named Plaintiffs' own experiences iterated herein show, it is not uncommon for the Class Vehicles' fuel pumps to fail before the vehicle has even been driven 50,000 miles, with one Named Plaintiff's pump failing after as low as 17,500[60] miles of driving. Likewise, it is not uncommon for the Class Vehicle fuel pump to fail within the first year or two of driving. These early failures are well within the scope of Ford's durability and reliability testing.

110.    To skew pre-production testing in its favor, Ford tested its vehicles with fuel that had unrealistically high levels of lubricity. For example, in May 2006, as part of its testing of the CP4 pump, Ford requested fuel with high lubricity in its "engineering material specification" sheet. The specification sheet called for fuel with a *minimum* lubricity of 520 scar, and a *maximum* of 400 scar.[61] Although there is evidence that there is an abundance of poor quality fuel out in the field, the testing requirements sent by Ford to the fuel injection equipment manufacturers (like Bosch) listed 22 different types of tests "to support system sign-off requirements," and included items such as "corrosion test" and "thermos-cycling durability"—but no tests were performed using out-of-spec fuel.[62] Similarly, a "Statement of Work" between Ford and Bosch regarding the MY 6.7L trucks provides a detailed task list for both companies, but provides nothing on testing out-of-spec fuel.[63]

---

[59] *See, e.g., infra* ¶¶ 130-31.
[60] *See supra* ¶ 15.
[61] FORD_DIESEL_00005321.
[62] *See* FORD_DIESEL_00005893.
[63] *See* FORD_DIESEL_00006369.

111.    Ford should have performed more tests for the Class Vehicles using a wide range

of fuel. As detailed herein, the lubricity of fuel in real-world conditions varies dramatically in the

United States, suggesting it is prudent for vehicles manufacturer to consider worst-case and

realistic-case conditions during testing. As a report from Parker Racor, a well-known fuel filter

supplier, stated, "the real long term effect on fuel system life is often not adequately considered[,]

as much of the engine durability testing performed is done using high quality fuel that doesn't

represent the range of fuels seen in the market. Consideration of filtration performance under less

than ideal conditions is necessary to develop an acceptable level of protection."[64]   Ford never

adopted this approach, and instead asked for fuel with a lubricity target score that was much lower

than the level set by EPA regulations.

112.    Despite this knowledge, beginning with the 2011 model year Ford was touting the

improved durability of its Power Stoke 6.7L engine, which was installed in many of the subject

Class Vehicles and incorporated the CP4 fuel pump. Indeed, Ford claimed that the Power Stroke

improve durability while increasing fuel injection pressure up to nearly 30,000 psi, increasing

noise reduction and also tolerating up to 20% biodiesel fuel mixtures.[65] The Power Stroke

continued to use the new lower-volume CP4 fuel injection pump, including but not necessarily

limited to the 2012-2020 Ford Power Stroke Super Duty trucks equipped with a 6.7L engine.

113.    Some of these vehicles are modified for commercial purposes, such as cargo vans,

specialized work trucks, and a variety of ambulances offered by Ford. The CP4 has long

experienced problems, and the failure of these pumps can be devastating to people and businesses

alike. The CP4 performed terribly from the start, but Ford put it into more and more engines.

---

[64] Hardison & Pearce, *supra* note 24.
[65] *See* 2011 Ford Super Duty Brochure at 5, available at https://www.ford.com/services/assets/
Brochure?make=Ford&model=SuperDuty&year=2011&postalCode=55401 (last accessed May 20, 2020).

114.     Further, Ford accepted the fact that U.S. diesel was "out of spec" and chose against hardware changes, acknowledging and rejecting a suggestion from Chevron in November 2009 that "Ford need[s] to change hardware to be more robust instead of counting on the fuel suppliers to improve quality, or ask for tighter lubricity specification."[66]

115.     In September 2010, when Ford was still experiencing lubricity issues with its diesel HPFPs, Ford engineer Brien Fulton noted that, "Diesel fuel systems and water don't mix, even on the microscopic level."[67]

116.     Meanwhile in 2010, under the leadership of Derrick Kuzak, Ford's group vice president of Global Product Development, Ford advertised that its "new diesel engine will deliver significant improvements in torque, horsepower, and fuel economy while adding more fueling flexibility." For 2011, Kuzak promised, "This all-new diesel engine has been so extensively tested both in the lab and in the real world that we're confident we're giving our customers the most reliable and productive powertrain available today."  Ford claimed that the new Power Stroke engine could utilize up to 20 percent biodiesel; however, in order to achieve greater fuel efficiency, the Power Stroke engine incorporated a newer, lower-volume fuel injection pump, Bosch's CP4 pump.[68]

---

[66] Nov. 13, 2009 email from Chevron Ornite Company OEM & Industry Liaison Jerry C. Wang to Ford employees re: "TLP09-117 Brief Report on HFRR Lubricity Evaluation of Diesel Fuels," submitted by Ford to NHTSA in response to NHTSA ODI Inquiry No. EA11003, part of compilation of Ford fuel pump-related emails in "Appendix G" to Ford's Jan. 20, 2012 NHTSA submission (document titled "INRD-EA11003-50107P"), at 433. *See also id.* (emphasis added) (Wang presents another option to Ford, stating, "[T]his is an out of spec fuel issue so there is no need to change hardware and hope fuel quality will improve or *just accept this as fact of life if the warranty is manageable*").

[67] Sept. 17, 2010 email from Ford Diesel Powertrain Systems Technical Specialist Brien Fulton to Ford employees Robin Lawther, Forest Heggie, Karl Burroughs, and Carlos Armesto re: "High pressure fuel systems vs water in diesel fuel," submitted by Ford to NHTSA in response to ODI Inquiry No. EA11003, part of compilation of Ford fuel pump-related emails in "Appendix G" to Ford's Jan. 20, 2012 NHTSA submission (document titled "INRD-EA11003-50107P"), at 365-66.

[68] *See, e.g.,* "New 2011 Ford Super Duty Power Stroke Diesel Offers Customers More Fueling Choices," FORD-TRUCKS.COM (content provided by FORD.COM), Mar. 17, 2010, available at https://www.ford-trucks.com/articles/new-2011-ford-super-duty-power-stroke-diesel-offers-customers-more-fueling-choices-1/ (last accessed Jun. 3, 2020).

117.     At least as early as 2010, Ford recognized the problem and began looking for ways to blame consumers or fuel supplies for the poor performance of their CP4 pumps:

> 2008–2011 Super Duty, equipped with the diesel engine that have been filled with gasoline, incorrect diesel fuel or other non-diesel fuels can damage the fuel system components, including the High-Pressure Injection Pump and fuel injectors.  Non-recommended fuels and additives do not meet the lubricating, cooling and anti-corrosion properties that is required of the fuel system components.

9/8/2010 Technical Service Bulletin ("TSB") email by Tony Lusardi, Ford Product Concern Engineer for the 6.7L Diesel.  Rather than acknowledge the problem to unsuspecting consumers, Ford would point to "fuel contamination," thereby shifting the blame to the customer.[69]

118.     On February 7, 2011, as the first models of the Class Vehicles were being sold, NHTSA investigated Ford for a potential defect in its predecessor diesel high pressure fuel injection pumps as well as certain model year vehicles containing the CP4 pump.[70]

119.     In its January 2012 submission to NHTSA, Ford represented the following: "Ford has ensured that the HPFP design in the peer vehicles is compatible with diesel fuels sold in the United States through engine and vehicle testing with the previously referenced diesel test fuels."[71]

---

[69] *See, e.g.*, Nov. 23, 2009 email from Ford Diesel Drivability Service Engineer Zachary Baker to Ford Diesel Engine Team Leader Derek McCallister re: "6.4 Pump & Injectors," submitted by Ford to NHTSA in response to ODI Inquiry No. EA11003, part of compilation of Ford fuel pump-related emails in "Appendix G" to Ford's Jan. 20, 2012 NHTSA submission (document titled "INRD-EA11003-50107P"), at 8 (emphasis added) (Baker explaining how to deal with customer warranty claims involving HPFP failures as follows: "In the event that fuel contamination is evident (contaminated fuel, corrosion in the secondary filter housing, rusted injector barrels, etc.), *and there is a catastrophic fuel system failure with debris in the fuel system*, I will advise the dealer that *the repair will likely not be covered under warranty due to fuel contamination*"); *id.* at 2 (emphasis added) (Dec. 2, 2009, email from Ford engineer Scott Eeley to fellow Ford engineers Bob Espinoza, Leon Bergeron, Craig Davis, Scot McDonagh, Carlos Armesto et al. re: "6.4 Pump & Injectors," (noting that "[m]ore than 115 ml water in the fuel system is abnormal and indicates excess water in the fuel supply chain. *Failures caused by non-specified fuel are not covered by Ford Motor Company Warranty—refer to Owners Guide*"); *id.* at 1 (discussing ways for Ford to "reduce warranty costs" by giving Ford service technicians tips for placing blame on consumers, such as identifying a historical "check engine light" diagnostic trouble code in the customer's vehicle data download which indicates that the customer has "ignore[d] the light [and] they should be held responsible (insurance claim)").

[70] The scope of the investigation was the 2008–2012 Super Duty F-Series trucks (NHTSA defect investigation EA11-003:NVS-213hkb).

[71] Jan. 20, 2012, Ford Response to NHTSA Inquiry EA11-003, Document titled, "INRD-EA11003-50102P.pdf," at 20, available at https://static.nhtsa.gov/odi/inv/2011/INRL-EA11003-50102P.pdf (last accessed Mar. 16, 2019).

Ford also represented that, "[d]uring development of the 6.7L engine, Ford . . . addressed the risk of low lubricity fuel by specifying that HPFPs include a 'wear package' that the supplier [Bosch] had developed for pumps that were intended for use in markets where low lubricity fuel was known to be a concern."[72] This "wear package," if even implemented, was clearly ineffective, and there is simply no way that Ford's aforementioned engine and vehicle testing to "ensure[] that the HPFP design . . . is compatible with diesel fuels sold in the United States" did not show the CP4 pump failing when used with U.S. diesel fuel.

120.    However, nearly a year prior to this submission, Ford had internally activated a "Job Aid" for Ford dealers to address "2011 F-Super Duty vehicles equipped with a 6.7L diesel engine which . . . may have damaged fuel system components including the high pressure (HP) pump and fuel injectors. ***Fuel and additives which do not meet the minimum lubrication, cooling and anti-corrosion properties required by the high[-]pressure fuel system components*** may cause symptoms including, but not limited to, the following: crank/no start, long crank/hard start, rough run, low power, engine knocking, exhaust smoke and/or fuel rail pressure (FRP) slow to build."[73] These symptoms are known consequences of CP4 pump implosion.[74]

121.    Ford should not have been surprised when it encountered warranty problems due to catastrophic CP4 failures in the very first model-year of the 6.7L Power Stroke-engine trucks.[75]

---

[72] *Id.* at 24.

