United States District Court
Southern District of Texas
**ENTERED**
September 29, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ERIC STEVENS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:18-CV-00456 |
| | § | |
| FORD MOTOR COMPANY, | § | |
| | § | |
| Defendant. | § | |

## ORDER ON EXPERT TESTIMONY AND CLASS CERTIFICATION

Plaintiffs Darren Fulton and Craig Broussard[1] bring this putative class action against Defendant Ford Motor Company ("Ford"), alleging that Ford equipped their 6.7L Power Stroke diesel engine trucks (the "Class Vehicles") with a defective CP4 fuel injection pump system[2] and that Ford knew the CP4 pump system was defective. *See* (D.E. 79, p. 1–5). Plaintiffs assert various causes of action, all arising from this alleged defect and Ford's alleged failure to disclose it.[3]

---

[1] Several individuals have been named as plaintiffs over the course of this action, *see* (D.E. 1; D.E. 17), but Darren Fulton and Craig Broussard are the only remaining representative plaintiffs. (D.E. 79, p. 1, 5). Hereinafter, Fulton and Broussard are collectively referred to as "Plaintiffs," unless otherwise specified.

[2] Although Plaintiffs and Ford have different names for the relevant fuel pump system, CP4 and CP4.2, respectively, *see* (D.E. 79, p. 1; D.E. 84, p. 8), the parties refer to the same fuel pump system. As such, whenever the Court refers to the CP4 pump, it means the CP4.2 pump and vice versa.

[3] Specifically, Plaintiffs asserted the following causes of action: fraudulent concealment, violations of the Texas Deceptive Trade Practices-Consumer Protection Act, *see* TEX. BUS. & COM. CODE § 17.41 *et seq.*, unjust enrichment, breach of implied warranty of merchantability, *see id.* §§ 2.314 & 2A.212, and violations of the Magnuson-Moss Warranty Act, *see* U.S.C. § 2301, *et seq.* (D.E. 79, p. 100–114).

After approximately two years of discovery, Plaintiffs moved to certify their claims as a class action. (D.E. 210; D.E. 211).[4] Plaintiffs seek Rule 23(a) and (b)(3) certification of the following two classes:

> **The Failure Class:** All persons or entities who have purchased in the State of Texas a Class Vehicle, and who (i) experienced a catastrophic failure of their engine because of the defective CP4 fuel pump, and (ii) incurred out-of-pocket costs to pay for the repair of their Class Vehicle.

> **The Overpayment Class:** All persons or entities who have purchased in the State of Texas a Class Vehicle, and who have not yet experienced a catastrophic failure of the engine because of the defective CP4 fuel pump, or who had their catastrophic failure repair costs covered under warranty.

(D.E. 210, p. 11). Also pending before the Court are various motions to exclude expert testimony, filed in support of Plaintiffs' and Ford's arguments for and against class certification, respectively. *See* (D.E. 131; D.E. 132; D.E. 149; D.E. 151; D.E. 175).

Having considered the relevant briefings and applicable law, the Court makes the following rulings:

(1) The Court **GRANTS** Ford's motion to exclude the testimony of Dr. Bradley Edgar (D.E. 132);

(2) The Court **GRANTS** Ford's motion to exclude the testimony of Edward Stockton (D.E. 131);

(3) The Court **DENIES** Ford's motion to exclude the testimonies of Steve Gaskin and Colin Weir (D.E. 175);

(4) The Court **DENIES** Plaintiffs' motion to exclude the testimony of Roger Gault (D.E. 149);

(5) The Court **DENIES** Plaintiffs' motion to exclude the testimony of Dr. Peter Lillo (D.E. 151); and

---

[4] The D.E. 210 filing is Plaintiffs' sealed corrected motion for class certification, and D.E. 211 is the same motion unsealed. Plaintiffs' original motion for class certification appears in D.E. 112. Because D.E. 210 and D.E. 211 are the live class certification motions, the Court **DENIES as moot** D.E. 112.

(6) The Court **DENIES** Plaintiffs' motion for class certification (D.E. 210; D.E. 211).

The Court explains each ruling below, beginning with the motions to exclude expert testimony.

## I. Motions to Exclude Expert Testimony

### A. Legal Standard – Federal Rule of Evidence 702, *Daubert*, and *Prantil*

A witness qualified as an expert may testify if the party offering the expert's testimony proves by a preponderance of the evidence that: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting FED. R. EVID. 702); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that district courts may consider a list of non-exhaustive factors in evaluating the reliability of expert testimony, including "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 593–94 (1993)). The *Daubert* analysis is "flexible" and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

The *Daubert* inquiry applies in full force at the class certification stage. *See, e.g., Prantil v. Arkema Inc.*, 986 F.3d 570, 575 (5th Cir. 2021) (holding that "the *Daubert* hurdle must be

cleared when scientific evidence is relevant to the decision to certify" because "if an expert's opinion would not be admissible at trial, it should not pave the way for certifying a proposed class."). To clear the *Daubert* hurdle, expert testimony must be supported by "more than subjective belief or unsupported speculation." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (citing *Daubert*, 509 U.S. at 590). Rather, testimony "must be reliable at each and every step or else it is inadmissible." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion . . . ." *Id.* (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). If "an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz*, 555 F.3d at 388.

The decision to allow or exclude experts from testifying under *Daubert* is within the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S. Inc.*, 224 F.3d 402, 405 (5th Cir. 2000); *see also Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) ("District courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous."). The district court need not hold an evidentiary hearing to resolve objections to expert witnesses if the existing record is sufficient for the Court to fulfill its gatekeeping role. *See Johnson v. Thibodaux City*, 887 F.3d 726, 737 n.11 (5th Cir. 2018); *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016). The overarching concern is relevance and reliability. *Smith*, 495 F.3d at 227.

**B. Ford's Motions to Exclude Plaintiffs' Expert Testimony**

Ford moves to exclude the testimonies of Plaintiffs' experts (1) Dr. Bradley Edgar

(D.E. 132); (2) Edward Stockton (D.E. 131); and (3) Steven Gaskin and Colin Weir (D.E. 175), arguing that their testimonies fail to satisfy Rule 702 and *Daubert* and are thus unreliable and inadmissible. The Court addresses each expert in turn.

### i. Dr. Bradley Edgar

Plaintiffs rely on Dr. Edgar, a mechanical engineer, to prove that Class Vehicles contain a class-wide defect: the CP4 fuel pump. *See* (D.E. 132, p. 4). Dr. Edgar opines that the CP4 pump "is defectively designed and inadequate for real-world U.S. diesel fuel." (D.E. 113-1, p. 7). According to Dr. Edgar, the "CP4 fuel pump has a defectively fragile . . . design because it relies on a series of assumptions about diesel fuel quality that are unrealistic." *Id.* This combination purportedly causes the CP4 pump to wear and generate metal shavings that can contaminate the fuel injection system, potentially leading to "catastrophic failure of the fuel injection system and total shut-down of the engine itself." *Id.* Dr. Edgar further opines that the likelihood of system failure increases when real-world U.S. diesel fuel is contaminated by water or other particles. (D.E. 144-1, p. 11). Dr. Edgar's conclusion that the CP4 pump is defective is based on several factors, including:

(1) the CP4's "radical departure" from its predecessor, the CP3;

(2) the CP4's susceptibility to breakdown due to metal shavings generated by the CP4 design;

(3) U.S. diesel fuel's low lubricity, which accelerates the effects of the CP4 design;

(4) outside sources and studies consistent with his analysis;

(5) and "documents and testimony" proffered by Ford likewise consistent with his analysis.

(D.E. 113-1, p. 7–9).

Ford moves to exclude Dr. Edgar's report and opinion that the CP4 pump is a class-wide

or common defect as unreliable under Rule 702 and *Daubert*. (D.E. 132, p. 4, 19).[5] After reviewing the record before it, the Court agrees. Dr. Edgar's proposed testimony is unreliable under Rule 702 and *Daubert* because it (1) is not based on sufficient facts and data and (2) lacks a reliable methodology and application thereof to the facts of this case. *See* FED. R. EVID. 702; *Daubert*, 509 U.S. at 590.

### a. Insufficient Facts and Data

While Dr. Edgar's report is certainly not devoid of facts and data, *see generally* (D.E. 113-1), Dr. Edgar's report lacks those facts and data that are central to supporting his ultimate conclusion that the CP4 fuel pump is defectively designed. Specifically, Dr. Edgar's conclusion is supported neither by sufficient data about the failures of the CP4 fuel pump, *see id.* at 26, nor sufficient data about the CP3 fuel pump, which is Dr. Edgar's proposed more "reliable and robust" design, *see id.* at 22, 77.

Regarding the CP4 pump failures, Dr. Edgar did not address contrary evidence and other data pertinent to his analysis. *See id.* at 12; *see also* (D.E. 133-1, p. 24–25; D.E. 166, p. 14–15). For example, Dr. Edgar acknowledges in his deposition that he had not reviewed testing that Bosch and Ford conducted to prove the CP4's robustness to U.S. diesel fuel. (D.E. 133-1, p. 12, 16). Dr. Edgar also purported to have "participated in vehicle inspections, including physically inspecting diesel fuel pumps and other systems components." (D.E. 113-1, p. 12); *see also* (D.E. 144-1) (stating Dr. Edgar "[a]ttended two vehicle inspections"). But Dr. Edgar did not incorporate any

---

[5] The parties seem to disagree about the scope of Ford's challenge to Dr. Edgar. *Compare* (D.E. 145, p. 8–10) (Plaintiffs' responsive brief asserting "Ford does not challenge key portions of Dr. Edgar's opinion"), *with* (D.E. 166, p. 10 n.1) (Ford stating in its reply that it did "move to exclude the entirety of Dr. Edgar's testimony") (quoting D.E. 133, p. 24). After review, the Court agrees that Ford's original motion to exclude plainly states that "the Court should exclude Dr. Edgar's report and testimony in its entirety." (D.E. 133, p. 24). As such, the Court treats Ford's motion to exclude Dr. Edgar as a challenge to Dr. Edgar's entire report and opinions—including those stated in Dr. Edgar's rebuttal report (D.E. 144-1)—and finds that all of Dr. Edgar's opinions are excluded under Rule 702 or *Daubert*.

such inspections into his report, nor did he inspect or investigate Plaintiffs' Class Vehicles, the genesis for this lawsuit. *See* (D.E. 133-1, p. 18). By failing to inspect or even investigate the cause of pump failure in Plaintiffs' Class Vehicles, Dr. Edgar's opinion that Plaintiffs' fuel pump replacements were caused by incompatibility with U.S. diesel fuel, *see* (D.E. 113-1, p. 7) is unsupported, *see Belville v. Ford Motor Co.*, 919 F.3d 224, 231, 235 (4th Cir. 2019) (approving a district court's exclusion of experts when they "had not tested or inspected the [p]laintiffs' actual vehicles or attempted to connect their testing to any of those vehicles."). Significantly, Dr. Edgar also acknowledged that he could not rule out customer abuse as causing the pump failures. *See* (D.E. 133-1, p. 21). By failing to inspect and stating that he could not rule out customer abuse, Dr. Edgar's report cannot show that the named Plaintiffs' Class Vehicles actually contain a defective CP4 pump, or whether Plaintiffs caused the engine failures in their Class Vehicles. This renders Dr. Edgar's report unhelpful to the jury.