[73] Mar. 30, 2011 Ford Job Aid Article No. 21820, Global Concern No. 103-2011-0041, available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-50103P.pdf, at 24 (emphasis added) (last accessed May 20, 2020).

[74] *See, e.g., infra* ¶ 131 (providing examples of CP4-related customer complaints in which drivers experience sudden engine shut off and inability to restart the vehicle).

[75] Indeed, Ford contemplated these very warranty issues during the pre-production phase. *See, e.g.,* FORD_DIESEL_00026201, Nov. 5, 2008 email between Ford employees P. Bruckner, K. Pumford, et al. re: ▮▮▮▮▮▮▮▮▮ at -620

*See, e.g.*, FORD_DIESEL_00014053, at -4054, June 2012 Ford presentation discussing warranty claims ███████████████████████████████████████████████████████ ███████████████████████████ *id.* at -4055 (emphasis added) ██████████████████ ███████████████████████████████████████████████████████

And indeed, Ford saw this problem year after year, but continued to conceal it from the public.[76]

122.    The chart below shows the warranty claims based on the Class Vehicle's months in service. This chart is notable in several respects. First, it shows that the defect can manifest at any time, including right after the sale of the vehicle.  Second, it shows that the peak in manifestation during a vehicle's service life is around 28-32 months, which is well within the factory warranty period (assuming the drivers did not drive 100,000 miles in two-and-a-half years), and far short of what Bosch represented was the useful life of the pump.  This is significant; if the pump did not have an inherently fragile design, the typical pattern of failure would be a small spike in the beginning (for parts that were defectively manufactured or assembled, or "early failures"), then a virtually flat line during the pendency of most of the warranty ("random failures"), then a rise as the warranty period is set to expire ("wear-out failures").  This is known as a "bathtub curve," and it is frequently used in reliability engineering.

_____

██████████████████████████████████████████████████████

[76] *See, e.g.*, FORD_DIESEL_00015951, Mar. 10, 2016 Ford PowerPoint entitled, ████████ at -5953 (discussing how ███████

███████████████████████ FORD_DIESEL_00016600, Nov. 4-17, 2017 email chain between Ford and Bosch employees, at -6600 (Ford Supervising OPD Engineer D. Kunitz discussing yet another "no-start" CP4-induced vehicle failure and noting, "With pump corrosion being identified as [the] cause . . . we need to trace back where and when corrosion occurred and take steps to eliminate the source. . . . If we cannot pinpoint a special cause, I would expect a rash of similar failures."); FORD_DIESEL_00016983, May 24, 2017 Ford PowerPoint entitled, █████████ at -6984 ███████████ *id.* at -6986 ████████████████████████████████████████████ ████████████████████

**Chart 2: Warranty Claims on Months in Service**



### I. The CP4 Defect Poses an Inherent Risk to Vehicle Occupant Safety and Renders the Class Vehicles *Per Se* Defective.

123.    The federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.[77]

---

[77] 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

124.     The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists.[78]   A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident."   49 U.S.C. § 30102(a)(8).   Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related.[79]   Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles.[80]   Violating these notification requirements can result in a maximum civil penalty of $15,000,000.[81]

125.     Importantly, Ford was on notice—and indeed, has repeatedly *admitted*—that the safety risks of moving stalls or "no-starts" such as those associated with the CP4 fuel pump pose an inherent risk to vehicle occupant safety. In August 2016, Ford conducted a safety recall for model year 2015-16 Ford Transit vans equipped with 3.2-liter diesel engines due to "[a] fuel injection pump malfunction" which "may cause the engine to not start or stall without warning and

---

[78] *See United States v. Gen. Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983).
[79] 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c).
[80] 49 C.F.R. §§ 577.5(a), 577.7(a).
[81] 49 U.S.C. § 30165(a)(1).

without the ability to restart."[82] Ford further acknowledged that "[a]n engine stall while driving, without warning or the ability to restart can increase the risk of a crash."[83]

126.    Based on its duty to monitor safety-related complaints and concerns, Ford assuredly saw *scores* of consumer complaints regarding the now-notorious CP4 pump defect.

127.    For example, on September 21, 2011, the following story was circulated on RV.net by one sorely disappointed owner of a 2011 F-350 6.7L Power Stroke diesel with only 35,000 miles:

> To all my friends here at Rvnet[:]
>
> I see my issues with my fuel system have traveled to Rvnet. I would have started a thread earlier in the saga but have been very busy. This should have been a simple situation to fix. It has turned into a circus.
>
> Here is the link to the story. It has escalated into an epic event:
>
> http://www.ford-trucks.com/forums/1099978-painful-an-update.html
>
> I wanted to know the facts of the failure before I brought the story here. I wanted to keep rampant speculation and unnecessary commentary out of the discussion. It is really an unfortunate turn of events.    The    cliff's    notes    version    is    as    follows:
>
> Truck quit like the key was turned off. It was a Saturday[.]
>
> Ford Roadside assistance towed it to the nearest open Ford facility[.]
>
> This dealer began the service work late on Monday morning.
>
> According to them their diagnostics led them to replace the fuel rail pressure sensor. After waiting a day for the part...still no start[.]
>
> According to them, further diagnostics then led them to the fuel

---

[82] *See* Aug. 22, 2016 Ford Part 573 Safety Recall Report for NHTSA Recall Campaign No. 16V-618, available at https://static.nhtsa.gov/odi/rcl/2016/RCLRPT-16V618-7678.PDF (last accessed Nov. 14, 2018); *see also* Mark Williams, *Recall Alert: 2015-2016 Ford Transit*, PICKUPTRUCKS.COM (Aug, 25, 2016), https://news.pickuptrucks.com/2016/08/recall-alert-2015-2016-ford-transit.html.
[83] Ford Part 573 Safety Recall, *supra* note 82.

injection control module. The part will be in on Friday afternoon and we will get it out the door before we close...wrong again.

There has been no mention of contaminated fuel up to this point. This is a huge deal because fuel samples should have been taken before any fuel system work was attempted. Now the dealer has 3 days of work where he can not recover any warranty money. Anyone see what's coming?

Now the dealership dance starts. They claim fuel contamination and tell me I am paying. On Monday, they contacted the Ford tech hotline with an exaggerated story about water in the fuel.

I called Ford customer care. After 2.5 hours of discussion over the course of Monday afternoon, I was summarily dismissed with the admonition that the bill for the repairs would be mine. My request to talk to an upper level customer service manger was refused.

I removed the truck from the non servicing dealer. I can not tell you how much fun that was. I had it towed 75 miles to my servicing dealer.

They have begun work on the truck. There is no evidence of water penetration beyond the water separator/primary fuel filter. There was less than 2 ounces of water removed from the separator...if that is where it actually was found...they captured the sample in used drinking water bottles. The under hood secondary filter shows no evidence of ever having water in it. The parts they said were damaged with rust have no signs of rust.

The high pressure fuel pump is toast. There is no evidence present showing water contamination...or any other form of contamination.

Now we wait for the Ford Field Service Engineer . . . .  I am not confident at all that this will be resolved in a fashion that makes me whole."[84]

128.   Then, the following day, this same user posted an update, which read as follows:

Well, another day has slipped by in my ongoing attempt to get my truck fixed under warranty. It has been 12 days since the truck quit. There have been some developments.

---

[84]   ricatic, Forum Post re: *My Big Ford Drum is Broke…*, RV.NET (Sept. 21, 2011, 6:50 p.m.), http://www.rv.net/forum/index.cfm/fuseaction/thread/tid/25428988.cfm.

First, my dealer has decided that this is unquestionably a warranty repair. His repair and service records on the truck indicate no history of water being found in the separator when they worked on the truck. There can be no long term water presence to do the type of damage that the non servicing dealer tried to claim. Ford technical documents with pictures showing the type of water and rust damage required to void warranty show parts exponentially more damaged than one might expect. My parts show no such damage.

The Ford tech hotline is not cooperating with my dealer. They have refused to send out a Field Service Engineer . . . ."[85]

129.    Five years later, this same F-350 owner posts again to his original "Open Roads" enthusiasts forum now that the CP4 issue has gone viral, stating the following (after summarizing his 2011 debacle):

The real cost to fix this problem, at least with Ford, is over $10,000...my repair was $10,300 . . . and if you do not make these repairs to Ford's specification (replace everything but the tank) the engine warranty is flagged[)]. [S]eeing that Ford does not fix many of them under warranty anyway rends that position moot[.]

I close this missive with a comment made to me during my Ford ordeal by the lead engineer at Ford for the 6.7 engine project...paraphrasing for brevity... "I was at Bosch the other day. I walked by two pallets full of failed CP4 pump returns...one Ford and one GM...looked about the same size pile of each..."[86]

130.    In a similar vein, on August 1, 2016, the owner of a 2015 Ford F-350 Supercab submitted the following complaint to NHTSA regarding the defective condition:

2015 F350 6.7 DIESEL WITH 46,000 MILES THAT IS DOWN BECAUSE [HPFP] IS DEFECTIVE AND SPREADING MEDAL THROUGH SYSTEM. FORD HAS INSPECTED AND SAID IT IS BECAUSE OF WATER IN FUEL, EVEN THOUGH NO WARNING LIGHTS OR CODES ARE AVAILABLE. FORD PULLED SENSORS OUT OF ENGINE AND REJECTED REPAIR BECAUSE OF TARNISH ON SENSORS. THE ONLY CODES WERE FOR (LOW FUEL PRESSURE & REDUCED

---

[85] ricatic, Forum Post re: *My Big Ford Drum is Broke…*, RV.NET (Sept. 22, 2011, 4:46 p.m.), https://www.rv.net/forum/index.cfm/fuseaction/thread/tid/25428988/srt/pa/pging/1/page/6.cfm.
[86] ricatic, Forum Post re: *2011 Duramax and up fuel pump problems*, RV.NET (Jan. 22, 2016, 9:55 a.m.), https://www.rv.net/forum/index.cfm/fuseaction/thread/tid/28726814/srt/pa/pging/1/page/2.cfm (ellipses in original).