Putting aside Dr. Edgar's lack of inspection or investigation into Plaintiffs' Class Vehicles, it is also problematic that Dr. Edgar conducted no independent testing of the CP4 pump. Dr. Edgar asserts that no independent testing is required in this case. (D.E. 144-1, p. 21–22). According to Dr. Edgar, this was so because "Ford, Bosch, and independent entities had already performed a significant amount of testing to understand the causes and modes of [pump] failure . . . [and] [a]ll parties independently came to similar conclusions." *Id.* at 21. Dr. Edgar also opined that because he is "not advancing a new or significantly more complex theory," no additional testing should be required. *Id.* While failure to independently test may not always alone constitute grounds to exclude, it is appropriate in this case because Dr. Edgar has no other basis to support his opinions.

Upon inspection of Dr. Edgar's initial D.E. 113-1 expert report, Dr. Edgar's CP4 failure analysis rests on two grounds: (1) his own statements contained in his expert report, *id.* at 26–35,

and (2) a set of Polish periodical articles: *Testing of Modern Fuel Injection Pumps* (the "First Polish Article") and *Analysis of Hypocycloid Drive Application in High-Pressure Fuel Pump* (the "Second Polish Article"), *see id.* at 9, 26, 27 (citing D.E. 116-47; D.E. 116-48).

As to Dr. Edgar's own assertions about the CP4's failures, Dr. Edgar offers no facts or data supporting his conclusion that the CP4 pump is indeed defective. Dr. Edgar's opinion as to the CP4's alleged failures rests on a series of layered factual assumptions without corresponding data.[6] Lacking these critical facts and data in support also renders Dr. Edgar's opinion unreliable and inadmissible.

Regarding the two Polish articles, Dr. Edgar uses both to establish that others have reached the same conclusion that the CP4 pump is defective. For example, Dr. Edgar cites the First Polish Article to establish the CP4's lack of stabilization, which allegedly causes a rotational defect in the pump's roller pin. (D.E. 113-1, p. 31) (citing D.E. 116-47, p. 3). Likewise, Dr. Edgar uses the Second Polish Article to establish that this rotational issue is the "fundamental flaw" of the CP4. *Id.* at 32 (citing D.E. 116-48, p. 4). But these two articles rest on factual assumptions themselves. The First Polish Article purports to describe "the methods for diagnosing and testing . . . [the] modern CP4 fuel injection pump." (D.E. 116-47, p. 2). While the First Polish Article loosely describes testing the CP4 pump, a careful review of the article reveals that its assertions about the

---

[6] Edgar opines throughout: "*if* the [fuel pump's] tappet and roller pin assembly begins to rotate out of position, it will 'flip' until it is 90 degrees out of alignment," (D.E. 113-1, p. 26) (emphasis added); "*if* small particles are entrained into the small space between the roller and the roller shoe . . . the cam and roller will start sliding or skipping," *id.* at 27 (emphasis added); "[*i*]*f* particles enter the roller shoe, and if the film of fuel is not thick enough, the hard diamond-like coating of the tappet roller shoe will wear," *id.* at 28 (emphasis added); "*if* the wear particles come in between the cam and the roller, they can create increased point-contact stresses which can damage the ultra-smooth faces of the components," *id.* at 29 (emphasis added); and "*if* the wear particles lodge between the roller and the roller shoe, they can cause the roller to stick," "[i]f the roller sticks or stops rolling, it can cause the tappet to slide between the cam and the roller or to rotate out of alignment with the cam," *id.* (emphasis added).

CP4's failures are unsupported by data contained within it. For example, the First Polish Article states that "[a] defect of [the CP4 fuel injection pump] is lack of stabilization, which causes . . . the whole roller [to] rotate 360 [degrees]." *Id.* at 3. To support this assertion, the Article cites Figure 5, *id.* at 3, an internal cross-reference to a photograph of a fuel-pump roller in an allegedly faulty position, *see id.* at 4. The Court finds this photograph insufficient to support the First Polish Article's assertions about the CP4 fuel pump's stabilization. While the photograph is useful to show what the defect might look like after the fact, Figure 5 is not helpful in that it does not attempt to show with what frequency, if any, the alleged defect occurs. Another example is that the First Polish Article states:

> If the roller starts rotations around its own axis during the pump operation, it is no longer possible for it to return to its original position. Then, it starts destroying a cam on the pump drive shaft. As a result of friction on a cam and a roller, metal filings are generated, fouling and destroying the whole fuel supply system.

*Id.* at 4. The Article cites Figure 6 for this assertion, which is a photograph of a roller in relation to a drive shaft cam. *See id.* Like Figure 5, Figure 6 might show what the alleged defect could look like after it has occurred, but it is not pertinent in this context because it does not show the frequency with which the alleged defect occurred. *See id.* Such is the case for all assertions made throughout the First Polish Article. *See id.* at 1–5. The Court thus finds that all of Dr. Edgar's assertions resting on the First Polish Article are insufficiently data driven and unsupported by sufficient facts. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144–45 (1997) (holding that the district court did not abuse its discretion when it excluded expert testimony that was not "sufficiently supported by the . . . studies on which they purported to rely [and] [t]he studies were so dissimilar to" the facts of the case).

The Second Polish Article suffers from the same flaw as its counterpart. The Second Polish Article is not solely concerned with the CP4. *See* (D.E. 116-48). The only potentially relevant part

is two pages referencing the CP4. *See id.* at 3–4. After review, this section takes the CP4's failure for granted, providing no data or methodological support for its assertion that the "improper cam-roller is a fundamental flaw of [the CP4]." *Id.* at 4. As such, Dr. Edgar's assertions resting on the Second Polish Article are also insufficiently data-driven and unsupported by facts. *See Joiner*, 522 U.S. at 144–45.

Dr. Edgar also lacks sufficient facts and data to support his CP4 defect claim because his report lacks sufficient facts and data about the CP3 pump, the CP4 pump's predecessor and the allegedly "more reliable" pump. (D.E. 113-1, p. 7, 21). In a product liability action in which the plaintiff alleges a design defect, the plaintiff must prove by a preponderance of the evidence that: "(1) there was a safer alternative design; and (2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery." TEX. CIV. PRAC. & REM. CODE § 82.005(a). Dr. Edgar proffers the CP4's predecessor, the CP3, as the safer alternative design. *See* (D.E. 113-1, p. 77). Dr. Edgar opines that "Ford did not need to switch to the [CP4]" as "the CP3 pump was extremely reliable and robust . . . ." *Id.* Although Dr. Edgar makes that assertion, Dr. Edgar has done no comparative analysis explaining why Ford's CP4 pumps are more susceptible to low lubricity than other alternative pumps. Because he provides no comparative analysis, Dr. Edgar's opinion that the CP3 is a more reliable pump design lacks sufficient facts and data. *See Kumho Tire*, 526 U.S. at 157 (a district court is not required to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Because Dr. Edgar provided no factual or data support for his own opinions, relies heavily on two data-lacking Polish articles, and because his testimony lacks any comparative analysis between the CP3 and the CP4, the Court finds that Dr. Edgar's testimony and opinion as a whole rest on insufficient facts and data. Thus, Dr. Edgar's testimony and opinion does not pass muster

under Rule 702 or *Daubert*.

### b. Unreliable Methodology and Application

Dr. Edgar's testimony and opinion also suffers from unreliable methodology and unreliable application of such methodology to the facts of this case. Dr. Edgar opines, *inter alia*, that the CP4 "is a radical departure from its predecessor, the CP3." (D.E. 113-1, p. 7). Again, in Dr. Edgar's opinion, the CP3 was the safer alternative design. *Id.* at 77. This segment of Dr. Edgar's report, as previously mentioned, is factually insufficient. Along the same lines, Dr. Edgar's testimony lacks reliable methodology and application to the facts of this case, as there was no comparative analysis conducted between the two pump designs.

Dr. Edgar concludes that the CP4 pump is "susceptible to breakdown if the metal shavings generated by this design become lodged between the roller pin and roller shoe . . . ." *Id.* at 8. The keyword in this statement, and in other similar statements Dr. Edgar makes, is "if." Dr. Edgar contends that such scenarios are highly probable, allowing him to opine, for example, that "the pump is susceptible to failure," because of the "high likelihood that commercial diesel fuel is not lubricious enough, and [because] the CP4 pump's design leaves so little margin for error." *Id.* at 4. But low diesel fuel quality would presumably affect all diesel fuel pumps, Ford's or otherwise, and Edgar does not provide a comparative analysis to explain why Ford's CP4 pumps are more susceptible to low lubricity than other alternative pumps. *See* (D.E. 133-1, p. 35) (Dr. Edgar testifying that he has neither compared Ford's system with the system of other companies in the industry nor did he conduct a field comparison of the CP3 pump to the CP4 pump). This conclusion leaves "too great an analytical gap" to be filled, and thus it is unreliable. *See Burleson v. Tex. Dep't Crim. Just.*, 393 F.3d 577, 587 (5th Cir. 2004).

Dr. Edgar also concludes that "for every 12.5 vehicles sold," a CP4 pump is replaced,

making the replacement rate 8%. (D.E. 113-1, p. 64, 66). By Dr. Edgar's estimation, the "replacement rate is expected to grow until the vehicles reach the end of their useful life and are no longer in service." *Id.* at 66. In this section of the report, Dr. Edgar explains how he calculated the replacement rate. *See id.* at 56–66. Although this section contains some methodology and application, the test under *Daubert* and its progeny is whether the methods and application are **reliable**, *see Daubert*, 509 U.S. at 590–91, and here, Dr. Edgar's report falls short under *Daubert* because it fails to sufficiently address alternative theories that could undermine his own theory. *See* (D.E. 113-1, p. 56–66).

Specifically, Dr. Edgar does not describe how he addressed confounding variables—such as contamination, abuse, misfuelling, or failure to maintain—which may have contributed to the fuel pump's failure and the consumers exercising their warranty or paying to have their fuel pumps replaced. *See, e.g.,* (D.E. 129-5, p. 27–39). Instead, Dr. Edgar ruled out these scenarios as potential causes for the CP4 fuel pumps' failures without any basis and solely blamed the CP4's design as the cause. Such an approach—ruling out possible explanations without having some scientific basis for ruling on the phenomenon alleged—warrants exclusion of Dr. Edgar's opinion given the facts of this case. *See Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 402 (5th Cir. 2016) (observing that "the district court has broad discretion to make the fact-specific inquiry in a given case as to whether [this type of approach] is sufficiently reliable, especially in the absence of evidence ruling in the expert's conclusion") (internal quotations omitted).

In sum, Dr. Edgar's proposed testimony lacks a reliable methodology and reliable application to the facts of this case, leaving too large an analytical gap that cannot pass muster under Rule 702 or *Daubert*. Thus, under a straightforward application of Rule 702 and *Daubert*, Dr. Edgar's opinion and testimony should be excluded.

It is also worth briefly noting that two additional *Daubert* factors weigh in favor of excluding Dr. Edgar's testimony in this case. First, there is no evidence that Dr. Edgar's theory has been subjected to peer review or publication. And second, there is little evidence, if any, that Dr. Edgar's theory is generally accepted in the scientific community. *See supra* Section I.B.i.a. For all the reasons explained above and these two additional factors, the Court finds Dr. Edgar's report fails to satisfy *Daubert* and Rule 702 and **GRANTS** Ford's motion to exclude Dr. Edgar's expert testimony. (D.E. 132).