POWER). NO OTHER CODES. INITIAL INSPECTION REVEALED ABOUT 3/4 INCH OF WATER IN WATER SEPARATOR BUT NO LIGHT OR CODE. THE WARNINGS OCCURRED WHEN TRUCK WAS STARTED AND IT RAN ABOUT 100 FT BEFORE BEING SHUTDOWN AND TOWED TO DEALERSHIP. THIS APPEARS TO BE A COMMON PROBLEM SINCE FORD OFFERS A REPAIR KIT FOR THIS ISSUE. TOTAL COST OF REPAIR IS BETWEEN $9500,00 & $12,500 DOLLARS AND THIS ON A TRUCK WHICH IS STILL UNDER WARRANTY THAT FORD WILL NOT HONOR. THE TRUCK WASN'T A YEAR OLD UNTIL MAY 2016 AND HAS BEEN DOWN FOR OVER FOUR MONTHS BECAUSE FORD WILL NOT REPAIR. THIS IS THE BOSCH C4 SERIES PUMP. *BF *TR[87]

131. Indeed, Ford is notorious for blaming consumers for this catastrophic failure and blatantly refusing to take responsibility for its own defective vehicle design. By way of example, see the following non-exhaustive list of complaints that consumers have filed with NHTSA regarding the same exact CP4-fueled issue occurring over and over again in Ford diesel vehicles:

- Mar. 21, 2014, 2013 Ford F-250 Supercab customer complaint filed with NHTSA:

  HAD CHECK ENGINE LIGHT COME ON. BROUGHT TO FORD SERVICE 3 TIMES. THE LAST TIME THEY QUOTED ME 11,145 TO FIX SAYING WATER WAS IN FUEL. I THOUGHT IT WAS UNDER WARRANTY, WHICH THEY CLAIM IT IS NOT. MY INSURANCE COMPANY SENT BY AN ENGINEER, WHICH HE SENT FUEL TO INDEPENDENT LAB. FUEL RESULTS CAME BACK NEGATIVE FOR EXCESSIVE FUEL. TRUCK HAS BEEN AT SERVICE CENTER FOR 1 MONTH, WITH NO RESULTS. *TR[88]

- Jan. 9, 2014, 2013 Ford F-250 Supercab customer complaint filed with NHTSA:

  VEHICLE STALLED AND STOPPED RUNNING IN TRAFFIC ON HIGHWAY 231 IN MONTGOMERY AL. . . . CALLED FORD ROADSIDE ASSIST. I HAVE 125K EXTENDED WARRANTY AND HAD VEHICLE TOWED TO NEAREST FORD DEALERSHIP . . . . VEHICLE WAS DIAGNOSED WITH 'EVIDENCE OF WATER IN FUEL SYSTEM[.'] THERE WAS NO WATER PRESENT IN SYSTEM, NO 'WATER IN FUEL

---

[87] NHTSA ID No. 10892303.
[88] NHTSA ID No. 10576017.

SYSTEM' WARNING LIGHT HAS [EVER] LIT UP ON THIS VEHICLE, HAD IT CHECKED IN THE PAST, WAS TOLD WAS FUNCTIONAL, WAS TOLD REPAIRS WERE 'NOT COVERED' . . . .  THE REPAIRS ARE MORE THAN I CAN AFFORD FOR A TRUCK THAT IS UNDER WARRANTY. THIS IS CLEARLY A SYSTEM FAILURE. *TR[89]

- Feb. 12, 2014, 2011 Ford F-350 Supercrew customer complaint filed with NHTSA:

THE ENGINE LIGHT CAME ON TODAY IN MY 2011 F350 DIESEL. DEALER SAYS DEF PUMP ERROR CODE. DEALER SAYS NO PUMPS AVAILABLE UNTIL 03/15/2014. I THINK FORD SHOULD ISSUE A SERVICE BULLETIN. DEALER SAYS NO WARRANTY. DEALER STATES TRUCK WILL SHUT DOWN AT ANY TIME. THIS SHOULD BECOME A RECALL ISSUE WITH THE NHTSA. OWNERS OF THESE TRUCKS TOW TRAILERS FREQUENTLY WITH LENGTHS IN EXCESS OF 36'. HAVING A TOW VEHICLE SHUT DOWN IN TRAFFIC AT HIGHWAY SPEEDS IS EMINENTLY DANGEROUS AND WILL CAUSE FATALITIES
REFER TO NHTSA CAMPAIGN NUMBER: 13V535000 ON SIMILAR VEHICLES. *TR[90]

- May 23, 2014, 2011 Ford F-350 Supercrew customer complaint filed with NHTSA:

THIS DIESEL TRUCK WAS BEING DRIVEN AT 20 MPH WHEN WITHOUT ANY WARNING, THE ENGINE SHUT OFF RESULTING IN LOSS OF ALL POWER STEERING AND BRAKES. WOULD NOT RESTART. TOWED TO DEALER SERVICE. DEALER DIAGNOSED LACK OF FUEL PRESSURE AND THEY OBSERVED METAL SHAVINGS IN THE LOWER FILTER INDICATING THE HPFP WAS DISINTEGRATING. DEALER SUBMITTED PICTURES OF THE FLOW CONTROL VALVE TO FORD WARRANTY PRIOR APPROVAL PER SERVICE MANUAL DIRECTIONS. DEALER OBSERVATION WAS THAT THEY OBSERVED NO SIGNIFICANT WATER OR DEBRIS CONTAMINATION IN THE FUEL FILTER. PRIOR APPROVAL RESPONSE WAS THAT THE PICTURES SUBMITTED WERE REPRESENTATIVE OF FUEL CONTAMINATION AND DENIED THE WARRANTY COVERAGE FOR THE REPAIR. NO WATER IN FUEL INDICATION WAS EVER SEEN BY OWNER. FILTERS MAINTAINED PER MAINTENANCE SCHEDULE. BILL FOR

---

[89] NHTSA ID No. 10559221.
[90] NHTSA ID No. 10563967.

REPAIR IS ESTIMATED AT APPROX $11,000.

TWO WEEKS PRIOR, THIS VEHICLE WAS TOWING A 14K LB 5TH WHEEL DOWN THE SANTIAM PASS IN OREGON. STEEP INCLINES, SHARP DROP OFFS, AND SNOW ON THE ROAD. A SUDDEN LOSS OF POWER WITHOUT WARNING WOULD VERY LIKELY HAVE RESULTED IN LOSS OF CONTROL OF THE VEHICLE, SEVERE BODILY INJURY, OR DEATH. IT APPEARS THE BOSCH CP4 FUEL PUMP WAS NOT DESIGNED TO OPERATE WITH THE 560 SCAR FUEL LUBRICITY OF US FUELS AND THAT FORD IS BLAMING PUMP FAILURES ON WATER CONTAMINATION BY OBSERVATION OF A CORROSION APPEARANCE ON ANOTHER COMPONENT. WARRANTY COVERAGE WAS DENIED WITHOUT ANY OBSERVATION OF THE FUEL PUMP ITSELF. NOTE THAT NO INDICATION THAT ANYTHING WAS WRONG WITH THE TRUCK WAS OBSERVED PRIOR TO THE FAILURE. THE TRUCK IS EQUIPPED WITH A FACTORY 5TH WHEEL HITCH AND IS INTENDED TO HAUL UP TO 21.5K LB TRAILERS. SUDDEN LOSS OF POWER STEERING AND BRAKES WITHOUT WARNING UNDER THIS INTENDED USE IS EXTREMELY DANGEROUS. *TR[91]

- Aug. 14, 2014, 2013 Ford F-350 Supercrew customer complaint filed with NHTSA:

I WAS DRIVING IN MY NEIGHBORHOOD AT ABOUT 25 MPH AND THE ENGINE QUIT, AND WOULD NOT RESTART!! [ . . . ] THE TRUCK HAD TO BE TOWED TO THE DEALER AND IT HAS [BEEN] THERE FOR OVER A WEEK AND THEY CALLED YESTERDAY AND TOLD ME THERE WERE METAL SHAVINGS IN THE FUEL PUMP AND I DO NOT KNOW IF THE METAL SHAVINGS GOT INTO THE OIL SYSTEM TO RUIN THE ENGINE!! *TR[92]

- Dec. 9, 2014, 2012 Ford F-250 Supercrew customer complaint filed with NHTSA:

TL* THE CONTACT OWNS A 2012 FORD F-250 SD. THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 63 MPH, THE REDUCED POWER AND THE CHECK ENGINE WARNING LIGHTS ILLUMINATED. THE VEHICLE WAS TOWED TO A SECOND DEALER, WHO DIAGNOSED THAT THERE WAS AN UNKNOWN SUBSTANCE IN THE FUEL TANK. THE VEHICLE WAS NOT

---

[91] NHTSA ID No. 10593571.
[92] NHTSA ID No. 10622326.

REPAIRED . . . .   THE APPROXIMATE FAILURE MILEAGE
WAS 18,877.[93]

132.    Because the Class Vehicles have an inherent safety defect (as evidenced by the

customer complaints cited herein), the purchasers and lessors of the Class Vehicles have been

economically injured, because a vehicle which later turns out to have a safety defect is clearly

worth less than it was at the point-of-sale while the defect was still being concealed.

**J.    The Cost and Damage from "Progressive" CP4 Failures Are Significant.**

133.    In addition to catastrophic CP4 failure, there are harmful consequences from the

progressive failure that the pump exhibits. Early symptoms of progressive failure of the Bosch

CP4 pump include malfunction and failure of the precision common rail fuel injectors.

Microscopic metal debris from the CP4 pump may slip past the filter in the metering valve and

into the pumping chambers of the CP4 pump, and then flow out to the downstream fuel pipes, fuel

rails, and to the injectors, thereby contaminating the whole fuel system with microscopic debris.

The openings in the injectors are very small (a few microns), and microscopic pump wear debris

can either hold the injector nozzle needle open, or closed, or slow its opening and closing rate.

134.    If the injector nozzle needle is left open too long or stuck open, this will result in

gross over-fueling of the combustion chamber, which can lead to progressive damage of the power

cylinder (including the piston, rings, block, connecting rod, and crankshaft). Over-fueling can

overheat the piston and result in a twisted or melted piston, or burn a hole in the piston. Over-spray

penetration can also result in dilution of the lube oil on the power cylinder walls and lead to

scuffing and eventual failure of the piston, connecting rod, and the engine block. Severe dilution

of the lube oil can also damage engine and rod main bearings and other oil-lubed running surfaces.

---

[93] NHTSA ID No. 10663076.

135.    A stuck or sticking injector which causes over-fueling can also increase fuel consumption and thereby reduce fuel economy. The air-fuel ratio of modern diesels is 18 parts air to one part fuel or higher (18:1–70:1 or what is called "lean burn") for optimal combustion. But when the injectors are sticking open or blocked open, the fueling becomes uncontrolled (by the electronic control unit) and air/fuel ratios can become much richer than design calibration. This increases the potential for white smoke (unburned fuel), black smoke (burned but wasted fuel), combustion pressures, and temperatures and emissions (NOx, particulate matter, CO, CO2, and unburned hydrocarbons) beyond capabilities of exhaust after-treatment systems to control. Fuel economy will also likely decline since the wasted fuel to produce the smoke is not doing work to produce power, and so miles per gallon should be reduced.

136.    In addition, a blocked closed injector (due to wear debris) forces the engine control system to demand more fueling from the remaining functional injectors to compensate for the loss of a power cylinder, and this can also cause reduced performance and increased fuel consumption/reduced fuel economy.