*ii. Edward Stockton*

Plaintiffs designate Mr. Stockton, an economic services consultant, to provide damages testimony with respect to the Failure Class, which contains those putative class members that incurred out-of-pocket costs for repairs associated with CP4 pump failures caused by the pump's alleged defect. *See* (D.E. 146, p. 8). According to Plaintiffs, Mr. Stockton specifically describes his methodology for determining class-wide damages as follows:

(1) Mr. Stockton will analyze a robust set of data to ascertain the typical cost of repairs associated with a catastrophic failure from a defective CP4 fuel pump;

(2) Mr. Stockton will obtain the aggregate number of subject repairs from Dr. Edgar and adjust to account for repairs that were covered by warranty; and

(3) Mr. Stockton will multiply the typical repair cost by number of customer-paid subject repairs.

*See id.* at 8–12, 18; *see* (D.E. 118-25, p. 7–10).

Ford attacks the reliability of Mr. Stockton's methodology in three main ways. First, although Ford concedes that this three-step formula "may or may not" be simple, Ford nonetheless contends that Mr. Stockton's opinion is unreliable because Mr. Stockton has not provided a reliable method for developing the "typical repair cost" figure that would fit into such a mathematical

formula. (D.E. 162, p. 8). As such, Mr. Stockton "fails to get past step one . . . ." *Id.* Second, Ford argues that even if Mr. Stockton gets past step one, he cannot get past step two because Mr. Stockton cannot use Dr. Edgar's unreliable opinion to develop the "aggregate number of subject repairs." *Id.* Third, Ford asserts that Mr. Stockton's testimony is inadmissible because it does not "fit" Plaintiffs' theory of liability. *Id.* at 13.[7]

The Court initially considers Ford's first argument: whether Mr. Stockton has provided a reliable methodology for calculating typical repair costs. As Fifth Circuit precedent requires, the Court conducts a full *Daubert* inquiry of Mr. Stockton's report. *Prantil*, 986 F.3d at 576.[8] Any objections to Mr. Stockton's report unrelated to reliability or relevance go to "the weight" of his opinions "rather than [their] admissibility." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019).

---

[7] Ford argues that Mr. Stockton's damages estimate does not "fit" Plaintiffs' theory of liability because Mr. Stockton's damages theory depends on compensating putative class members for repairs that Plaintiffs' liability theory says will not remedy the purported defect. (D.E. 162, p. 14). While Plaintiffs contend that the damages "claimed by the Failure Class are out-of-pocket costs of repairs occasioned by the failure of the CP4 fuel pump" (D.E. 146, p. 25), they also allege that "any such repair is futile because it will not actually fix the issue so long as the vehicle is being filled with U.S. diesel fuel," (D.E. 79, p. 2).

[8] Notably, the *Daubert* inquiry differs from that set forth in *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), which is not applicable in a motion to exclude expert testimony. *Daubert* requires courts to evaluate the "evidentiary reliability" of expert testimony. *See Daubert*, 509 U.S. at 590. By contrast, *Comcast* asks courts to ensure damages are "susceptible of measurement" across a putative 23(b)(3) class by confirming that the proposed damages model "measure[s] only those damages attributable" to plaintiffs' theory of liability. *Comcast*, 569 U.S. at 35. Stated differently, "*Comcast* demands [a] fit between plaintiffs' class-wide liability theory and plaintiffs' class-wide damages theory." *Slade v. Progressive Sec. Ins.*, 856 F.3d 408, 411 (5th Cir. 2017). As such, "while potentially related or overlapping in certain instances, the inquiries under *Daubert* and *Comcast* are fundamentally distinct from one another." *Earl v. Boeing Co.*, No. 4:19-cv-507, 2021 WL 3140545, at *3 (E.D. Tex. July 26, 2021) (Mazzant, J.). Stated differently, "all expert opinions satisfying *Comcast* also satisfy *Daubert*, but not all expert opinions satisfying *Daubert* satisfy *Comcast*." *Id.* (citing *Comcast*, 569 U.S. at 32 n.4); *see In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) ("Expert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied."). Considering this critical distinction, the Court sets aside any contention offered by either party pertaining to the inquiry under *Comcast* because such analysis would be inappropriate at this juncture.

To establish reliability under *Daubert*, "an expert bears the burden of furnishing 'some objective, independent validation of [his] methodology.' 'The expert's assurances that he has utilized generally accepted [principles] is insufficient.'" *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (alteration in original) (quoting *Moore*, 151 F.3d at 276); *see also Joiner*, 522 U.S. at 146 ("opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" is unreliable and inadmissible). An expert's subjective assurances are insufficient because there must be an adequate "fit" between an expert's data and opinions, *Moore*, 151 F.3d at 276, and—without it—"[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

In attacking the reliability of Mr. Stockton's methodology in calculating typical repair costs, Ford analogizes Mr. Stockton's opinion to the expert's in *In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014) (Morrow, J.). *See* (D.E. 131, p. 10–11). In that case—also a putative class action—the district court excluded the damages expert because he "provide[d] no damages model at all." *In re ConAgra*, 302 F.R.D. at 552. The court reasoned that "[a]lthough the methodologies [the expert] describes may very well be capable of calculating damages in this action, [the expert] has made no showing of that in the case. [The expert] does not identify any variables he intends to build into the models, nor does he identify any data presently in his possession to which the models can be applied." *Id.* Thus, the court was "left only with [the expert's] assurance that he can build a model to calculate damages" and found that the expert's testimony was "so incomplete as to be inadmissible as irrelevant." *Id.* (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (internal quotations omitted)).

Ford argues that the Court should reach the same conclusion here. (D.E. 131, p. 10). Although Mr. Stockton lists a variety of data sources on which he intends to rely, Ford argues that

"Mr. Stockton has done no damages calculations or developed a formula tying together the . . . data sources on which he will need to rely"; does not "identify any of the actual variables that will be a part of his damages calculation"; is "unable to determine whether any of his potential data sources will prove sufficient to include in his damages formula until he receives and analyzes the data from each source"; has "not reviewed the data that has been collected"; and has not prepared a survey he states he needs. *Id.* at 10–11. Ford therefore concludes that "only Mr. Stockton's *ipse dixit* connects his list of potential data sources to his opinion that he can measure typical and aggregate out-of-pocket repair costs." *Id.* at 11.

Conversely, Plaintiffs argue that *In re ConAgra* is distinguishable because unlike the expert in that case, Mr. Stockton provides a damages model and identifies all the data point variables he will incorporate into the damages model. (D.E. 146, p. 17, 19).[9] Further, to refute Ford's contention that Mr. Stockton has not identified how to incorporate the data variables into his model, Plaintiffs argue that the data points will "be in a form that already reflects the cost of the relevant CP4 repair." *Id.* at 21. Once Mr. Stockton has all the data points, which are the elements of the cost of repair, adding each element of the cost of repair yields the total cost of repair. *Id.* at 19. Plaintiffs contend that this damages model, and the work Mr. Stockton has done so far, is sufficient at the class certification phase. *See id.* at 22–23.

Plaintiffs also highlight as persuasive authority *Siqueiros v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022), where the court admitted Mr. Stockton's expert testimony in what Plaintiffs argue are similar circumstances. *See* (D.E. 206; D.E. 206-1). In

---

[9] Mr. Stockton lists these data variables in his report, which include "labor rates, labor hours, required parts, part prices, miscellaneous shop charges, and diagnostic fees taken from warranty records, invoices from customers, dealership repair records, dealership composite statements, part list prices, Ford technical service bulletins, and Ford's 'standard repair items.'" (D.E. 146, p. 16) (citing D.E. 118-25, p. 10–22).

*Siqueiros*, like here, the plaintiffs purchased vehicles with alleged defects. *Siquerios*, 2022 WL 74182, at *1. The plaintiffs designated Mr. Stockton to develop a methodology for calculating plaintiffs' benefit-of-the-bargain damages. *Id.* at *3. Mr. Stockton opined that these damages could be determined by measuring the cost of remedying the defect, i.e., the cost of repair. *Id.* The defendant moved to exclude, arguing Mr. Stockton's methodology was unreliable. *Id.* at *11. However, these challenges were primarily premised on the defendant's argument that Mr. Stockton could not assume that the defect existed in making his calculations. *See id.* The district court held, citing Ninth Circuit precedent, that Mr. Stockton could make such assumptions as a damages expert and, moreover, that cost-of-repair was an appropriate methodology for calculating benefit-of-the-bargain damages. *Id.* at *10–11.

Although the *Siqueiros* court ultimately admitted Mr. Stockton's testimony, the Court finds *Siqueiros* unpersuasive in deciding the instant matter. Unlike the defendant in that case, Ford is not challenging the reliability of cost-of-repair as a methodology for calculating damages generally. *See* (D.E. 162, p. 8). Rather, Ford is arguing that Mr. Stockton has not gone beyond identifying "potential sources of data" and has not developed, built, or tested any analysis. *Id.* at 11–12. Mr. Stockton's failure to do so results in his failure to provide an appropriate methodology for analyzing data points to obtain the typical repair cost in this case, which is the first step in Mr. Stockton's cost-of-repair analysis. *Id.* at 8–12.

After considering the parties' arguments concerning the reliability of Mr. Stockton's methodology as it relates to ascertaining the typical repair costs, the Court finds that Mr. Stockton's methodology is unreliable under *Daubert*. *See Daubert*, 509 U.S. at 589–90. This case differs slightly from *In re ConAgra* in that Mr. Stockton identifies various data points he could **potentially** use, and he provides a three-step process for determining repair costs. *See* (D.E. 146, p. 8–10, 11–

12). Vitally, however, Mr. Stockton shows neither how he will use the various data points to conduct his analysis nor how—after analyzing the data points—he could calculate those repair costs. *See* (D.E. 162, p. 8–10). The data sources identified may very well be reliable once gathered and utilized in Mr. Stockton's formula; however, the relevant inquiry at this stage is whether Mr. Stockton's methodology is reliable. *See Caramba, Inc. v. Nationwide Mut. Fire Ins. Co.*, No. H-19-1973, 2020 WL 7684136, at *7 (S.D. Tex. Dec. 24, 2020) (Atlas, J.) (explaining that "[t]he issue under *Daubert* is not the reliability of the information in the file, but rather the reliability of [an expert's] methodology [in] analyzing that information" and excluding the expert's opinion as unreliable because he "fail[ed] to describe any analysis").

Mr. Stockton does not provide necessary analysis or calculations, rendering his methodology "incomplete." *See In re ConAgra*, 302 F.R.D. at 552–53; *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 676 (E.D. La. 2016) (Vance, J.) (excluding an expert's testimony as unreliable when the expert failed to "provide any evidence of his calculations or any description of his results"). Mr. Stockton's opinion that "[i]t is possible to form reasonable and reliable estimates of typical out-of-pocket repair costs" fails to establish the requisite reliability under *Daubert. See* (D.E. 118-25, p. 5); *see also Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

For these reasons, the Court finds that Mr. Stockton does not demonstrate a reliable methodology for calculating typical repair costs. As such, Mr. Stockton's testimony is inadmissible under Rule 702 and *Daubert*.[10] Accordingly, the Court **GRANTS** Ford's motion to exclude Mr.