137.    In some cases, injector nozzle tips can be broken by wear debris trapped in spray holes or under the nozzle needle seat, essentially turning the injector into an open fuel hose. A broken nozzle tip can result in gross over-fueling which may cause hydraulic lock[94] and bending of the connecting rods. Over-fueling also causes over-temperature conditions which can damage exhaust valves, cylinder heads, exhaust manifolds, turbochargers and after-treatment systems. These progressive damages can occur before the CP4 pump catastrophically fails, and causes noticeable loss of fuel pressure warnings, engine stall, or no start conditions which forces the consumer to seek a repair and pump replacement. Fuel systems contaminated with microscopic

---

[94] "Hydraulic lock" refers to a condition when the piston hits solid fuel, rather than air or a fuel/air mix.

wear debris must be completely replaced including fuel pressure pipes, rails, pressure sensors and injectors.

138.    In short, the Class Vehicles are inherently less durable than previous models because of the CP4 fuel pump defect. Less durability means that Class Vehicle owners will experience more repair costs.  CP4 pumps and corresponding fuel injection systems, even when replaced or "fixed," will continue to fail in the Class Vehicles.

139.    Because of its incompatibility with U.S. diesel fuel, CP4 pumps and corresponding fuel injection systems, even when replaced or "fixed," will continue to fail in the Class Vehicles.

140.    The Bosch CP4 Pump problem is so prevalent that several automotive parts sellers now provide kits to mitigate the inevitable harm.[95]  "Disaster Prevention Kits" or "bypass kits" usually refer to a fuel bypass system that does not prevent the failure, the loss of the expensive injection pump, or the need to clean metal shavings from the fuel system.  But these kits are designed to redirect the lubricating fuel for the CP4 back to the fuel tank, so that it will be filtered before it returns to the engine.  The bypass kit directs the fuel contaminated with metal shavings into the gas tank, which is less expensive to clean than the engine and high-pressure fuel system— in other words, a Band-Aid solution. These bypass kits are also less expensive than more complete remedies, requiring only $300-$400 in parts, and are marketed as having the ability to "prevent the contamination from the failure from entering the high pressure fuel system."[96] Many

---

[95] *See, e.g.*, online sales listing for "CP4 Disaster Prevention Kit 11-16 6.7L Ford Powerstroke," DieselPowerProducts.com, available at https://www.dieselpowerproducts.com/p-17545-grp-cp4-disaster-prevention-kit-11-16-67l-ford-powerstroke.aspx (last accessed May 20, 2020); online sales listing for "XDP CP4 Disaster Prevention Kit – 6.7L Powerstroke 2011-2019," FullForceDiesel.com, available at https://shop.fullforcediesel.com/xdp-cp4-bypass (last accessed May 20, 2020); online sales listing for "XDP 6.7L Powerstroke CP4 Bypass Kit XD282," XtremeDiesel.com, available at https://www.xtremediesel.com/xdp-67l-powerstroke-cp4-bypass-kit-xd282 (last accessed May 20, 2020).

[96] Online sales listing for "6.7L Ford Powerstroke 'Disaster Prevention Kit' (CP4 Bypass Kit)," AccurateDiesel.com, available at https://www.accuratediesel.com/6-7l-powerstroke-disaster-prevention-kit.html (last accessed May 20, 2020).

consumers have turned to this sort of remedy preemptively due to the known impending failures their vehicles are facing.

141.    Another method of addressing the Bosch CP4 Pump failure is to modify the Class Vehicles to return to the older, more reliable technology of simply using more fuel. With Power Stroke engines, the strategy may be simply to buy a predecessor CP3 pump from an independent automotive parts vendor and install it in place of the Bosch CP4 Pump.  Indeed, the CP4 pump is so substandard that many Class Vehicle owners have opted to replace their CP4 pumps with CP3 pumps at a cost of at least $3,000 per vehicle for the replacement parts alone.[97] Resorting to this "remedy" fails to make consumers whole because they are not getting the fuel efficiency promised with the Bosch CP4 Pump, and for which they paid a premium.  Further, consumers are having to pay thousands of dollars out of pocket to essentially redesign a design flaw that was intentionally implemented by Ford in the Class Vehicles.

142.    Another purported "remedy" is to leave the CP4 in place on the Class Vehicle, but install a lift pump, a second pump to assist the Bosch CP4 Pump and increase the fuel pressure.[98] But, again, this (pseudo-)fix deprives consumers of the fuel-efficiency for which they paid a premium.

143.    The lift pump and CP3 pump options remedy part of the problem by pumping and burning more fuel.  So, in addition to the expense of buying a new fuel injection pump, the "remedies" would require owners to purchase more fuel.

---

[97] *See, e.g.*, online sales listing for "2011-2019 Ford 6.7L Dual High Pressure Fuel Kit," HSMotorsports.com, available at https://hs-motorsports.com/products/11-16-ford-6-7l-dual-high-pressure-fuel-kit?variant= 7149497188409 (last accessed May 20, 2020).
[98] *See, e.g.*, online sales listing for "FASS TS F18 140G Titanium Signature Series Fuel Lift Pump 140GPH17-19 6.7L Ford Powerstroke," DieselPowerProducts.com, available at (last accessed May 20, 2020).

144.    A fourth way to mitigate the damage is to spend money for fuel additives to increase the lubricity of the fuel.  This approach may work best in conjunction with the previously discussed modifications, but even by itself, it can be expensive.

145.    In short, there is no known way to remedy or mitigate CP4 pump failure without decreasing the fuel efficiency promised to Plaintiffs and other Class members and without significant expense to Plaintiffs and other Class members.

## K. Ford Knew Durability and Superiority Were Material to Consumers and Falsely Promised its Trucks Were Durable and Superior

146.    Ford's 2011 Super Duty truck brochures for the 6.7L Power Stroke engine equipped vehicles emphasized the "impressive fuel economy" and "DURABILITY: Super duty is built to the extremely high standards of durability and reliability you'd expect in a full-size pickup that's Built Ford Tough."[99]

147.    This same brochure also touted how the 2011 Ford Super Duty's 6.7L Power Stroke diesel engine provided the "BEST DIESEL fuel economy, power and torque IN THE CLASS," with a "**20% IMPROVEMENT IN FUEL ECONOMY** over the previous model, making it the best in its class:"[100]

---

[99]    2011 Ford Super Duty Brochure, at 2, available at https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2011&postalCode=55401 (last accessed Nov. 15, 2018).
[100] *Id.* at 5.



148.    Ford similarly promoted its 2012 Super Duty 6.7L Power Stroke diesel trucks as "delivering up to a 20% improvement in fuel economy over the previous generation, making it the best in its class:"[101]

---

[101] 2012 Ford Super Duty Brochure, at 7, available at https://www.thoroughbredford.com/PDF-Vehicles/2012/2012-SuperDuty.pdf (last accessed Nov. 15, 2018).







149.    Similarly, in its advertising materials for the 2013 Ford Super Duty 6.7L Power Stroke diesel truck, Ford noted that, "This Super Duty® has endured more torture testing than any previous generation of Ford Truck—including over 10 million cumulative miles on the most tested Power Stroke® diesel engine ever."[102]

---

[102]    2013 Ford Super Duty Brochure, at 4, available at https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2013&postalCode=11738 (last accessed Nov. 15, 2018).

150.   The brochure specifically touts Ford's 2013 6.7L Power Stroke Diesel truck as having "[b]est-in-class horsepower, torque and fuel economy," explaining that the truck "delivers 400 hp, 800 lb.-ft of torque, and up to a 20% improvement in fuel economy over the previous generation, making it the best in its class[:]"[103]



**DIESEL BEATS THE COMPETITION 3 TIMES OVER.**

Best-in-class horsepower, torque and fuel economy.¹ The 6.7L Power Stroke® V8 Turbo Diesel gives you all 3. With this advanced engine, Super Duty® delivers 400 hp, 800 lb.-ft. of torque, and up to a 20% improvement in fuel economy over the previous generation, making it the best in its class. Designed, engineered and built by Ford, the 6.7L features many innovative details including aluminum cylinder heads with precision dual water jackets that help minimize weight and maximize cooling. It's also the most tested Power Stroke diesel ever. This B20-capable engine has proven itself in over 10 million miles of cumulative testing under extreme conditions from 120°F scorching heat to -40°F bone-chilling cold. It's Built Ford Tough.²

**Cleanest Super Duty diesel ever.** This engine generation utilizes industry-proven technology and innovative Ford strategies to meet the latest federal emissions standards — reducing nitrogen oxide (NOx) levels by more than 80% compared to the previous-generation diesel. For your part, just watch for a low diesel exhaust fluid (DEF) alert in the vehicle's message center, then locate the blue DEF fill cap and replenish the DEF supply. The reservoir holds 5 gallons of Ford-approved DEF, which can be located from your Ford Dealer or other authorized retailers.

**Delivers maximum power quickly.** The diesel engine's class-exclusive single-sequential turbocharger features the compact, efficient design of a dual-sided compressor wheel.

**Powers uplifts any time the engine's running.** Whether you're in motion or at a complete stop, you can power your uplifts with the about-and our class-exclusive live-drive power take-off (PTO) provision.² It keeps the job going with an output gear linked directly to the engine crankshaft.

**Standard TorqShift® 6-speed SelectShift Automatic.²** This rugged transmission is also designed, engineered and built by the Ford powertrain team. Its torque converter includes low-speed lockup capability (down to 900 rpm), which enables the engine to run efficiently at lower rpm. The high-strength billet-metal center, with its patented Ford rocker one-way clutch, easily handles the extreme low-end torque of the diesel engine, as well as the high speeds of the gas engine. Plus, a high-capacity, high-efficiency fluid filter extends your fluid- and filter-change intervals up to 150,000 miles.



¹Based on Ford drive-cycle tests of comparably equipped 2011/2012 Ford and 2011/2012 competitive models. ²Available feature.



2013 SUPER DUTY®
ford.com

---

[103] *Id.* at 5.

151.    Once again, in 2014, Ford proclaimed that its 6.7L diesel Power Stroke was "[t]he diesel leader on 3 fronts," including "[b]est-in-class fuel economy[,] [b]est-in-class 400 horsepower[,] [a]nd best-in-class 800-lb.-ft. of standard torque," with "innovative details that contribute to its durability:"[104]



152.    In its 2015 Super Duty brochure, Ford proclaimed that the 6.7L Power Stroke diesel truck had been "[p]roven in over 12 million miles of cumulative testing and real-world use under extreme conditions," making it "the most tested Power Stroke diesel ever."[105] Likewise, Ford's television advertisement for the 2015 Ford Super Duty touted its "main ingredient"—the "Ford

---

[104]  2014 Ford Super Duty Brochure, at 4, available at http://cdn.dealereprocess.net/cdn/brochures/ford/2014-f250superduty.pdf (last accessed Nov. 15, 2018).
[105]  2015 Ford Super Duty Brochure, at 4, available at https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2015 (last accessed Nov. 15, 2018).