---

[10] As Mr. Stockton's testimony is inadmissible on these grounds, the Court declines to address at length Ford's other arguments for excluding Mr. Stockton. However, the Court's exclusion of Dr. Edgar's report

Stockton's testimony. (D.E. 131).[11]

### iii. Steven Gaskin & Colin Weir

Plaintiffs designate Mr. Gaskin and Mr. Weir to provide damages testimony with respect to the Overpayment Class, which contains those putative class members whose vehicles have not experienced engine failure or who have had their engine failures covered by warranty. (D.E. 178, p. 10–13; D.E. 210, p. 11). Essentially, Plaintiffs' damages theory is that if Ford had disclosed the alleged defect, Plaintiffs would have paid less than they did for their vehicles. *See* (D.E. 175, p. 7–8). To show this, Plaintiffs must prove a "price premium," which is the difference in market price between what Plaintiffs paid and what they would have paid had Ford disclosed the alleged defect (i.e., the but-for market price). *See In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 234–35 (S.D.N.Y. 2019) (Furman, J.).

To calculate what Plaintiffs would have paid had Ford disclosed the alleged defect, Mr. Gaskin conducts a choice-based conjoint analysis[12] to estimate the Class Vehicle's reduction in

---

does impact Mr. Stockton's because "[i]f the foundational data underlying opinion testimony is unreliable, an expert will not be permitted to base an opinion on that data because any opinion from that data is likewise unreliable." *Spring St. Apartments Waco, LLC v. Phila. Indem. Ins. Co.*, No. 6:16-CV-00315-JCM, 2017 WL 2805014, at *6 (W.D. Tex. June 28, 2017) (Manske, J.). Mr. Stockton relies on Dr. Edgar to both provide the number of CP4 pump replacements not covered by warranty and to isolate repairs due to Plaintiffs' defect theory. *See* (D.E. 118-25, p. 23; D.E. 146-1, p. 3–4). Because Dr. Edgar's report is unreliable, *see supra* Section I.B.i, Mr. Stockton's testimony is also excluded as unreliable. *See Spring St. Apartments*, 2017 WL 2805014, at *6.

[11] In Plaintiffs' response, Plaintiffs "respectfully request leave for Mr. Stockton to supplement his report by making calculations based on evidence that has been subsequently produced" to "the extent that the Court determines it necessary." (D.E. 146, p. 18). At this late hour in the proceedings, supplementing Mr. Stockton's report would require significant amendment to the class certification briefing already before the Court. Such amendment would be untimely, result in substantial prejudice to Ford, and would not aid the Court. *See Garza v. Allstate Tex. Lloyd's Co.*, 284 F. App'x 110, 112 (5th Cir. 2008); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 572 (5th Cir. 1996). As such, the Court **DENIES** Plaintiffs' request for leave to supplement Mr. Stockton's expert report. (D.E. 146, p. 8).

[12] Conjoint analysis is a well-established and long-accepted statistical technique which uses "'survey data to determine how consumers value a product's individual attributes.'" *Earl*, 2021 WL 3140545, at *4 (quoting *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366-SVW, 2014 WL 7338930, at *4 (C.D. Cal. Dec.

market value due to the allegedly defective fuel pump. (D.E. 130-2, p. 5). Mr. Weir then uses Mr. Gaskin's report, in conjunction with supply-side considerations and the total sales of the Class Vehicles, to calculate the Overpayment Class's damages. (D.E. 130-3, p. 8–15). Ford argues that the Court should exclude both reports because: (1) both experts failed to account for supply-side economics; (2) Mr. Gaskin's conjoint analysis produced absurd results, and Mr. Gaskin "cherry-picked" data to mitigate the absurd results; (3) there were flaws in Mr. Gaskin's methodologies; and (4) Mr. Weir based his report on Mr. Gaskin's unreliable study, making Mr. Weir's report likewise unreliable. (D.E. 175, p. 17–25). The Court addresses each of Ford's arguments in turn.

### a. Failure to Account for Supply-Side Considerations

Ford argues that in determining the but-for market price, it is necessary to measure "actual" prices "in the but-for world," which is only possible if damages experts account for supply-side and demand-side factors. (D.E. 175, p. 12). Ford contends that Mr. Gaskin does not account for supply-side factors, such as "production costs, profit margins, manufacturing capacity, and competitor reactions to the proposed defect disclosure," rendering his report unreliable. *Id.* In support, Ford relies on *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 500 F. Supp. 3d 940 (N.D. Cal. Nov. 12, 2020) wherein the court excluded Mr. Gaskin's report because, among other things, it "examine[d] only what consumers say they would be willing to pay for certain vehicles" and thus ignored supply-side factors. *In re Volkswagen*, 500 F. Supp. 3d at 949; (D.E. 175, p. 12, 17–20). Ford contends that Mr. Gaskin's and Mr. Weir's reports in

---

18, 2014) (Wilson, J.)); *see also Guido v. L'Oreal, USA, Inc.*, No. 2:11-CV-01067-CAS, 2014 WL 6603730, at *5 (C.D. Cal. July 24, 2014) (Snyder, J.) ("Conjoint analysis has been used for decades as a way of estimating the market's willing[n]ess to pay for various product features."); Greg M. Allenby et al., *Valuation of Patented Product Features*, 57. J.L. & ECON. 629, 645 (2014) (stating that conjoint surveys are useful in estimating "industry demand" if "properly designed, pretested, and applied to representative samples").

this case are "nearly identical" to the reports the court excluded in *In re Volkswagen.* (D.E. 175, p.

12). Ford also highlights other district court cases that have excluded expert reports for similar

reasons. *Id.* at 19 (citing *In re Gen. Motors*, 407 F. Supp. 3d at 234–238 and *Schechner v. Whirlpool

Corp.*, No. 2:16-CV-12409, 2019 WL 4891192, at *7 (E.D. Mich. Aug. 13, 2019) (Murphy, III,

J.)).

    While Plaintiffs agree that a but-for market price should consider supply-side factors,

Plaintiffs contend that "Mr. Weir and Mr. Gaskin properly considered supply-side factors in

combination with the conjoint surveys." (D.E. 178, p. 15). In support, Plaintiffs point to several

district court cases denying motions to exclude expert testimony, including that of Mr. Gaskin and

Mr. Weir, in similar circumstances. *See id.* at 15–19 (collecting cases). Plaintiffs further argue that

Ford's cases are "inapposite" and that "[a]ny disagreement with *how* Plaintiffs' experts accounted

for supply-side (and other) factors goes to the weight, not the admissibility," of Mr. Gaskin's and

Mr. Weir's expert opinions. *Id.* at 19–25.

    After review, the Court agrees with Plaintiffs and finds that Mr. Gaskin's and Mr. Weir's

reports adequately consider supply-side factors. Specifically, the Court is persuaded by Plaintiffs'

cited cases. Such cases have "follow[ed] Mr. Weir's model and reject[ed] the argument that an

economist must recreate both the demand and the supply curve to establish diminution in value."

*In re Fisher-Price Rock 'N Play Sleeper Mktg., Sales Pracs. & Prods. Liab. Litig.*, 567 F. Supp.

406, 414 (W.D.N.Y. 2021) (Crawford, J.) (referencing *In re Dial Complete Mktg. & Sales Pracs.

Litig.*, 320 F.R.D. 326 (D.N.H. 2017) (McAuliffe, J.)); *see also In re Dial*, 320 F.R.D. at 336

(declining to exclude expert testimony that used "conjoint analysis to measure a market-

determined price premium"); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592,

606 (N.D. Cal. 2018) (Cousins, J.) (concluding the conjoint survey used to establish a price premium "passe[d] muster under *Daubert* and Federal Rule of Evidence 702").

Ultimately, the Court finds that the supply-side arguments present in this case go toward the weight, rather than the admissibility, of Mr. Gaskin's and Mr. Weir's expert reports— particularly given the conflicting district court views. *See In re Fisher-Price*, 567 F. Supp. 3d at 415 (explaining "that there is a legitimate difference of opinion, both among judges and experts, about the significance of supply side information in calculating loss of value" and concluding that "Mr. Weir's methodology is not wrong[.]" It is "simply different" from other methodologies used to establish a price premium.); *see also Cardenas v. Toyota Motor Corp.*, No. 18-22798-CIV-MORENO, 2021 WL 5811741, at *4–5 (S.D. Fla. Dec. 6, 2021) (Moreno, J.) (finding that critiques of Mr. Gaskin's conjoint survey "go to weight, not admissibility"). Accordingly, the Court will not exclude Mr. Gaskin's and Mr. Weir's reports as unreliable based on Ford's supply-side argument.

### b. "Absurd Results and Cherry-Picking"

Ford next argues that Mr. Gaskin's methodology produces absurd results and that Mr. Gaskin "ignored most of his irrational results to cherry-pick" a more palatable overpayment number. (D.E. 175, p. 20–21). As such, Ford argues Mr. Gaskin's methodology is inherently unreliable. *Id.* at 21 (citing *In re Volkswagen*, 500 F. Supp. 3d at 950; *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1050 (C.D. Cal. 2018) (Phillips, J.) ("incongruous results" confirmed that conjoint studies were unreliable)).

Plaintiffs respond that "Mr. Gaskin used the same conjoint methodology employed here as in other cases in which courts have accepted his opinions." (D.E. 178, p. 27). Plaintiffs proceed to explain why Mr. Gaskin's survey produces the results attacked by Ford, argue that Ford

misrepresented Mr. Gaskin's report, and contend that Ford's "cherry-picking" argument ignores that Mr. Gaskin utilized a conjoint analysis method "recognized by other conjoint experts as the preferred approach . . . ." *Id.* at 27–29. Lastly, Plaintiffs also argue that "[a]t best, Ford's attack goes to weight." *Id.* at 29.

Even assuming without deciding that Mr. Gaskin's survey produces absurd results (although this is doubtful based on Plaintiffs' arguments and cited authorities), the Court agrees with Plaintiffs that—at best—this attack goes to weight, not admissibility. Exclusion may be appropriate if an expert's report is "based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison[.]'" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984)); *see also Earl*, 2021 WL 3140545, at *8 (quoting *Boucher*, 73 F.3d at 21). However, simply casting doubt on how an expert uses conjoint analysis is insufficient for exclusion purposes. *See CliniComp Int'l, Inc. v. Athenahealth, Inc.*, 507 F. Supp. 3d 774, 779 (W.D. Tex. 2020) (Yeakel, J.) ("Any questions related to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."). The Court finds that Ford is attacking how Mr. Gaskin uses conjoint analysis and that Mr. Gaskin's assumptions are not so unrealistic or contradictory as to suggest bad faith. Accordingly, exclusion is not warranted under Ford's "absurd results" argument and Ford's criticisms can be addressed on cross-examination.