Super Duty 2nd Generation 6.7 Liter Power Stroke Diesel"—as giving the vehicle "the most horsepower and the most torque in its class."[106]

153.    In fact, Ford has represented *in every single one of its television advertisements* that Ford Super-Duty vehicles are fit for driving on American roadways, by featuring the Class Vehicles *driving on American roadways*. For example, in its 2015 "Ford Super Duty Challenge" television advertisements, numerous Class Vehicles are seen traversing all sorts of American terrain as if they are all adequately drivable and compatible with American diesel fuel:[107]



---

[106]    2015 Ford Super Duty Television Advertisement, last aired Dec. 28, 2014, available at https://www.ispot.tv/ad/7jGb/2015-ford-super-duty-main-ingredient (last accessed Dec. 26, 2018).
[107] 2015 "Ford Super Duty Challenge" Television Advertisement, available at https://www.ispot.tv/ad/7icj/2015-ford-super-duty-super-duty-challenge (last accessed Mar. 28, 2019).









154.    In Ford's 2016 Super Duty brochure, Ford promoted its 6.7L Power Stroke diesel trucks by proclaiming that, "**Best-in-class diesel fuel economy** is maintained with the help of

high-pressure fuel injectors that achieve a clean, efficient burn"—and once again, the vehicle is shown *driving* in this *American* advertisement:[108]






155.    The following year, Ford proclaimed that its 2017 6.7L Power Stroke diesel truck was "the strongest . . . yet" and "[t]he most tested Power Stroke diesel ever," with "class-best 925 LB.-FT. torque" and "unsurpassed diesel fuel economy"—and once again, the Class Vehicle is driving in this American advertisement:[109]

---



156.    Ford's television ads for the 2017 Super Duty similarly featured the Class Vehicles driving across all sorts of American terrain, with a voiceover telling consumers to, "Meet the all new 2017 Ford Super Duty,"[110] and that it is, "Time to imagine what *you* can do in a 2017 Ford Super Duty:"[111]

---

[110] 2017 Ford Super Duty Television Advertisement, available at https://www.ispot.tv/ad/AuMp/2017-ford-super-duty-punch-work-in-the-face (last accessed March 28, 2019).
[111] 2017 Ford Super Duty Television Advertisement, available at https://www.ispot.tv/ad/wYRV/ford-truck-month-2017-super-duty-trade-assistance (last accessed Mar. 28, 2019).









157.    For the 2018 model year, Ford promised consumers that its 6.7L Power Stroke

diesel trucks would "deliver [the Super Duty's] highest combination of horsepower and torque

ever."[112]  Ford further noted that its "twin -pilot injection delivers smooth, quiet acceleration," and

---

[112] 2018 Ford Super Duty Brochure, at 8, available at
https://www.ford.com/services/assets/Brochure?bodystyle=Truck&make=Ford&model=SuperDuty&year=2018 (last accessed Nov. 15, 2018).

that the trucks' "large fuel tanks—up to 48 gallons maximum—help extend driving range."[113] Ford also claimed that the "strength and integrity of the 6.7L diesel is maintained by a masterful mix of component materials," and that the truck has "excellent throttle response. . . delivered in part by a high-pressure, common rail fuel injection system . . . [with] piezo-controlled fuel injectors provid[ing] precise injection [and] superior fuel atomization."[114] The advertisement shows the Class Vehicle racing along an uphill highway while towing large bales of hay, promising consumers the performance of a vehicle that is, at base, *compatible with American fuel*:



158.    Ford demonstrates the drivability range of *all* of its F-Series trucks in a 2017-2018 ad campaign[115] which, again, falsely demonstrates to consumers that the Class Vehicles are not

---

[113] *Id.*

[114] *Id.*

[115] *See* https://www.youtube.com/watch?v=SR_mGhT2iLM (last accessed Mar. 28, 2019).

only "drivable" but able to haul massive trailer loads morning through night – a representation that is defied by the above-mentioned complaints to NHTSA[116] alone:





---



















159.     In addition, Ford provided an express five-year/100,000-mile limited warranty for the 6.7L Power Stroke diesel engine trucks.[117]

160.     Ford also represented to Ford Power Stroke diesel consumers that, with respect to the 2011–present 6.7L Power Stroke diesel engine, "You may operate your vehicle on diesel fuels containing up to 20% biodiesel, also known as B20,"[118] and provided further directions for which diesel fuel to use if *not* in North America—indicating Ford's obvious expectation that the Class Vehicles would be filled with American diesel fuel.

---

[117] *See, e.g.*, 2015 Ford Super Duty Brochure, at 24, available at https://www.ford.com/services/assets/Brochure?make=Ford&model=SuperDuty&year=2015 (last accessed Nov. 15, 2018).

[118] *See* 2020 Ford Super Duty Owner's Manual, Section entitled, "Fueling and Refueling: FUEL QUALITY—DIESEL," available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2020-Ford-F250-F350-F450-F550-F600-Owners-Manual-version-1._om_EN_10_2019.pdf (last accessed May 20, 2020); 2019 Ford Super Duty Owner's Manual, Section entitled, "Fueling and Refueling: FUEL QUALITY—DIESEL," at 184, available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2018-Ford-F-250_350_450_550-owners-manual-version-1_om_EN-US_05_2018.pdf (last accessed May 20, 2020); 2018 Ford Super Duty Owner's Manual, Section entitled, "Fueling and Refueling: FUEL QUALITY—DIESEL," at 189, available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2018-Ford-250-350-450-450-Owners-Manual-version-1_om_EN-US-EN-CA_10_2017.pdf (last accessed Nov. 26, 2018) ("You should use Ultra-Low Sulfur Diesel fuel (also known as ULSD) designated as number 1-D or 2-D with a maximum of 15-ppm sulfur in your diesel vehicle"); 2017 Ford Super Duty Owner's Manual, Section entitled, "Fueling and Refueling," at 188, available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2017-Super-Duty-Owners-Manual-version-1_om_EN_US_06_2016.pdf (last accessed Nov. 26, 2018) (stating same); 2016 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Fuel and Refueling," at 18–19, available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2016-Ford-6.7L-Diesel-F-250-550 Supplement-version-1_60l6d_EN-US_04_2015.pdf (last accessed Nov. 26, 2018) (stating same); 2015 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Fuel and Refueling," at 18, available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2015-Ford-6.7L-Diesel-F-250-550-Supplement-version-1_60l6d_EN-US_02_2014.pdf (last accessed Nov. 26, 2018) (stating same); 2014 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Fuel and Refueling," at 17, available at  http://www.fordservicecontent.com/Ford_Content/catalog/owner_guides/1460l6d1e.pdf  (last accessed Nov. 26, 2018) (stating same); 2013 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Fuel and Refueling," at 15, available at https://dmna.ny.gov/nynm/manuals/Ford_F_350_Owners_Manual_2013_Diesel_Supplement.pdf  (last accessed Nov. 26, 2018) (stating same); 2012 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Maintenance and Specifications," at 21-22, available at http://www.fordservicecontent.com/Ford_Content/catalog/owner_guides/1260l6d1e.pdf  (last accessed Nov. 26, 2018) (stating same); 2011 Ford 6.7 Power Stroke Owner Manual Diesel Supplement, Section entitled, "Maintenance and Specifications," at 21-22, available at http://www.fordservicecontent.com/Ford_Content/catalog/owner_guides/1160l6d1e.pdf (last accessed Nov. 26, 2018) (stating same).

161.    Ford has refused to honor its warranties, claiming that the metal shavings caused by the failures of their pump design voided the warranty because they also caused fuel contamination.[119]

162.    In short, Ford induced Plaintiffs and other Class members to pay a premium for increased durability, performance, and fuel efficiency, with a design it has long known would cause fuel contamination—a condition Ford now uses to absolve itself of the catastrophic and costly consequences to Plaintiffs and other Class members.

**L. Ford's "Certified Pre-Owned" Vehicle Sales Allow Ford to Further Profit Off of Its Fraudulent Conduct.**

163.    Ford also continues to market and sell the Class Vehicles through its "Certified Pre-Owned" program. In so doing, Ford continues to conceal the fact that the Class Vehicles are defective and contain serious safety and functionality defects, while fraudulently representing that these "Certified Pre-Owned" vehicles are free from safety defects and were built with "premium" and superior engineering and design.

164.    Indeed, Ford's "Certified Pre-Owned" website promises that every Ford Certified Pre-Owned vehicle "[m]ust pass a 172-Point Vehicle Inspection" so that "[w]hen you purchase a CPO vehicle, you get the confidence of this comprehensive inspection plus manufacturer-backed limited warranty coverage."[120] And this Certified Pre-Owned 172-Point Vehicle Inspection expressly comes with the promise that the vehicle's fuel system has been professionally evaluated.[121] Ironically, Ford touts its Certified Pre-Owned Program as "tak[ing] the risk out of buying a previously owned vehicle."[122] The Certified Pre-Owned package also purports to include

---

[119] *See, e.g.*, *supra* ¶ 131 (detailing how Ford has repeatedly refused to cover damage caused by CP4 pump implosion under warranty).
[120] https://www.ford.com/certified-used/about-certified/inspection/ (last visited May 20, 2020).
[121] *See id.*
[122] Ford Certified Pre-Owned Brochure,

a 12-month/12,000-mile Comprehensive Limited Warranty as well as a 7-year/100,000-mile Powertrain Limited Warranty, which *still* does not cover "[r]epairs caused by improper . . . loss of lubricant or fluids or contamination of . . . fuel."[123] In other words, Ford will continue to blame customers when their CP4 fuel pumps catastrophically fail in a "Certified Pre-Owned Vehicle," instead of taking responsibility for the fact that Ford manufactured the Class Vehicles with a fuel pump that is particularly incompatible with U.S. diesel fuel.

165.    And yet countless Class members who have purchased Certified Pre-Owned Class Vehicles have received none of the promises Ford promised, when Class members later come to learn that they have been duped into buying an American vehicle that is inherently incompatible with the only diesel fuel they can reasonably be expected to use in America.

## M. Allegations Establishing Agency Relationship Between Manufacturer Ford and Ford Dealerships

166.    Upon information and belief, Manufacturer Defendant Ford has impliedly or expressly acknowledged that Ford-authorized dealerships are its sales agents, the dealers have accepted that undertaking, Ford has the ability to control authorized Ford dealers, and Ford acts as the principal in that relationship, as is shown by the following:

    i.    Manufacturer Ford can terminate the relationship with its dealers at will;

    ii.    The relationships are indefinite;

    iii.    Manufacturer Ford is in the business of selling vehicles as are its dealers;

    iv.    Manufacturer Ford provides tools and resources for Ford dealers to sell vehicles;

---

https://www.ford.com/cmslibs/content/dam/brand_ford/en_us/brand/cpo/pdf/FCPO00221_FMUC0166000_Ford_Consumer_Brochure_R02.pdf (last accessed May 20, 2020).