The Court reaches the same conclusion on Ford's cherry-picking argument. At best, Ford's argument goes toward weight rather than admissibility. *See id.* Nonetheless, it does not appear Mr. Gaskin cherry-picks his results. In developing the overpayment amount, Mr. Gaskin "selects only the lowest dollar value, and divides by the largest price used in the conjoint survey, in order to

provide a conservative estimate that can be used across all types of Class Vehicles." (D.E. 178, p. 27). Plaintiffs assert "Mr. Gaskin used the same conjoint methodology employed here as in other cases in which courts have accepted his opinions." *Id.* As Plaintiffs indicate, the methodology Mr. Gaskin employs is widely accepted by other experts in his field. *See* (D.E. 147-1, p. 12) (citing BRYAN K. ORME & KEITH CHRZAN, BECOMING AN EXPERT IN CONJOINT ANALYSIS: CHOICE MODELING FOR PROS 114 (2017)). Because Mr. Gaskin relied on principals and methods widely accepted in the relevant scientific community and reliably applied those principals and methods, the Court will also not exclude Mr. Gaskin's and Mr. Weir's opinions based on Ford's "cherry-picking" argument. *See* FED. R. EVID. 702.

### c. Methodological Flaws

The Court can quickly dispose of Ford's additional criticisms of Mr. Gaskin's methodology. First, Ford criticizes features Mr. Gaskin includes in his survey, namely that his survey directs the respondents' focus toward the Class Vehicle's allegedly defective attribute and away from its non-defective attributes. (D.E. 175, p. 24). However, Ford's fails to address how heightening the fuel pump attribute's significance would produce unreliable results. *See Earl*, 2021 WL 3140545, at *7 ("[A]t no point do [d]efendants articulate why the features [the expert] included (or did not include) in the survey are contextually inadequate to produce reliable results through conjoint analysis—their *ipse dixit* is flimsy support at best."). As such, this argument is incomplete and unpersuasive. Further, these criticisms are issues of weight, not admissibility. *See id.* (citing *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring)).

Second, Ford suggests that Mr. Gaskin's findings are based on a hypothetical scenario dissimilar to the facts Plaintiffs allege and that the survey instructions provided to the survey respondents were "confusing and contradictory," leading to unreliable survey results. (D.E. 175,

p. 24). This attack also lacks meaningful support, and the Court will not exclude Mr. Gaskin's and Mr. Weir's testimony on this ground. *See Earl*, 2021 WL 3140545, at *7.

d. <u>Mr. Weir's Reliance on Mr. Gaskin's Report</u>

Finally, Ford contends that Mr. Weir's report is unreliable because it is based on Mr. Gaskin's unreliable report. (D.E. 175, p. 24–25). However, because the Court finds that Mr. Gaskin's report is reliable under *Daubert* and Rule 702, Ford's argument fails.

For the reasons stated above, the Court finds that Mr. Gaskin's and Mr. Weir's opinions are reliable and that Ford's concerns primarily go to the weight, rather than admissibility, of their reports. As such, the Court **DENIES** Ford's motion to exclude the testimony of Mr. Gaskin and Mr. Weir. (D.E. 175).

### C. Plaintiffs' Motions to Exclude Ford's Expert Testimony

Plaintiffs move to exclude (1) certain opinions of Ford's expert Roger Gault (D.E. 149) and (2) the testimony and report of Ford's expert Dr. Peter Lillo (D.E. 151).

#### i. *Roger Gault*

Ford designates Mr. Gault to provide contrary testimony to Dr. Edgar's opinion that the CP4 fuel pump is incompatible with U.S. diesel fuel and to testify that Dr. Edgar unreliably analyzed the characteristics of U.S. diesel fuel. *See* (D.E. 167, p. 11). Plaintiffs only seek to exclude Mr. Gault's opinions (1) relating to the breadth or impact of biodiesel presence in the U.S. marketplace and (2) regarding CP4 fuel pump design-related topics. (D.E. 149, p. 8–10). Specifically, Plaintiffs argue that Mr. Gault is unqualified to render such opinions and that the opinions are based on unreliable speculation. *Id.* For the reasons below, the Court finds Plaintiffs' arguments unavailing.

a. <u>Breadth and Impact of Biodiesel Presence in the U.S. Marketplace</u>

Plaintiffs argue that Mr. Gault is "not qualified to offer any opinion on the . . . breadth of the limited introduction of biodiesel into the U.S. marketplace . . . because he is uninformed on biodiesel generally." *Id.* at 8. According to Plaintiffs, without Mr. Gault possessing this "foundational knowledge," his opinion is "wholly unreliable." *Id.* at 9.

First, regarding Mr. Gault's qualifications, Ford bears the burden of establishing that Mr. Gault is qualified to opine on the lubricious effect and breadth of biodiesel in the U.S. marketplace through either his "knowledge, skill, experience, training, or education." *Hous. Aquarium, Inc. v. Occupational Safety & Health Rev. Comm'n*, 965 F.3d 433, 439 (5th Cir. 2020); *see* FED. R. EVID. 702. Mr. Gault is qualified to opine on these topics if there is "some reasonable indication of qualifications." *Anderson v. Allstate Ins. Co.*, No. 17-597-JWD-SJD, 2021 WL 292440, at *9 (M.D. La. Jan. 28, 2021) (deGravelles, J.) (citing *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 506 (5th Cir. 1999), *superseded by rule*, FED. R. EVID. 103, *on other grounds as stated in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002)).

After review, the Court finds that Mr. Gault is qualified to give these opinions. Mr. Gault has a Bachelor of Science in mechanical engineering with an emphasis on internal combustion engines, (D.E. 142, p. 18), and decades of experience working with internal combustion engines and fuel delivery processes, *id.* at 3. Most recently, Mr. Gault worked as the Vice President of Regulatory Activities for the Truck and Engine Manufacturers Association ("EMA"), where he sat on several fuel-related committees and served as EMA's delegate to ASTM International. *Id.* ASTM International is an entity that sets "voluntary consensus standards, adopted in some (but not all) state laws" regulating—among other things—diesel fuel. *Id.* at 6. These experiences indicate that Mr. Gault is well-versed in diesel fuel properties and the effects of poor-quality fuel

on automobile engines. *See id.*

Plaintiffs object to Mr. Gault's qualifications by highlighting Mr. Gault's inability to answer certain deposition questions and his deposition statement that he "is not a chemistry person." (D.E. 149, p. 6, 8–9). However, Plaintiffs' objections misconstrue Mr. Gault's qualifications and the nature of his testimony. *See* (D.E. 167, p. 19). Mr. Gault is not opining on the complexities of diesel chemistry structure or its potential to interact with other compounds not at issue in this case; rather, Mr. Gault opines on biodiesel effect and prevalence. *Id.* The Court is satisfied that Mr. Gault's formal education, extensive work experience, and comprehensive knowledge of pertinent professional standards and guidelines "reasonably indicat[e]" he is qualified to testify on both biodiesel effect and prevalence. *See Anderson*, 2021 WL 292440, at *9.

Most of Plaintiffs' contentions regarding reliability are directed towards Mr. Gault's qualifications and conclusions. *See* (D.E. 149, p. 8–9) (arguing that "Mr. Gault is not qualified to offer any opinion on the lubricious effect or breadth" of biodiesel and that without "foundational knowledge, Mr. Gault's speculation . . . is wholly unreliable"); (D.E. 185, p. 2) ("Mr. Gault's opinions inflate the effects and prevalence of biodiesel in U.S. diesel."). Mr. Gault is qualified to opine on these issues and the Court will not question Mr. Gault's conclusions. *See Guy*, 394 F.3d at 325 (A court "does *not* judge the expert conclusions themselves.").

Further, Mr. Gault's opinions are reliable. Mr. Gault opines that Dr. Edgar's sole dependence on the Alliance data to evaluate commercial diesel fuel quality is inappropriate because Alliance does not report the lubricity of biodiesel samples. (D.E. 167, p. 13). Mr. Gault supports his opinion by observing "the high volume of biodiesel that's consumed [today]" and that "biodiesel provides significant lubricity improvement ensuring compliance with the ASTM requirement." (D.E. 149-1, p. 4, 6). To support his conclusion that biodiesel improves fuel

lubricity, Mr. Gault calculated the average wear scar of biodiesel and petroleum diesel fuel samples over ten years using SGS and Infineum data. *See* (D.E. 167, p. 14–15). This conclusion is further supported by "data and evidence that is widely accepted and regularly relied on by experts in his field." *Id.* at 15–17. For example, the Alliance report "explain[s] its rationale for omitting biodiesel lubricity data" by noting that "biodiesel has been shown to provide good lubricity." *Id.* at 14. To show biodiesel prevalence in the U.S. market, Mr. Gault relies on SGS, Infineum, and Alliance report data. *Id.* at 15. Plaintiffs do not dispute these sources' validity. *See* (D.E. 149, p. 4).

As such, the Court finds that Mr. Gault based his opinion on sufficient facts and data, he employed a reliable methodology, and there is a sufficient nexus between the underlying facts and his conclusions. *See Knight*, 482 F.3d at 355. Moreover, the Court finds that Mr. Gault's opinions would help the jury "'to understand the evidence or to determine a fact in issue.'" *Roman v. W. Mfg.*, 691 F.3d 686, 694 (5th Cir. 2012) (quoting FED. R. EVID. 702(a)).

### b. CP4 Fuel Pump Design-Related Issues

Plaintiffs assert that Mr. Gault is not qualified to offer an opinion on the CP4 fuel pump design and Dr. Edgar's conclusions concerning it for two reasons. (D.E. 149, p. 10). First, Plaintiffs contend that although Mr. Gault is a mechanical engineer, he lacks expertise concerning the CP4 fuel pump design specifically. *Id.* Second, Plaintiffs argue that Mr. Gault's opinion is "disqualifie[d]" because "he has reviewed *no* documents relating" to the CP4 pump. *Id.* Plaintiffs mischaracterize the nature of Mr. Gault's opinion. Mr. Gault opined that Dr. Edgar's report is erroneous and did not consider specific contextual information. (D.E. 128-2, 10–11). While Mr. Gault's expertise may not encompass the CP4 fuel pump's design specifically, as a mechanical engineer specializing in internal combustion engines and fuel delivery processes, (D.E. 142, p. 3, 18), Mr. Gault is qualified to read and interpret Dr. Edgar's report. *See Jenkins v. Helmerich &*

*Payne Int'l Drilling Co.*, 577 F. Supp. 3d 587, 594–95 (S.D. Tex. 2021) (Ellison, J.) (rejecting argument that a "very tight fit" is required between an expert's qualifications and the subject matter of his or her testimony).

Further, contrary to Plaintiffs' assertion that Mr. Gault reviewed no documents relating to the CP4 pump, Mr. Gault's report cites to the sworn declaration of Bosch engineer Ralph Nussio. (D.E. 128-2, p. 11). Mr. Gault is permitted to base his opinions on other data of which he has been made aware. *See* FED. R. EVID. 703; *see also Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, No. 13-0366, 2016 WL 3180776, at *10 (E.D. La. June 7, 2016) (Brown, J.) ("[Rule] 703 allows experts to base their opinions on facts or data that the expert has been made aware of or personally observed, which includes the efforts of other experts . . . ."). Further, Plaintiffs may cross-examine Mr. Gault regarding the sources he reviewed in reaching his opinions. *See CliniComp Int'l, Inc.*, 507 F. Supp. 3d at 779. For the reasons stated, and because Mr. Gault's opinions would help rather than confuse the jury, the Court **DENIES** Plaintiffs' motion to exclude Mr. Gault's opinions. (D.E. 149).