[123] Ford Certified Pre-Owned Limited Warranty, http://173.236.95.166/brochures/CPO_Warranty_Ford.pdf (last accessed May 20, 2020).

v.    Manufacturer Ford supervises its dealers regularly;

vi.    Without Manufacturer Ford, the relevant Ford dealers would not exist;

vii.    Manufacturer Principal Ford requires the following of its dealers:

1.    Reporting of sales;

2.    Computer network connection with Manufacturer Ford;

3.    Training of dealers' sales and technical personnel;

4.    Use of Manufacturer Ford-supplied computer software;

5.    Participation in Manufacturer Ford's training programs;

6.    Establishment and maintenance of service departments in Ford dealerships;

7.    Certify Ford pre-owned vehicles;

8.    Reporting to Manufacturer Ford with respect to the car delivery, including reporting Plaintiffs' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9.    Displaying Manufacturer Ford logos on signs, literature, products, and brochures within Ford dealerships.

viii.    Dealerships bind Manufacturer Ford with respect to:

1.    Warranty repairs on the vehicles the dealers sell; and

2.    Issuing service contracts administered by Manufacturer Ford.

ix.   Manufacturer Ford further exercises control over its dealers with respect to:

1.   Financial incentives given to Ford dealer employees;

2.   Locations of dealers;

3.   Testing and certification of dealership personnel to ensure compliance with Manufacturer Ford's policies and procedures; and

4.   Customer satisfaction surveys, pursuant to which Manufacturer Ford allocates the number of Ford cars to each dealer, thereby directly controlling dealership profits.

x.   Ford dealers sell Ford vehicles on Manufacturer Ford's behalf, pursuant to a "floor plan," and Manufacturer Ford does not receive payment for its cars until the dealerships sell them.

xi.   Dealerships bear Manufacturer Ford's brand name, use its logo in advertising and on warranty repair orders, post Ford signs for the public to see, and enjoy a franchise to sell Manufacturer Ford's products, including the Class Vehicles.

xii.   Manufacturer Ford requires Ford dealers to follow the rules and policies of Manufacturer Ford in conducting all aspects of dealer business, including the delivery of Manufacturer Ford's warranties described above, and the servicing of defective vehicles such as the Class Vehicles.

xiii.   Manufacturer Ford requires its dealers to post Ford's name, logo, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized Ford dealers and servicing outlets for Manufacturer Ford cars.

xiv.    Manufacturer Ford requires its dealers to use service and repair forms containing Manufacturer Ford's name and logos.

xv.    Manufacturer Ford requires Ford dealers to perform Manufacturer Ford's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Manufacturer Ford.

xvi.    Manufacturer Ford requires Ford dealers to use parts and tools either provided by Manufacturer Ford, or approved by Manufacturer Ford, and to inform Ford when dealers discover that unauthorized parts have been installed on one of Manufacturer Ford's vehicles.

xvii.    Manufacturer Ford requires dealers' service and repair employees to be trained by Ford in the methods of repair of Ford's vehicles.

xviii.    Manufacturer Ford audits Ford dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.    Manufacturer Ford requires its dealers to provide Ford with monthly statements and records pertaining, in part, to dealers' sales and servicing of Manufacturer Ford's vehicles.

xx.    Manufacturer Ford provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi.    Manufacturer Ford provides its dealers with specially trained service and repair consultants with whom dealers are required by Manufacturer Ford to consult when dealers are unable to correct a vehicle defect on their own.

xxii.   Manufacturer Ford requires Ford vehicle owners to go to authorized Ford dealers to obtain servicing under Ford warranties.

xxiii.  Ford dealers are required to notify Manufacturer Ford whenever a car is sold or put into warranty service.

## V. TOLLING OF THE STATUTE OF LIMITATIONS

167.    As of the date of this Complaint, Ford continues to market its vehicles based on its "Built Ford Tough" motto and claims of superior durability, performance, and fuel efficiency, despite its knowledge that the Class Vehicles are defective and have failed or will fail—in fact, Ford still has not disclosed and continues to conceal that the Class Vehicles are defective, particularly incompatible with American diesel fuel, and will experience catastrophic and costly failure.

168.    Until shortly before the filing of this Complaint, Plaintiffs and other Class members had no way of knowing about Ford's wrongful and deceptive conduct with respect to their defective Class Vehicles.

169.    With respect to Class Vehicles that have not experienced a catastrophic CP4 pump failure, Plaintiffs and other Class members did not discover and could not reasonably have discovered that their Class Vehicles are defective, that their Class Vehicles are out of specification and particularly incompatible with American diesel fuel, that this heightened incompatibility has resulted in the breakdown of fuel components and contamination of fuel caused by the defective CP4 fuel pump, that their CP4 fuel pumps will fail, that the durability and performance of their

Class Vehicles is impaired by this defect and heightened incompatibility and that such durability and performance is far less than Ford promised, or that, as a result of the foregoing, they overpaid for their vehicles, that the value of their vehicles is diminished, that their vehicles will require costly modification to avoid a catastrophic even more costly failure, and that any such modifications will impair other qualities of the Class Vehicles that formed a material part of the bargain between the parties in the purchase of the Class Vehicles by Plaintiffs and other Class members.

170.    With respect to Class Vehicles that have experienced a catastrophic CP4 pump failure prior to the filing of this Complaint, Plaintiffs and other Class members did not discover and could not reasonably have discovered that their CP4 pump failure was due to a defect known to Ford or that such failure was due to a heightened incompatibility between the Class Vehicle and the fuel intended by Ford to be used in the Class Vehicles.

171.    Within the period of any applicable statutes of limitation or repose, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Ford were concealing the conduct complained of herein and misrepresenting the defective nature of the Class Vehicles.

172.    As pleaded herein, Ford knew of and failed to disclose a major, inherent product defect, and thus any imposition of "durational limitations" on the warranty breaches or claims alleged herein constitute "overreaching," and therefore any such durational limitations are unconscionable. When a manufacturer is aware that its product is inherently defective, but the buyer has no notice of or ability to detect the problem, there is perforce a substantial disparity in the parties' relevant bargaining power. In such a case, Plaintiffs' acceptance of any limitations on his/her contractual remedies, including any warranty disclaimers, cannot be said to be "knowing"

or "voluntary," and thereby renders such limitations unconscionable and ineffective. Ford's superior knowledge of the CP4 defect over the weaker-situated Plaintiffs and Class members demonstrates that the underlying vehicle transactions involved elements of deception such that there was significant unconscionability in the bargaining process, and any durational limitations that Ford may purport to asset on Plaintiffs' claims are unconscionable as a matter of law.

173.     Further, Plaintiffs and other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within their knowledge to consumers, dealerships or relevant authorities; nor would a reasonable and diligent investigation have disclosed that Ford was aware of the non-conforming and defective nature of the CP4 fuel pump and the Class Vehicles in which it was incorporated.  Plaintiffs only learned of the defective nature of the CP4 fuel injection pump and their vehicles and of Ford's scheme to design and sell such non-conforming and defective fuel pumps and vehicles, shortly before this action was filed.

174.     All applicable statutes of limitation and repose have also been tolled by Ford's knowing, active, and fraudulent concealment, and denial of the facts alleged herein throughout the time period relevant to this action.

175.     Instead of disclosing the defective nature of the CP4 fuel pumps to consumers, Ford falsely represented that CP4 pump failure in the Class Vehicles was caused by Plaintiffs' or other Class members' conduct or by the use of contaminated fuel.

176.     In reality, Ford's conduct in designing, manufacturing, marketing or selling Class Vehicles for use with American diesel fuel, with which Defendants knew the Class Vehicles were particularly incompatible, causes the "fuel contamination" that ultimately leads to CP4 pump failure.

177. Ford, with the purpose and intent of inducing Plaintiffs and other Class members to refrain from filing suit, pursuing warranty remedies, or taking other action with respect to Ford's conduct or the Class Vehicles, fraudulently concealed the true cause of CP4 pump failure by blaming Plaintiffs, Class members and/or contaminated fuel when Ford, even before the design, manufacture or sale of the Class Vehicles, knew that the defective nature of the Bosch CP4 Pump would and has caused fuel contamination and resulting CP4 pump failure.

178. Ford was under a continuous duty to disclose to Plaintiffs and other Class members the true character, quality and nature of the durability and performance of Class Vehicles, the ongoing process of fuel contamination in Class Vehicles, CP4 pump failure, and the true cause of CP4 pump failure.  Instead, Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the foregoing facts.  As a result, Ford is estopped from relying on any statutes of limitation or repose as a defense in this action.

179. For the foregoing reasons, all applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Ford's fraudulent concealment with respect to all claims against Ford; and, Ford is estopped from asserting any such defenses in this action.

## VI. CLASS ACTION ALLEGATIONS

180. Throughout this Complaint, "Class Vehicle" is defined as the following CP4-equipped, Ford-manufactured, diesel engine vehicles: 2011–present Ford "Super Duty" trucks containing a 6.7L "Power Stroke" diesel engine.

181. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following presently known class (collectively, the "Class"):

> All persons or entities who have purchased or leased the Class
> Vehicles (2011–present model year Ford diesel vehicles equipped

with a Power Stroke 6.7L engine and/or CP4 fuel injection pump system) in the state of Texas.

182.    Excluded from the Class are Ford and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any entity in which Ford has a controlling interest. In addition, Governmental entities and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff are excluded from the Class. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

183.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

184.    The Class Representatives are asserting claims that are typical of claims of the Class, and they will fairly and adequately represent and protect the interests of Class in that they have no interests antagonistic to those of the putative Class members.

185.    The amount of damages suffered by each individual member of the Class, in light of the expense and burden of individual litigation, would make it difficult or impossible for individual Class members to redress the wrongs done to them.  Plaintiffs and other members of the Class have all suffered harm and damages as a result of Ford's unlawful and wrongful conduct. Absent a class action, Ford will likely not have to compensate victims for Ford's wrongdoings and unlawful acts or omissions, and will continue to commit the same kinds of wrongful and unlawful acts or omissions in the future (indeed, upon information and belief, Ford continues to manufacture diesel-engine vehicles with the ticking time-bomb that is the CP4 pump to this day).