### ii. Dr. Peter Lillo

Ford designates Dr. Lillo "to analyze the design of the subject vehicles' fuel system, . . . investigate the cause of CP4 pump repairs on class vehicles, and to assess Dr. Edgar's opinion that all Bosch-sold replacement pumps represent a pump failure caused by his alleged defect." (D.E. 168, p. 6). To do so, Dr. Lillo conducted a root cause investigation, which is the subject of Plaintiffs' motion to exclude. *Id.* at 7; *see* (D.E. 151).

Plaintiffs assert three main arguments for excluding Dr. Lillo's expert testimony and report: (1) Dr. Lillo's sources and underlying assumptions are unreliable and misleading (D.E. 151, p. 13); (2) Dr. Lillo did no testing to verify his theories of root cause, or their frequency of occurrence,

*id.* at 23; (3) and Dr. Lillo's opinion about "proper" maintenance is a fact-based opinion for the jury, not an expert, *id.* at 25. The Court addresses each argument in turn.

### a. Reliability of Sources and Underlying Assumptions

First, Plaintiffs argue that Dr. Lillo's sources and underlying assumptions are unreliable because Dr. Lillo misstates Plaintiffs' defect theory. *Id.* at 13. Plaintiffs assert that Dr. Lillo only focuses on the effects of low lubricity fuel and not on the CP4 pump's allegedly defective design. *Id.* at 13–14. In Plaintiffs' words, Plaintiffs' theory is that "[t]he CP4 pump has a fragile and unstable design, which causes metal parts to rub against each other on the first day of operation and throughout the life of the vehicle," making it "fundamentally flawed in several respects." (D.E. 210, p. 12). Dr. Edgar further opines that "low lubricity fuel can exacerbate or accelerate pump wear and failure." (D.E. 184, p. 3).

While Plaintiffs argue that the effects of low lubricity do not encapsulate the entirety of their theory, *see id.*, after review, the Court finds that Dr. Lillo does not misstate or mischaracterize Plaintiffs' theory. Dr. Lillo considered the pump's design when conducting his root cause analysis, including Plaintiffs' theory that the pump caused metal parts to rub together. *See* (D.E. 168, p. 13) (citing D.E. 129-5).[13] Further, Dr. Lillo's report directly quotes Plaintiffs' pleadings and Dr. Edgar's report to describe the defect theory. (D.E. 129-5, p. 25–26). Even if Dr. Lillo ignored part of Plaintiffs' theory, that does not mean his testimony is unreliable. Rather, Dr. Lillo's opinion, which proposes alternative pump failure causes, *see id.* at 27, would aid the jury in determining the true cause of the pump failures. *See Roman*, 691 F.3d at 694 (quoting FED. R. EVID. 702)

---

[13] Dr. Lillo's report shows that many fuel pump failures were caused by factors unrelated to Dr. Edgar's theorized defect in the CP4 pump, for example, misfuelling and improper maintenance. *See* (D.E. 168, p. 13). Dr. Lillo found many fuel pump replacements "showed fuel contamination (**not including any metal—a central element of the description of Plaintiffs' theory of defect**)." *Id.* (emphasis added). This further shows that Dr. Lillo understood and considered Plaintiffs' defect theory in making his report.

(Expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue.").

Second, Plaintiffs argue that Dr. Lillo's report should be excluded as unreliable because he failed to account for normal customer use and relied on unrealistic expectations of customer behavior. (D.E. 151, p. 15). To support their normal-customer-use argument, Plaintiffs rely on *Dryer v. Ryder Automotive Carrier Group, Inc.*, 367 F. Supp. 2d 413 (W.D.N.Y. 2005). (D.E. 151, p. 15–17). In that case, in addition to finding the expert was unqualified, the court excluded the expert for failing to "put forth any reliable scientific or technical principles that could assist the jury." *Dryer*, 367 F. Supp. 2d at 432. Specifically, while the expert opined that good engineering designs should minimize the risks of unintended foreseeable uses of a product, the expert did nothing to apply those generalized principles to the facts of the case and was thus unreliable and unhelpful. *Id.* at 428. However, *Dryer* is uninstructive here.

First, unlike the expert in *Dryer*, Dr. Lillo "qualifies under Rule 702 to give expert testimony," and Plaintiffs do not contest Dr. Lillo's qualifications. *Id.* at 424; *see* (D.E. 151; D.E. 184).[14] *Dryer* is further distinguishable from the present case because the expert there simply reiterated that good engineering practices should minimize the risk of possible "foreseeable product misuse," without making an "attempt to apply such principles to the facts of the case." *Dryer*, 367 F. Supp. 2d at 428. This holding speaks to the reliability of the *Dryer* expert's methodology and does not stand for the proposition that expert testimony must always account for

---

[14] Even if Plaintiffs contested Dr. Lillo's qualifications, the Court finds that Dr. Lillo is qualified to testify on the common causes of pump failure. He is, among other things, "an ASE Master Certified Automotive Technician who has worked as a master technician in automotive and transmission repair shops" and has also "conducted design and failure root cause analyses" on vehicles and components and systems used in vehicles in the past. (D.E. 168, p. 6–7).

foreseeable customer use to be admissible. While the *Dreyer* expert used unreliable methodology that was unhelpful to the jury, Dr. Lillo uses scientific evidence that is grounded in sufficient facts and data along with his expertise to explain the basis of his conclusions. *See, e.g.*, (D.E. 129-5, p. 7–10). As such, *Dreyer* is unpersuasive, and Plaintiffs have cited no other authority for the proposition that Dr. Lillo must align his testimony with what Plaintiffs argue is foreseeable consumer use. Accordingly, Dr. Lillo is not excluded on this ground.

Plaintiffs next argue that Dr. Lillo "relied on the unrealistic expectations of customer behavior" as imposed by Ford's owner's manual. (D.E. 151, p. 17). However, Dr. Lillo's reliance on Ford's ownership manual does not make Dr. Lillo's report unreliable nor does it improperly blame consumers for pump failure. Dr. Lillo partly relied on Ford's ownership manual to determine whether improper consumer maintenance was a root cause of CP4 pump failure. *See generally* (D.E. 129-5).[15] If a consumer failed to follow the manual's maintenance instructions and his or her vehicle subsequently experienced pump failure, then Dr. Lillo considered whether improper consumer maintenance was the cause. *See* (D.E. 151, p. 25, 17; D.E. 151-1, p. 16). The Court sees no reason why Dr. Lillo cannot rely on Ford's owner's manual in determining whether Class Vehicles were properly maintained, and whether Ford's maintenance requirements are unrealistic has no bearing on the reliability and thus admissibility of Dr. Lillo's testimony. Rather, Plaintiffs can explore these issues on cross-examination. *See CliniComp Int'l, Inc.*, 507 F. Supp. 3d at 779.

Plaintiffs' third and last argument regarding the reliability of Dr. Lillo's sources is that he

---

[15] Dr. Lillo found that there are a variety of reasons for CP4 pump replacements. (D.E. 129-5, p. 27). Common causes include: improper maintenance; fuel contamination; improper service; secondary effect of failure of another component of the vehicle; improper vehicle modification; manufacturing issues; and misfuelling. *Id.* at 27–39.

selectively relies on technician notes that fit his theory and discredits technician notes that do not. (D.E. 151, p. 20–23). However, Plaintiffs do not show where Dr. Lillo does this. Rather, Plaintiffs cite instances where, for example, Dr. Lillo acknowledges that there is "very little causal information that [could] be used to help determine what the cause of the repair was." (D.E. 151, p. 21) (citing D.E. 151-1, p. 8). Stating that technician notes contain insufficient information or may be incomplete does not necessarily mean Dr. Lillo discredited these notes, nor is there anything in the record showing Dr. Lillo selectively relied on notes benefiting Ford. As such, the Court does not exclude Dr. Lillo's testimony on this basis either.

b. Testing the Root Cause Theory

Plaintiffs next argue that Dr. Lillo's opinions are unreliable because he did no testing to verify his root cause theories or determine their frequency of occurrence. (D.E. 151, p. 23–25). But independent testing is not required here. Dr. Lillo states he discusses potential causes of fuel pump failure in his report because "[a]ccording to the Scientific Method, when investigating the potential cause for any specific repair, all of the potential causes should be considered and only those inconsistent with available evidence should be ruled out." *See* (D.E. 129-5, p. 27). As such, Dr. Lillo's report does not purport to assign definitively the cause of any particular pump failure or the frequency of that cause; rather, the purpose of Dr. Lillo's report is to set forth potential mechanisms, in engineering terms, under which the CP4 pump could fail, including those caused by customer error. *See id.* In setting forth these potential mechanisms, Dr. Lillo utilizes and relies on several sources including technician notes, warranty records, and his personal inspection of vehicles. *See* (D.E. 168, p. 7–8).[16] This is altogether different from Dr. Edgar's excluded opinion

---

[16] Contrary to Plaintiffs' implication that Dr. Lillo limited his investigation to reviewing a fraction of the available evidence, *see* (D.E. 151, p. 14), Dr. Lillo reviewed and analyzed sufficient sources, including: the

because Dr. Edgar's opinion purports to assign a defect to the CP4 pump and purports the CP3 as a safer alternative design, without any testing to show his theory is correct or testing showing the CP3 is in fact safer, amidst other issues with Dr. Edgar's report. *See* (D.E. 113-1, p. 75–76). Again, to be reliable, Dr. Lillo was not required to do independent testing to determine the actual cause of any repair or to suggest the prevalence of such cause. This is not the purpose of Dr. Lillo's report, and the Court declines to exclude Dr. Lillo on this ground.

### c. Whether Proper Maintenance Is a Fact-Based Opinion for the Jury

Plaintiffs characterize Dr. Lillo's opinion as "rel[ying] on what the manual says, and then opin[nig] that 'proper maintenance' means anything that deviates from the manual." (D.E. 151, p. 25). Plaintiffs state that "proper maintenance" is a fact-based question that does not require an expert's assistance. *Id.* Again, Plaintiffs contend *Dreyer* is instructive. In *Dreyer*, the expert opined that the plaintiff lacked "common sense" when the plaintiff loaded a vehicle dangerously. *Dreyer*, 367 F. Supp. 2d at 439. There, the court held that "common sense" was, by definition, not a technical question and excluded this portion of the expert's report. *Id.* Here, Plaintiffs argue that the jury should determine what constitutes proper maintenance, especially when Dr. Lillo "simply asserts that anything that falls outside the bounds of the owners' manual constitutes improper maintenance." (D.E. 151, p. 26).

The Court disagrees. While Dr. Lillo may assert that failing to adhere to the owner's manual constitutes improper maintenance, *see, e.g.*, (D.E. 129-5, p. 142) ("Many of the subject repairs could have been prevented by members of the Plaintiffs' proposed class properly following the instructions that Ford provides in their vehicles' Owners Manuals"), his report goes further.

---

pleadings; deposition testimony; expert reports; and other exhibits and records pertinent to this litigation. *See* (D.E. 168, p. 7–8). Dr. Lillo also personally inspected Plaintiffs' Class Vehicles. *Id.* at 8.