186.    **Numerosity under Federal Rule of Civil Procedure 23(a)(1):** The Class is so numerous that individual joinder of all of its members is impracticable.  Due to the nature of the

trade and commerce involved, Plaintiffs believe that the total number of Class Plaintiffs is at least in the thousands and are numerous and geographically dispersed across Texas.  While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, as well as by the notice Class members will receive by virtue of this litigation so that they may self-identify.  The disposition of the claims of Class members in a single class action will provide substantial benefits to all Parties and the Court.  Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

187.  **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):** This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

     i.     Whether Ford engaged in the conduct alleged herein;

     ii.     Whether Ford knew about the CP4 defect and the inherent problems related thereto when said component part is used with American diesel fuel, and if so, how long Ford knew or should have known as much;

     iii.     Whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed the defective Class Vehicles into the stream of commerce in the United States;

     iv.     Whether the Ford diesel engine systems that are the subject of this complaint are defective such that they are not fit for ordinary consumer use;

     v.     Whether Ford omitted material facts about the quality, durability, fuel economy, and vehicle longevity of the Class Vehicles;

vi.     Whether Ford designed, manufactured, marketed, and distributed Class Vehicles with defective or otherwise inadequate fuel injection systems;

vii.     Whether Ford's conduct violates Texas consumer protection statutes, constitutes breach of warranty, constitutes fraudulent concealment/omission, and/or constitutes breach of warranties as asserted herein;

viii.     Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

ix.     Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, what amount.

188.     **Typicality under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs' claims are typical of the other Class members' claims because all have been comparably injured through Ford's wrongful conduct as described above.

189.     **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent. Additionally, Plaintiffs have retained counsel with substantial experience in handling complex class action and multi-district litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

190.     **Superiority of Class Action under Federal Rule of Civil Procedure 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The financial detriment suffered by Plaintiffs and the other members of the Class are

relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford.  Accordingly, it would be impracticable for the members of the Class to individually seek redress for Ford's wrongful conduct.  Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### VII. CAUSES OF ACTION
### CLAIMS BROUGHT ON BEHALF OF THE CLASS
### AND ON BEHALF OF THE NAMED PLAINTIFFS

### COUNT I
### FRAUDULENT CONCEALMENT
### (Common Law)

191.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

192.     Plaintiffs assert this Count on behalf of themselves and the Class.

193.     As set forth above, Plaintiffs and Class members have suffered from a defect that existed in the Class Vehicles at the time of purchase and which began damaging the Class Vehicles and their fuel delivery systems upon first use.

194.     Ford intentionally concealed and suppressed material facts concerning the durability, performance, fuel efficiency, and quality of the Class Vehicles, and facts concerning the fragility of the design of the CP4 high-pressure fuel pump in the Class Vehicles as well as its compatibility with American diesel fuel, in order to defraud and mislead the Class members about the true nature of the Class Vehicles and reap the financial benefits of that deception.

195.     Ford knew that there was a significant uptick in the number of high-pressure fuel pump failures from the moment it introduced the CP4 fuel pump into certain of its diesel vehicle

models beginning in the 2011 model year, but it did not disclose this information to Plaintiffs or Class members.

196.    Ford had knowledge by at least 2002[124] that its diesel fuel injection systems were particularly incompatible with American diesel fuel specifications.

197.    As alleged above, prior to the design, manufacture and sale of the Class Vehicles, Ford knew that the Bosch CP4 Pumps were prone to quickly and catastrophically fail in the Class Vehicles and that such failure would result in contamination of the fuel system components and require repair and replacement of those components, the repairs or replacements of which Ford would refuse to cover under its warranties.

198.    Despite this knowledge, Ford marketed the Class Vehicles in advertising and other forms of communication, including the standard and uniform material provided with each Class Vehicle, touting the increased durability, fuel economy and performance of the Class Vehicles and the Class Vehicles had no significant defects and were compatible with U.S. diesel fuel. Marketing and advertising materials of Ford asserted that the Class Vehicles would be "delivering up to 20% improvement in fuel economy over the previous generation making it best-in-class." Ford promoted its 6.7L Power Stroke engines as "best-in-class horsepower, torque and fuel economy" and the ability of the Class Vehicles to run on B20 biodiesel.

199.    The foregoing omitted facts and representations were material because they directly impacted the value of the Class Vehicles purchased or leased by Plaintiffs and Class members, because those facts directly impacted the decision regarding whether or not Plaintiffs and Class members would purchase a Class Vehicle, and because they induced and were intended to induce Plaintiffs and Class members to purchase a Class Vehicle. Longevity, durability, performance,

---

[124] *See supra* ¶ 8.

safety, and compatibility with U.S. diesel fuel are material concerns to U.S. diesel vehicle consumers and to reasonable consumers, like Plaintiffs and Class members. Ford represented to Plaintiffs and Class Members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time-bomb, wherein pump disintegration begins at the first fill of the tank. Plaintiffs and Class members did not know of the CP4 fuel pump defect in their Class Vehicles and could not have discovered it through reasonably diligent investigation.

200.     Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail, and due to its false representations regarding the increased durability and fuel efficiency of the Class Vehicles, and due to its partial and inadequate disclosures of the Class Vehicles' defects, Ford had a duty to disclose to Class members that their vehicles were incompatible with the use of U.S. diesel fuel and the consequences of that incompatibility, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that catastrophic failure of the Bosch CP4 Pumps will damage Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles.

201.     As alleged above, Ford made specific disclosures and representations to Plaintiffs and Class members through the marketing and advertising materials used nationally, and specifically within the state of Texas, during the timeframe prior to the Plaintiffs and Class members purchasing or leasing the Class Vehicles. Ford had a duty to disclose the truth about the CP4 fuel pump defect because: (1) Ford made disclosures about the Class Vehicles; (2) Ford made representations that were misleading or untrue; and (3) Ford made a partial disclosure that conveyed a false impression about the Class Vehicles. As outlined above, Ford made disclosures

and representations that were false and misleading, therefore Ford had a duty to disclose the whole truth about the CP4 fuel pumps installed in the Class Vehicles and their heightened fragility and incompatibility with American diesel fuel.

202.    Ford knew that Plaintiffs and Fraudulent Concealment Class members would and did reasonably relied upon Ford's false representations and omissions.  Plaintiffs and Fraudulent Concealment Class members had no way of knowing that Ford's representations and omissions were false and misleading, that an internal component of the Class Vehicles is devastatingly defective to the entire fuel and engine system, that the Class Vehicles were incompatible with the fuel Ford knew would be used to operate the Class Vehicles, that the normal and intended use of the Class Vehicles will cause the Class Vehicles to fail, or that Ford would refuse to repair, replace or compensate Plaintiffs and Fraudulent Concealment Class members for the failure of the Bosch CP4 Pumps and the known consequences of that failure to the Class Vehicle engines.

203.    Ford knew that Plaintiffs and Fraudulent Concealment Class members could not have known that Class Vehicles will fail when used as intended by Ford.

204.    Ford falsely represented the durability, quality and nature of the Class Vehicles and omitted material facts regarding the lack of durability of the Class Vehicles, the incompatibility of the Class Vehicles with the fuel intended by Ford to be used in the Class Vehicles, and the consequences of that incompatibility, for the purpose of inducing Plaintiffs and Fraudulent Concealment Class members to purchase Class Vehicles, and to increase Ford's revenue and profits.

205.    Ford's scheme to design, market and sell Class Vehicles with defective CP4 pumps, knowing that U.S. diesel fuel that was certain to be used in the Class Vehicles and the consequence of using U.S. diesel fuel in those vehicles, then concealing its fraudulent scheme from the public

and consumers over numerous model years, reveals a corporate culture that emphasized sales and profits over integrity and an intent to deceive Plaintiffs, Fraudulent Concealment Class members and the American public regarding the durability and performance of the Class Vehicles and their fuel delivery systems.

206.    Had Plaintiffs and Fraudulent Concealment Class members known that the Class Vehicles did not have increased durability over other diesel vehicles, the Class Vehicles were particularly incompatible with the fuel intended by Plaintiffs, Fraudulent Concealment Class members and Ford to be used in the Class Vehicles (without which the Class Vehicles would serve no purpose to Plaintiffs and Fraudulent Concealment Class members), or that the Class Vehicles will fail when used as intended, Plaintiffs and Fraudulent Concealment Class members would not have purchased a Class Vehicle, or would have paid substantially less for their Class Vehicle than paid based on Ford's false representations and omissions, or, in the case of Plaintiffs and Fraudulent Concealment Class members whose vehicles experienced catastrophic CP4 pump failure, would have taken affirmative steps to mitigate the impact of or prevent failure.

207.    Because of Ford's false representations and omissions, Plaintiffs and Fraudulent Concealment Class members have sustained damages because they own vehicles that are diminished in value. They did not receive the benefit-of-the-bargain as a result of Ford's concealment of the true nature and quality of the Class Vehicles.

208.    Ford's failure to disclose the heightened incompatibility of the Class Vehicles with U.S. diesel fuel was intended to cause and did cause Plaintiffs and Fraudulent Concealment Class members to operate Class Vehicles with U.S. diesel fuel; and, as a result, Plaintiffs and Fraudulent Concealment  Class members have been harmed resulting in damages including but not limited to the decrease in fuel economy caused by progressive CP4 failure, the cost  of repair or replacement

of the CP4 fuel pump, the cost of damage caused to the Class Vehicles by a catastrophic failure of the CP4 fuel pump, loss of use of the Class Vehicles, diminished value of the Class Vehicles, loss of earnings, benefit-of-the-bargain damages, the purchase price of the vehicle, and other damages.

209.    Ford has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Class members by concealing material information regarding the heightened incompatibility of the Class Vehicles with U.S. diesel fuel and the defective fragility of the CP4 fuel pump therein.

210.    Accordingly, Ford is liable to Plaintiffs and Fraudulent Concealment Class Members for damages in an amount to be proved at trial.

211.    Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Fraud Class Members' rights and the representations and omissions made by Ford to them were made in order to enrich Ford.  Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, the amount of which is to be determined by a jury, according to proof.

**COUNT II**
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT ("DTPA")**
**(Tex. Bus. & Com. Code §§ 17.41, _et seq._)**

212.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

213.    Plaintiffs assert this Count individually and on behalf of the Class against Ford.

214.    Plaintiffs assert a claim under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46.

215.    Plaintiffs are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.46(4).

216.     Ford engaged in "trade or commerce" within the meaning of the DTPA.

217.     The DTPA prohibits "false, misleading, or deceptive acts or services in the conduct of any trade or commerce[.]" Tex. Bus. & Com. Code § 17.46(a). By its acts, omissions, failures, and conduct described in this Complaint, Ford has violated Tex. Bus. & Com. Code § 17.46(b)(1), (2), (5), (7), (9), (12) (13), (20), and (24). Ford participated in unfair and deceptive trade practices that violated the DTPA as described herein. In the course of its business, Ford concealed and suppressed material facts concerning the CP4 fuel pump. Ford falsely represented the quality of the Class Vehicles and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with the vehicles (and the consequences of the heightened incompatibility), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiffs and other Class members to purchase Class Vehicles, and to increase Ford's revenue and profits. Ford participated in unfair and deceptive trade practices that violated the Texas DTPA as described herein. In the course of its business, Ford knowingly concealed and suppressed material facts concerning the defective CP4 fuel pumps in the Class Vehicles. Ford falsely represented the quality of the Class Vehicles and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said incompatibility), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiffs and other Class Members to purchase Class Vehicles, and to increase Ford's revenue and profits.