For example, in cases where improper maintenance coincides with CP4 pump failure, part of Dr. Lillo's root cause analysis is to highlight the importance of determining whether these maintenance issues actually contributed to the cause of the CP4 pump failure. Dr. Lillo also considers whether aftermarket modifications, which are present on Class Vehicles, affected the fuel pump system. *See id.* at 150. These opinions are beyond the common knowledge of jurors. As stated above, *supra* Section I.C.ii.a, any issues Ford has with Dr. Lillo's reliance on Ford's owner's manual go to the weight, rather than admissibility of Dr. Lillo's opinions.

For these reasons, the Court finds that Dr. Lillo's testimony is admissible and **DENIES** Plaintiffs' motion to exclude Dr. Lillo. (D.E. 151).

## II. Motion for Class Certification

Having ruled on the parties' motions to exclude expert testimony, the Court now turns to Plaintiffs' motion for class certification. (D.E. 210; D.E. 211). In their motion, Plaintiffs seek Rule 23(a) and 23(b)(3) certification of the following two classes:

> **The Failure Class:** All persons or entities who have purchased in the State of Texas a Class Vehicle, and who (i) experienced a catastrophic failure of their engine because of the defective CP4 fuel pump, and (ii) incurred out-of-pocket costs to pay for the repair of their Class Vehicle.

> **The Overpayment Class:** All persons or entities who have purchased in the State of Texas a Class Vehicle, and who have not yet experienced a catastrophic failure of the engine because of the defective CP4 fuel pump, or who had their catastrophic failure repair costs covered under warranty.

(D.E. 210, p. 11).

"A class may be certified under Rule 23(b)(3) only if it meets the four prerequisites found in Rule 23(a) and the two additional requirements found in Rule 23(b)(3)." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 623 (5th Cir. 1999), *abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *see also M.D. v. Perry*, 675 F.3d 832, 837 (5th Cir.

2012). The Rule 23(a) prerequisites are:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a); *see also Mullen*, 186 F.3d at 623. These factors are otherwise known as numerosity, commonality, typicality, and adequacy of representation. *See Mullen*, 186 F.3d at 623. Rule 23(b)'s two requirements are "predominance" and "superiority." *Id.*; *see also* FED. R. CIV. P. 23(b)(3). Predominance requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and superiority requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Further, while not expressly required in Rule 23, the Fifth Circuit has recognized an "implicit 'ascertainability' requirement[.]" *In re Deepwater Horizon*, 739 F.3d 790, 821 (5th Cir. 2014) (referencing FED. R. CIV. P. 23). To meet the ascertainability requirement and "in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Id.* (quoting *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012)) (cleaned up).

The party seeking certification bears the burden of proving that class certification is appropriate. *Berger v. Compaq Comp. Corp.*, 257 F.3d 475, 479 n.4 (5th Cir. 2001); *see also Wal-Mart Stores, Inc.*, 564 U.S. at 350 (explaining that a party seeking class certification must "affirmatively demonstrate his compliance" with Rule 23). "Unsupported allegations that the case satisfies the requirements of Rule 23 are an insufficient basis for certifying a class action." *Kase*

*v. Salomon Smith Barney, Inc.*, 218 F.R.D. 149, 152 (S.D. Tex. 2003) (Rainey, J.) (citing *Fleming v. Travenol Labs., Inc.*, 707 F.2d 829, 833 (5th Cir. 1983)). "However, the party seeking class certification may rely on reasonable, common-sense assumptions and inferences to satisfy the requirements." *Id.* (citing *Zeidman v. J.R. McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981)).

Before certifying any class, "[a] district court must conduct a rigorous analysis of the [R]ule 23 prerequisites[,]" *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996), "go beyond the pleadings to determine whether the requirements . . . have been met [by] 'understand[ing] the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues[,]'" *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (quoting *Castano*, 84 F.3d at 745), and "consider 'how a trial on the merits would be conducted' if the class were certified." *Prantil*, 986 F.3d at 574 (quoting *Castano*, 84 F.3d at 740).

### A. Rule 23(a)

#### i. Numerosity

Numerosity is satisfied if the class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). Generally, there is a presumption that joinder is impracticable if the class contains more than forty members. *See Reyes v. Julia Place Condo. Homeowners Ass'n., Inc.*, No. CV 12-2043, 2017 WL 430056, at *2 (E.D. La. Jan. 31, 2017) (Barbier, J.), (citing *Mullen*, 186 F.3d at 624), *aff'd sub nom. Reyes v. Steeg L., L.L.C.*, 760 F. App'x 285 (5th Cir. 2019); *see also Morrow v. Washington*, 277 F.R.D. 172, 190 (E.D. Tex. 2011) (Ward, J.) (citing *Mullen*, 186 F.3d at 624 for numerosity presumption). The "Fifth Circuit has held that the minimum number of class members is satisfied in a case with 100 to 150 potential members." *Verde Minerals, LLC v. Koerner*, No. 2:16-CV-199, 2020 WL 3546244, at *2 (S.D. Tex. Apr. 1, 2020) (Ramos, J.) (citing *Mullen*, 186 F.3d at 624). However, in addition to the size

of the class, numerosity requires courts to consider "the geographical distribution of the class, the ease with which class members may be identified, the nature of the class action, and the size of each plaintiff's claim." *Zeidman*, 651 F.2d at 1038.

Here, Plaintiffs argue that numerosity is satisfied as to both the Overpayment and Failure Classes. *See* (D.E. 210, p. 21). However, the only evidence Plaintiffs cite in support of numerosity is Dr. Edgar's expert report, which the Court has excluded. *See supra* Section I.B.i. Dr. Edgar's report details that Ford sold or leased approximately 288,697 Class Vehicles in Texas and that the number of Texas truck owners who had "catastrophic failure" not covered by Ford's warranty would easily be several thousand individuals. *See* (D.E. 210, p. 21) (referencing D.E. 113-1, p. 58).

Although the Court will not rely on Dr. Edgar's report, the Court nonetheless finds that numerosity is satisfied. While not explicitly cited in support of numerosity, Plaintiffs have attached Ford's responses to Plaintiffs' first set of interrogatories in support of their motion for class certification. (D.E. 116-4). In these responses, Ford explains that the CP4 pump is equipped in every 2011–2019 Ford vehicle with a 6.7L diesel engine. *See id.* at 7. Plaintiffs also attach charts demonstrating the thousands of Class Vehicles sold each year and case notes from over one-hundred customers who paid out-of-pocket repairs. (D.E. 113-5; D.E. 113-7). Given this evidence, the nature of the class action, the geographical distribution of the class, the ease by which the class members could be identified, and that Ford does not contest numerosity, the Court finds that numerosity is satisfied as to both the Overpayment and Failure Classes.

### ii. Commonality

Commonality is satisfied if there are "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). A question of law or fact is common to the class if it is "'of such a nature that

it is capable of classwide resolution—which means the determination of its truth or falsity will **resolve an issue that is central to the validity of each one of the claims** in one stroke.'" *M.D*, 675 F.3d at 840 (emphasis added) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350). As such, commonality "demands more than the presentation of questions that are common to the class because 'any competently crafted class complaint literally raises common questions.'" *Id.* (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 349). However, even a single question that is common to the class, capable of class-wide resolution, and central to the validity of each of the claims made, is enough to satisfy commonality. *See In re Deepwater Horizon*, 739 F.3d at 811.

Here, the Court finds that Plaintiffs have not met their burden to establish commonality. Although Plaintiffs argue that "[n]umerous common questions of law and fact exist because the focus is on Ford's common course of conduct[,]" (D.E. 210, p. 22), common to all Plaintiffs' claims—and the only question central to the validity of all Plaintiffs' claims—is whether Ford's CP4 pump was defective. (D.E. 210, p. 23) ("Common to all of the claims is the defect itself[.]"). Without the existence of a defective CP4 pump there can be no common question that "will *resolve* an issue that *is central to the validity* of each one of the [class member's] claims[.]" *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (emphasis added).

To prove that the CP4 pump is defective and thereby establish commonality, Plaintiffs rely solely on Dr. Edgar's testimony. *See* (D.E. 210, p. 23 n.70). The Court, however, has excluded Dr. Edgar's report under *Daubert*, and '"[e]xpert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot prove that the Rule 23(a) prerequisites have been met in fact[.]'" *Prantil*, 986 F.3d at 575 (internal quotation marks omitted) (quoting *In re Blood Reagents*, 783 F.3d at 187). "[T]he *Daubert* hurdle must be cleared when scientific evidence is relevant to the decision to certify." *Id.* Because Plaintiffs have relied upon the CP4's alleged defect to be common to all

the claims, and Plaintiffs have failed to put forth reliable evidence demonstrating this defect, Plaintiffs cannot show commonality. *See Kramer v. Toyota Motor Corp.*, 668 F. App'x 765, 766 (9th Cir. 2016) (affirming the district court's denial of class certification and concluding that "[w]ithout any evidence of a common defect, there are no 'common questions of law or fact' binding the proposed class together") (quoting *Comcast Corp.*, 569 U.S. at 33). Accordingly, the Court finds that commonality is not met.

### iii. Typicality

Typicality is satisfied if the "claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "There is significant overlap between typicality and commonality." *M.D. v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013) (Jack, J.). Like commonality,

> [t]ypicality does not require a complete identity of claims. Rather the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.

*Id.* (quoting *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated on other grounds by M.D.*, 675 F.3d at 832. "The Fifth Circuit's standard for typicality 'is not demanding.'" *Earl v. Boeing Co.*, 339 F.R.D. 391, 419 (E.D. Tex. 2021) (Mazzant, J.) (quoting *Mullen*, 186 F.3d at 625). However, typicality does

> require[] a showing that the named plaintiffs are in fact those asserted as the common class claims. In this sense, typicality is commonality addressed from the perspective of the named plaintiffs. Commonality requires showing that, in fact, all members of the proposed class share a common claim, the validity of which can be determined on a classwide basis. Typicality requires showing that, in fact, the proposed representatives have that claim.

*M.D.*, 294 F.R.D at 29.

Here, Plaintiffs assert typicality is met because "all Class members claim injuries caused

by the same conduct by Ford." (D.E. 210, p. 24–25). But Plaintiffs cannot demonstrate that class members' injuries are caused by the same conduct by Ford because Plaintiffs cannot prove a common defect. Without any evidence of a common defect, Plaintiffs cannot show that the named Plaintiffs have the same claim as other class members, i.e., that Ford knowingly sold a defective product. *See Ardoin v. Stine Lumber Co.*, 220 F.R.D. 459, 466 (W.D. La. 2004) (Minaldi, J.) (finding typicality not met when plaintiffs could not prove "that all of the [products at issue] belonging to the purported class members [were] defective," and "it [could not] even be readily determined which, if any, [of the products at issue were] defective"); *see also Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 201–02 (W.D. Tex. 2004) (Sparks, J.) (finding typicality not met when there were individual issues of defectiveness). Stated differently, because Plaintiffs have not shown a common claim exists, Plaintiffs similarly cannot show that proposed class representatives have that claim. *See M.D.*, 294 F.R.D. at 29. Accordingly, the Court finds that typicality is not met.