218.     Specifically, by misrepresenting the Class Vehicles as safe, durable, reliable, and compatible with U.S. diesel, and by failing to disclose and actively concealing the CP4 fuel pump defect, Ford engaged in deceptive business practices prohibited by the Texas DTPA, including:

a.      Knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles;

b.      Knowingly making a false representation as to whether the Class Vehicles are of a particular standard, quality, or grade;

c.      Advertising the Class Vehicles with the intent not to sell them as advertised; and

d.      Engaging in unconscionable, false, or deceptive act or practice in connection with the sale of the Class Vehicles.

219.    Ford's unfair or deceptive acts or practices, including the above-mentioned concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the Plaintiffs and Class Members about the true safety and reliability of Class Vehicles, the quality of Ford's Power-Stroke diesel-engine vehicles, and the true value of the Class Vehicles.

220.    As alleged above, Ford intentionally and knowingly misrepresented facts regarding the Class Vehicles and the defective high-pressure fuel pumps installed therein with an intent to mislead Plaintiffs and Class Members.

221.    Ford knew or should have known that its conduct violated Texas DTPA.

222.    To protect its profits, Ford concealed the CP4 fuel pump defect and continued to allow unsuspecting new and used vehicle purchasers to continue to buy, lease, and drive inherently defective Class Vehicles.

223.    Ford's representations violate subdivisions (b)(5) and (b)(24) of the DTPA in that they constitute representations that particular goods and services have certain qualities, uses or

benefits when they did not and failing to disclose information about goods or services with the intent to induce Plaintiffs to enter into transactions that they would not have entered into had the information been disclosed.

224.    Ford owed Plaintiff and Class Members a duty to disclose the truth about the quality, reliability, durability, and safety of the Class Vehicles because Ford:

> a.      Possessed exclusive knowledge of the CP4 fuel pump defect in its Power-Stroke diesel-engine vehicles;

> b.      Intentionally concealed the foregoing from the Class Members; and/or

> c.      Made incomplete representations about the quality, reliability, durability, and safety of the Class Vehicles, while purposefully withholding material facts from the Class Members that contradicted these representations.

225.    Because Ford fraudulently concealed the CP4 fuel pump defect in the Class Vehicles, and failed to disclose to Plaintiffs and Class Members at the time of purchase or lease that the vehicles are prone to catastrophic high-pressure fuel pump failure which (1) causes the Class Vehicles to stall while in motion with a subsequent inability to restart; and (2) results in a comprehensive high-pressure fuel injection system repair/replacement process costing $8,000–$20,000 that Ford will not cover, the Class Vehicles are worth significantly less than the amounts paid by Plaintiffs and Class members at the time of purchase or lease. Indeed, consumers who purchased or leased the Class Vehicles would not have purchased or leased said vehicles, or would have paid significantly less for them, had they known of the existence of this defect prior to purchase or lease.

226.    Plaintiffs and Class Members suffered ascertainable loss caused by Ford's misrepresentations and its failure to disclose material information. Plaintiffs and Class Members

did not receive the benefit of their bargains as a result of Ford's misconduct.

227.    As a direct and proximate result of Ford's violations of the Texas DTPA, Plaintiffs and Class Members have suffered injury-in-fact and/or actual damages.

228.    Plaintiffs and Class members seek monetary relief against Ford pursuant to Tex. Bus. & Com. Code §§ 14.41, *et seq.* Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and mental anguish damages and additional damages up to three times the amount of economic damages as permitted by the DTPA.

229.    In or around March 2019, Plaintiff Fulton made a demand in satisfaction of Tex. Bus. & Com. Code § 17.505(a) on behalf of himself and similarly situated Texas Class Vehicle acquirers; sixty (60) days have elapsed since the demand was made without any claim resolution efforts by Ford. Likewise, on May 13, 2020, Plaintiff Broussard made a written demand to Ford on behalf of himself and similarly situated Texas Class Vehicle acquirers in accordance with Tex. Bus. & Com. Code § 17.505(a). Thus, Plaintiffs have met all conditions precedent to brining this cause of action against Ford, and/or will have met all such conditions within the required statutory notice period. To date, Ford has not directly responded to any of the aforementioned written demands, aside from moving to dismiss all Texas Class claims (including Plaintiffs' DTPA claims) pending before this Court.[125]

**COUNT III**
**UNJUST ENRICHMENT**

230.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

231.    Plaintiffs bring this Count individually and on behalf of the Class against Ford.

232.    Ford has received and retained a benefit from the Plaintiffs and other Class members, and inequity has resulted.

---

[125] *See, e.g.*, ECF Nos. 8, 31, and 36.

233.    Ford benefitted from selling and leasing the Class Vehicles for more than they were worth as a result of Ford's actions, at a profit, and Plaintiffs and Class Members have overpaid for the Class Vehicles and been forced to pay other costs.

234.    Thus, all Plaintiffs and Class members conferred a benefit on Ford.

235.    It is inequitable for Ford to retain these benefits.

236.    Plaintiffs and Class members were not aware of the true facts about the Class Vehicles prior to purchase or lease, and did not benefit from Ford's conduct.

237.    Ford knowingly accepted the benefits of its unjust conduct. And, as a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY,**
**(Tex. Bus. & Com. Code §§ 2.314 and 2A.212)**

238.    Plaintiffs incorporate by reference all paragraphs t as though fully set forth herein.

239.    Plaintiffs bring this Count individually and on behalf of the Class against Ford.

240.    Ford was at all times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(2), and "seller" of motor vehicles under § 2.103(a)(4). With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

241.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code. §§ 2.105(a) and 2A.103(a)(16).

242.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law, pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

243.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

244.    The Bosch CP4 fuel pumps in the Class Vehicles are inherently defective in that they are incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

245.    Ford was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

246.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and Class members have been damaged in an amount to be proven at trial.

**COUNT V**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT,**
**(15 U.S.C. § 2301, *et seq.*)**

247.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

248.    Plaintiffs bring this Count individually and on behalf of the Class.

249.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)–(d).

250.    The Class Vehicles manufactured and sold by Ford are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

251.    Plaintiffs and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).  They are consumers because they are persons entitled under applicable state law to enforce against the warrantors the obligations of their implied warranties.

252.    Ford was a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

253.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

254.    Ford provided Plaintiffs and Class members with an implied warranty of merchantability in connection with the purchase or lease of the Class Vehicles, that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).  As a part of the implied warranty of merchantability, Ford warranted that the Class Vehicles were fit for their ordinary purpose as safe, American-diesel-fuel compatible motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

255.    Ford breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs and Class members pursuant to 15 U.S.C. § 2310(d)(1).  Without limitation, the Class Vehicles share a common defect in that they are all equipped with a Bosch CP4 high-pressure fuel injection pump which is not compatible with the lubricity of American diesel fuel.  This incompatibility causes the Class Vehicles to suddenly fail during normal operation, leaving occupants of the Class Vehicles vulnerable to crashes, serious injury, and death. Even where death or serious injury does not occur, the CP4's heightened incompatibility with American diesel fuel renders the Class Vehicles, when sold/leased and at all times thereafter,

unmerchantable and unfit for their ordinary use of driving in America with standard American diesel fuel.

256.    In its capacity as a warrantor, Ford had knowledge of the inherently defective nature of the high-pressure fuel-injection system in the Class Vehicles.  Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

257.    Any limitations Ford might seek to impose on their warranties are procedurally unconscionable.  There was unequal bargaining power between Ford and Plaintiffs as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

258.    Any limitations Ford might seek to impose on its warranties are substantively unconscionable.  Ford knew that the Class Vehicles were defective and particularly incompatible with U.S. diesel fuel, ant the Class Vehicles would fail when used as intended. Moreover, Ford knew the Class Vehicles would pose safety risks after the warranties purportedly expired. Ford failed to disclose this defect to Plaintiffs and Class members. Thus, Ford's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

259.    Plaintiffs have had sufficient direct dealings with either Ford or its agents (i.e., dealerships) to establish privity of contract between Ford and Plaintiffs.  Nevertheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and

intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as catastrophic CP4 fuel pump failure can cause the vehicle to stall while in motion and then subsequently become unable to be restarted, which increases the risk of a crash and presents an unreasonable risk to vehicle occupant safety.

260.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

261.    Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Ford is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

262.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000 exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of the Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Class members in connection with the commencement and prosecution of this action.

263.     Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Class members to recover out of pocket costs incurred in attempting to rectify and/or mitigate the effects of the CP4 incompatibility defect in their Class Vehicles.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Ford as follows:

A.     Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.     An order temporarily and permanently enjoining Ford from continuing unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.     Injunctive relief in the form of a recall, free replacement, or buy-back program;

D.     An order establishing Ford as a constructive trustee over profits wrongfully obtained, plus interest;

E.     Costs, restitution, damages, including punitive damages, exemplary damages and treble damages, and disgorgement in an amount to be determined at trial;

F.     An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

G.     An award of costs and attorney's fees; and

H.     Such other or further relief as may be appropriate.

## IX.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: June 5, 2020

Respectfully submitted,

/s/ Robert C. Hilliard
Robert C. Hilliard
Texas State Bar No. 09677700
Federal I.D. No. 5912
Hilliard Martinez Gonzales LLP
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Phone: (361) 882-1612
Fax: (361) 882-3015
Email: bobh@hmglawfirm.com

***ATTORNEY IN CHARGE FOR
PLAINTIFFS***

**OF COUNSEL:**
Rudy Gonzales, Jr.
Texas State Bar No. 08121700
Federal I.D. No. 1896
Email: rudy@hmglawfirm.com
Lauren Akers
Texas State Bar No. 24076233
Email: lakers@hmglawfirm.com
Marion Reilly
Texas State Bar No. 24079195
Federal I.D. No. 1357491
Email: marion@hmglawfirm.com
Bradford P. Klager
State Bar No. 24012969
Federal I.D. No. 24435
Email: brad@hmglawfirm.com
**HILLIARD MARTINEZ GONZALES LLP**
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Phone: (361) 882-1612
Fax: (361) 882-3015

*-And-*

Steve W. Berman (admitted *pro hac vice*)
steve@hbsslaw.com
Jerrod C. Patterson (admitted *pro hac vice*)
jerrodp@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000

Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

***-And-***

Andrew Parker Felix, Esq. (*pro hac vice* forthcoming)
MORGAN & MORGAN, P.A.
20 North Orange Ave., Ste. 1600
P.O. Box 4979
Orlando, FL  32801
Telephone: (407) 244-3204
Facsimile: (407) 245-3334
Andrew@forthepeople.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 5, 2020, I electronically filed the foregoing using the CM/ECF system which will serve notification of such filing to the email of all counsel of record in this action.

By: <u>*/s/ Robert C. Hilliard*</u>

Robert C. Hilliard