### iv. Adequate Representation

Like typicality, adequacy of representation can merge with commonality, but it "also raises concerns about the competency of class counsel and conflicts of interest." *See id.* (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 349 n.5). Adequate representation requires that the representative parties and class counsel "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). In evaluating this requirement, courts consider "the zeal and competence of the representatives' counsel" and "the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees." *Berger*, 257 F.3d at 479 (quoting *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982)) (cleaned up). Here, the parties do not dispute whether putative class representatives have the ability and

incentive to represent the claims of the class vigorously nor whether class counsel is adequate. After review, the Court finds that the named Plaintiffs have asserted they are ready, willing, and able to prosecute their claims, (D.E. 210, p. 25), and the Court finds no reason to question the qualifications or abilities of Plaintiffs' legal representation. *See* FED. R. CIV. P. 23(g)(1)(A).

However, in determining adequacy of representation, courts must also consider whether "differences [between named plaintiffs and class members] create conflicts between the named plaintiffs' interest and the class members' interests." *James*, 254 F.3d at 571. Ford contends that the named Plaintiffs "have potential conflicts of interest with absent class members" due to "the material factual differences between named Plaintiffs and the majority of absent class members." (D.E. 128, p. 29). According to Ford, these material factual differences center around each named Plaintiff's allegation that his Class Vehicle experienced a manifestation of the alleged defective CP4 fuel pump. *Id.* Ford states that, conversely, many putative class members have not experienced a manifestation, meaning that "named Plaintiffs will each be subject to various unique defenses—including improper maintenance and misuse of their vehicles—unavailable against putative class members who have not experienced a defect." *Id.* Ford argues that the named Plaintiffs' obligation to prove that their own conduct did not contribute to the vehicle problems are "'likely to usurp a significant portion of the litigant[s'] time and energy[,]'" *Doll v. Chi. Title Ins. Co.*, 246 F.R.D. 683, 687 (D. Kan. 2007) (Lungstrum, J.) (quoting *Aks v. Southgate Trust*, No. 92-2193-JWL, 1992 WL 401708, at *5 (D. Kan. 1992) (Lungstrum, J.)), and distract the named Plaintiffs. (D.E. 128, p. 29–30). Additionally, Ford argues that "*even* [if] *a single named Plaintiff* caused his own fuel pump malfunction . . . [it] would bind every other member of the class—even absent class members or other named Plaintiffs who may not be subject to the same defense." (D.E. 128, p. 30).

For similar reasons, Ford also asserts specific inadequacy arguments against named Plaintiffs Fulton and Broussard. *See id.* at 31–32.[17] Conversely, Plaintiffs argue that any unique defenses that may or may not apply to each named Plaintiffs will not become a major focus of the litigation "because the question at trial is **whether there is a class-wide defect**." (D.E. 155, p. 25) (emphasis added). Plaintiffs point out that the "CP4 fuel pump is the same for all putative class members and the theory of liability applies throughout the class to satisfy the adequacy requirement." *Id.* (citing *Spegele v. USAA Life Ins. Co.*, 336 F.R.D. 537, 554 (W.D. Tex. 2020) (Garcia, C.J.).

The Court agrees that proving whether the CP4 fuel pump is defective is the focus of this litigation for all class members, including the named Plaintiffs. Regardless of whether the named Plaintiffs could be subject to certain defenses, the named Plaintiffs have made clear that their goal is to prove that the CP4 fuel pump is defective and that Ford failed to disclose that defect. *See id.* at 26. As such, it is possible that Plaintiffs could have met their burden to prove adequate representation had Plaintiffs produced evidence of a common defect.

However, because Plaintiffs rely solely on Dr. Edgar's report—and the Court has rejected Dr. Edgar's report as unreliable under *Daubert*—Plaintiffs cannot prove a common defect. Without evidence of a common defect, each named Plaintiff will, out of necessity, be required to prove that his specific vehicle was defective. The named Plaintiffs will also likely have to defend that their actions did not cause engine damage or failure in their specific vehicle. As the named

---

[17] Specifically, Ford asserts that "Plaintiff Darren Fulton is an inadequate representative because he caused his [engine problems] through abuse and no longer owns his vehicle." (D.E. 128, p. 31) (asserting that "Mr. Fulton repeatedly ignored vehicle alerts that his fuel was heavily contaminated with water, and instead drove until his fuel system malfunctioned"). Ford also asserts that "Plaintiff Craig Broussard is an inadequate representative because he no longer owns his first vehicle, caused his [engine problems] through abuse, and did not pay to repair his fuel system." *Id.* at 32 (asserting that Mr. Broussard's own actions in using a contaminated auxiliary fuel tank and water-contaminated fuel led to the fuel system replacement).

Plaintiffs will be obligated to prove that a defect existed within their specific vehicle, they will no longer be able to represent and protect the putative class members' interests. *See Berger*, 257 F.3d at 479. These putative class members may have suffered a defect, but without showing that defect is common to that of the named Plaintiffs, the putative class members will not be fairly and adequately represented by the named Plaintiffs. Therefore, Plaintiffs fail to establish adequate representation.

### v. Ascertainability

"Generally speaking, the ascertainability requirement mandates that the putative class be 'adequately defined.'" *Earl*, 339 F.R.D. at 422 (citing *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam)). Defining a class with precision is necessary to properly identify "those entitled to relief, those bound by the judgment, and those entitled to notice." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004) (citation and internal quotation marks omitted). To prove ascertainability, "a party need only demonstrate—'at some stage of the proceeding'—that the class is 'adequately defined and clearly ascertainable.'" *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334 (5th Cir. 2019) (quoting *Frey v. First Nat'l Bank Sw.*, 602 F. App'x 164, 168 (5th Cir. 2015) and *Union Asset Mgmt. Holding A.G.*, 669 F.3d at 639).

Ultimately, "the touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Earl*, 339 F.R.D. at 422 (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)). The court must be able to determine whether a particular individual is a member "without resorting to 'intensive, individualized factual inquiries.'" *Pfeffer v. HSA Retail, Inc.*, No. SA–11–CV–959, 2012 WL 1910034, at *3 (W.D. Tex. May 24, 2012) (Rodriguez, J.) (quoting

*Dumas v. Albers Med., Inc.*, No. 03–0640–CV–W–GAF, 2005 WL 2172030, at *5 (W.D. Mo. Sep. 7, 2005) (Fenner, J.)); *see also Morrow*, 277 F.R.D. at 187 (noting that a court must be able to determine "whether a particular individual is a member" of the putative class "without having to answer numerous fact-intensive questions").

Here, Plaintiffs argue that the Court can ascertain the class members of both the Failure Class and the Overpayment Class by examining "[t]wo conditions" that "exist for membership in either of the Classes: (i) purchase of at least one of the Class Vehicles (ii) in Texas." (D.E. 210, p. 20). According to Plaintiffs, "[d]etermining which Class fits each Class member is straightforward . . . ." *Id.* Plaintiffs state that if the Court certifies the Failure Class, they will subpoena every Texas Ford dealership to identify purchasers who had the fuel injection system replaced in their Class Vehicles but did not have Ford's New Vehicle Limited Warranty cover the repair cost. *Id.* Plaintiffs further state that class members who are not part of the Failure Class are, by default, members of the Overpayment Class and are easily identified from Ford's own records. *Id.* at 20–21.

By Plaintiffs' description, ascertaining class members of both the Failure and Overpayment Classes seems feasible. However, because the Court excluded Dr. Edgar—whose report is the only evidence Plaintiffs have relied on to show a class-wide defect—the Court no longer has the connecting evidence of a class-wide defect such that the Failure Class is easily ascertainable, and by extension, the Overpayment Class. If the Court were to certify either class without evidence of a class-wide defect, the Court would be forced to engage in "intensive, individualized factual inquiries" as to each Class Vehicles' pump failure to determine whether the failure was caused by a defective CP4 pump and then identify potential Failure Class members. *See Pfeffer*, 2012 WL 1910034, at *3; *see also Morrow*, 277 F.R.D. at 187; *see also* (D.E. 128, p. 12). This renders both classes unascertainable.

*vi. Conclusion on Rule 23(a)'s Prerequisites*

Plaintiffs have not met their burden to establish commonality, typicality, and adequate representation. Moreover, because Plaintiffs cannot show a common defect, neither the Failure or Overpayment Class can be adequately defined or clearly ascertained. As such, the Court declines to certify the Failure and Overpayment Classes.

**B. Rule 23(b)(3)**

The "prerequisites of Rule 23(a) are phrased in the conjunctive and, therefore, all four conditions must be met in order for this suit to be certified as a class action." *McClinton v. Turbine Support, Div. of Chromalloy Am. Corp.*, 68 F.R.D. 236, 237 (W.D. Tex. 1975) (Wood, J.); *see also Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (A "class action [] may only be certified if the trial court is satisfied . . . that the prerequisites of Rule 23(a) have been satisfied."). As Plaintiffs have failed to carry their burden on the Rule 23(a) and ascertainability requirements, it is unnecessary to determine whether they meet Rule 23(b)(3)'s predominance and superiority requirements. *See A.B. v. Haw. State Dep't of Educ.*, 334 F.R.D. 600, 611 (D. Haw. 2019) (Kobayashi, J.) ("Because the proposed class does not meet the Rule 23(a) requirements, it is not necessary to address the Rule 23(b) requirements"); *Cleary v. Philip Morris USA, Inc.*, 265 F.R.D. 289, 293 (N.D. Ill. 2010) (Kennelly, J.) (finding that "the Court need not address whether . . . a class action is a superior method of adjudication as required by Rule 23(b)(3)" when the plaintiff "failed to meet the requirements of Rule 23(a)(3)"); *Bozes v. Parish of St. Bernard*, 252 F.R.D. 313, 317 (E.D. La. 2008) (Duval, Jr., J.) (finding that class certification was precluded "because plaintiffs[] did not establish numerosity" under Rule 23(a)(1) without analyzing Rule 23(b)(3) requirements). As stated above, the Court declines to certify the Failure and Overpayment Classes.

### III. Conclusion

For the reasons stated herein:

(1) The Court **DENIES as moot** Plaintiffs' motion for class certification. (D.E. 112).

(2) The Court **GRANTS** Ford's motion to exclude the testimony of Dr. Bradley Edgar. (D.E. 132).

(3) The Court **GRANTS** Ford's motion to exclude the testimony of Edward Stockton. (D.E. 131).

(4) The Court **DENIES** Ford's motion to exclude the testimony of Steven Gaskin and Colin Weir. (D.E. 175).

(5) The Court **DENIES** Plaintiffs' motion to exclude the testimony of Roger Gault. (D.E. 149).

(6) The Court **DENIES** Plaintiffs' motion to exclude the testimony of Dr. Peter Lillo. (D.E. 151).

(7) The Court **DENIES** Plaintiffs' corrected motion for class certification. (D.E. 210; D.E. 211).

(8) The Court **DENIES as moot** Plaintiffs' unopposed motion for a 30-day extension of pre-trial deadlines. (D.E. 191).

(9) The Clerk of Court is **ORDERED** to **TERMINATE** the following plaintiffs from the docket sheet: Eric Stevens, Christopher Rodriguez, Michael Frakes, Terry Pennell, Ray Moore, Michael Stone, Kent Bakken, Lynn Kirkpatrick, and Scotty McCollum.

(10) The parties are **ORDERED** to file an "Agreed Proposed Amended Scheduling Order" by **October 21, 2022**.

SO ORDERED.

DAVID S. MORALES
UNITED STATES DISTRICT JUDGE

Signed: Corpus Christi, Texas
September 29th, 2022

47 / 47